UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Ronaldo Ligons, et al., | Civil File No. 15-CV-2210 (PJS/BRT) |
| Plaintiffs, | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MINNESOTA DEPARTMENT OF CORRECTIONS, THOMAS ROY, DR. DAVID A. PAULSON, M.D., AND NANETTE LARSON'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| Minnesota Department of Corrections, et al., | |
| Defendants. | |

## INTRODUCTION

When this lawsuit was commenced in May 2015, Plaintiffs Ronaldo Ligons and Barry Michaelson (collectively "Plaintiffs") were both inmates in the custody of Defendant Minnesota Department of Corrections (DOC). Plaintiffs assert that the DOC's alleged failure to treat their Hepatitis C with newly-developed drugs violates their Eighth Amendment rights and other federal statutes. While no class has been certified, Plaintiffs seek, among other things, injunctive relief on behalf of themselves and others they allege are similarly situated, despite the fact that both Plaintiffs' injunctive relief claims are moot and otherwise barred by the law. Because Plaintiffs' claims are without support in the record and otherwise fail as a matter of law, the DOC, its Commissioner, Dr. David Paulson, and Nanette Larson respectfully request that the Court grant their motion for summary judgment and dismissal the Second Amended Complaint in its entirety, and with prejudice.

## DOCUMENTS COMPRISING THE RECORD

1.      Second Amended Complaint (Doc. No. 42)

2.      Defendants' Answer to the Second Amended Complaint (Doc. No. 45)

3.      Affidavit of David A. Paulson, M.D., M.B.A. and exhibits

4.      Affidavit of Nanette Larson and exhibits

5.      Affidavit of Rick Pung and exhibits

6.      Affidavit of Kathryn A. Fodness and exhibits

## STATEMENT OF UNDISPUTED FACTS

**A.      The Parties.**

Ligons is currently incarcerated in the Minnesota Correctional Facility in Faribault (MCF-FRB).  (Sec. Am. Compl. ("SAC") ¶ 3.)

Michaelson was incarcerated in the Minnesota Correctional Facility at Stillwater (MCF-STW) when this case was filed.  (*Id.* ¶ 8.)  Michaelson was released from prison on March 27, 2017, and is living in the community on supervised release.  (Affidavit of Rick Pung ("Pung Aff.") ¶ 16.)

Defendant DOC is an agency of the State of Minnesota, which is headed by a Commissioner of Corrections.  Minn. Stat. §§ 15.01, 241.01.  The DOC operates 10 adult prisons, including facilities in Faribault, Oak Park Heights, Rush City, St. Cloud, Shakopee, and Stillwater.  (Pung Aff. ¶ 18.)

Defendant Tom Roy is the Commissioner of the DOC and is sued in his official capacity only.  (SAC ¶ 31.)

Dr. Paulson is a medical doctor, and the DOC's Medical Director.  (Affidavit of David A. Paulson, M.D., M.B.A. ("Paulson Aff.") ¶¶ 1, 2; Deposition of David A. Paulson ("Paulson Dep."), attached to the Affidavit of Kathryn A. Fodness ("Fodness Aff.") as Ex. A at 7.)  Except under unusual circumstances, Dr. Paulson does not see inmates for primary care.  (*Id.* ¶ 8.)  Dr. Paulson is sued in his individual and official capacities.  (SAC ¶ 34.)

Defendant Nanette Larson is the DOC's Health Services Director.  (Affidavit of Nanette Larson ("Larson Aff.") ¶ 1; Deposition of Nanette Larson ("Larson Dep."), attached to the Fodness Aff. as Ex. B at 9.)  Larson is an administrator, and is not a medical practitioner.  (*Id.*; Larson Aff. ¶ 2.)  Her role is akin to a hospital administrator. (Larson Aff. ¶ 3.)  Larson is sued in her individual and official capacities.  (SAC ¶ 38.)

## B.     Medical Care At The Minnesota Department of Corrections.

The DOC contracts with Centurion Managed Care to provide medical services and day-to-day care to inmates.  (Larson Aff. ¶ 5.)  Centurion medical practitioners, including medical doctors, physician assistants, and nurse practitioners, provide health care at each DOC facility with the assistance of DOC-employed registered nurses and licensed practical nurses.  (*Id.* ¶ 6.)[1]  Before contracting with Centurion, the DOC contracted with

---

[1]  Plaintiffs brought claims under Section 1983 against two Centurion medical practitioners – Dr. Rolf Hanson and Dr. Darryl Quiram, SAC ¶¶ 113-20, and against Centurion for violation of the Rehabilitation Act, *id.* ¶¶ 153-63.  Plaintiffs stipulated to the dismissal of claims against Dr. Hanson on February 19, 2016, Doc. No. 49, and the Court dismissed him from the action on February 23, 2016, Doc. No. 78.  Plaintiffs stipulated to the dismissal of claims against Dr. Darryl Quiram on October 28, 2016, Doc. No. 78, and the Court dismissed him from the action on October 31, 2016, Doc. No. 80. (Footnote Continued on Next Page)

other correctional medical services vendors including Corizon Correctional Healthcare (formerly, CMS).  (*Id.* ¶ 5.)

### C.   Hepatitis C.

HCV is a blood-borne pathogen that affects the liver.   (Paulson Aff. ¶ 9.) HCV infection is slowly progressing and most patients do not report subjective symptoms.   (Paulson Aff. ¶ 15; Expert Report of Newton E. Kendig, MD ("Kendig Rep."), attached to the Fodness Aff. as Ex. C at 7.)  The modes of HCV transmission are clear and well understood.   (Paulson Aff. ¶ 14.)   HCV is primarily spread through percutaneous exposures.   (Kendig Rep. at 5, 6; Deposition of Dr. Newton Kendig ("Kendig Dep."), attached to the Fodness Aff. as Ex. D at 56-59; Paulson Aff. ¶ 10.) Until the late 1980s and early 1990s, when testing became available, individuals were also at an increased risk of contracting HCV through receipt of clotting factors or from solid organ transplants.  (*Id..*)

The risk of HCV transmission through sexual contact or in the household setting is considered extremely low.  (*Id.*; *see also* Kendig Rep. at 5, 6; Kendig Dep. at 56-59, 75-76; Deposition of Dr. Julie Thompson ("Thompson Dep."), attached to the Fodness Aff. as Ex. E at 105-106; Deposition of Dr. Bennet D. Cecil III ("Cecil Dep."), attached to the Fodness Aff. as Ex. F at 40-41.)   Likewise, transmission among individuals sharing

_____

(Footnote Continued from Previous Page)
Plaintiffs stipulated to the dismissal of claims against Centurion on November 16, 2016 and the Court dismissed Centurion on that date.  (Doc. Nos. 90, 91.)

personal care items, such as razors or toothbrushes, is extremely rare.  (Paulson Aff. ¶ 10; Paulson Dep. at 78-81; Kendig Rep. at 6.)

Illicit injection drug use and tattooing are prohibited by the DOC.  (Paulson Aff. ¶ 11; Pung Aff. ¶ 21.)  In his 22 years as Medical Director, Dr. Paulson has never heard of HCV transmission between inmates or between inmates and DOC staff.  (Paulson Aff. ¶ 10; *see also* Paulson Dep. at 78-81.)

Not everyone infected with HCV will develop a chronic HCV infection.  (Paulson Aff. ¶ 13; Kendig Rep. at 7.)  Approximately 25-30% of individuals infected with HCV clear the infection from their system without any treatment.   (Paulson Aff. ¶ 13.) The remaining individuals develop a chronic HCV infection.   (*Id.*)[2]  A subset of those individuals who develop chronic HCV infection develop liver disease or other medical conditions attributable to HCV.  (Kendig Rep. at 5.)  Among those individuals who do develop liver disease, the disease progresses slowly over the course of decades.  (*Id.* at 7; Paulson Aff. ¶ 15.)

### D.     Screening For Hepatitis C.

The  U.S.  Centers  for  Disease  Control  and  Prevention  (CDC)  and  the U.S. Preventive Services Task Force (USPSTF) recommend HCV screening for persons who are at a high risk of infection.  (Kendig Rep. at 6-7; Kendig Dep. at 129-32; Paulson Aff. ¶ 63.)  Medical practitioners use a two-step process to determine whether a patient

---

[2] Hereinafter and unless otherwise stated, reference to HCV patients or inmates means only those individuals who have chronic HCV infection, not the 25-30% of individuals whose bodies have eradicated the infection without treatment.

has an active HCV infection.  (Paulson Aff. ¶¶ 25-26, 68; Kendig Rep. at 6-7.)  First, a blood test determines whether the patient has the HCV antibody in his blood.  (Paulson Aff. ¶¶ 25, 68; DOC Deposition under Fed. R. Civ. P. 30(b)(6) ("DOC Dep."), attached to the Fodness Aff. as Ex. G at 15-16; Kendig Rep. at 6.)[3]  Results of this HCV antibody test are reported as "non-reactive," "reactive," or "inconclusive."  (Paulson Aff. ¶ 25.)  A patient with a "non-reactive" result does not have the HCV antibody in his or her blood, indicating that he or she has never been infected with HCV.  (*Id.*)  A patient with a "reactive" result has the HCV antibody in his or her blood.  (*Id.*)  Patients with a reactive result either have an active infection or had an active infection at some time in the past (*i.e.*, the patient's body eradicated the infection on its own or the patient was successfully treated for HCV in the past).  (*Id.*)

Patients who test positive for the HCV antigen receive a second blood test called an antigen or RNA test to determine whether the patient has an active HCV infection.  (*Id.* ¶¶ 26, 68; Kendig Rep. at 6-7.)  Patients who are "HCV RNA positive" have an active HCV infection.  (Paulson Aff. ¶ 26.)  Those who test "negative" do not have an active infection, even if the result of the initial HCV antibody test was reactive.  (*Id.*)

### E.    Medical Monitoring Of HCV Patients.

If HCV infection progresses, it progresses slowly and can remain dormant for many years.  (Paulson Aff. ¶¶ 14, 15; Kendig Rep. at 7.)  Progression is even slower in a correctional setting where medical practitioners can control an inmate's other medical

---

[3] Dr. Paulson testified as the DOC's designated representative for the purposes of the deposition of the DOC noticed by Plaintiffs under Fed. R. Civ. P. 30(b)(6).

conditions and monitor an inmate's medications.  (Paulson Aff. ¶¶ 16, 17; *see also* Kendig Dep. at 84-85.)   The correctional environment itself, which is free of environmental toxins and prohibits the use of drugs and alcohol, also slows progression. (Paulson Aff. ¶ 16; *see also* Kendig Dep. at 84-85.)

One condition that may affect HCV patients is chronic liver disease, which generally develops over the course of decades.  (Paulson Aff. ¶ 18; Kendig Rep. at 7.) The degree to which an HCV-infected patient's liver has been affected by liver disease is discussed in terms of fibrosis or accumulation of scar tissue in the liver.  (Paulson Aff. ¶ 19; Kendig Rep. at 5, 7-8.)  "Stage" refers to the amount of liver scarring.  (Paulson Aff. ¶ 19.)  Stages of fibrosis range from Stage 0 to Stage 4.  (*Id.*)  Stage 0 is absence of fibrosis.  (*Id.*)  Stage 4 means a large amount of scarring, known as cirrhosis of the liver. (*Id.*)

A number of non-invasive tests assist medical practitioners in estimating the degree of fibrosis in a patient's liver, and in determining the timing of HCV treatment in the early stages of liver disease.  (*Id.* ¶ 20; Kendig Rep. at 8; Kendig Dep. at 81-82; 147-49.)  These tests include the AST-Platelet Ratio Index (APRI) and Fibrosis-4 (FIB-4) index, which are calculated using blood test results.  (Paulson Aff. ¶ 21; Kendig Rep. at 8.)

**F.**     **Hepatitis C: Screening And Treatment At The Minnesota Department of Corrections.**

**1.**     **Development Of DOC Guidelines For Screening And Treatment Of HCV.**

The DOC has had HCV treatment guidelines since at least 1999.  (Paulson Aff. ¶ 28.)  Since then, the DOC's HCV treatment guidelines have had multiple iterations and have been subject to substantial review and revision based on a collaborative, evidence-based approach.  (*Id.* ¶¶ 43-55 (describing revisions).)  The guidelines, and the DOC's practices with respect to screening for and treatment of HCV, have been revised with the advent of different FDA-approved HCV treatments and as new research has refined the medical community's understanding of HCV and liver disease.  (*Id.*)

Treatment of HCV has been revolutionized over the last three years.  (Paulson Aff. ¶ 42; Kendig Rep. at 8.)  Previous HCV treatments involving pegylated interferon and ribavirin, which often took nearly a full year of treatment, have been phased out with the advent of a class of drugs referred to as direct-acting antivirals (DAAs).  (Paulson Aff. ¶ 31; *see also id.* ¶ 39 (discussing the use of pegylated interferon and ribavirin for the treatment of HCV).)

**a.**     **The DOC's April 2015 HCV Treatment Guidelines.**

In response to the new crop of DAAs, the DOC amended its treatment guidelines in April 2015 (hereinafter "2015 Guidelines").  (*Id.* ¶¶ 44-47; *see also* 2015 Guidelines, attached to the Paulson Aff. as Ex. B.)  In drafting the 2015 Guidelines, Dr. Paulson consulted multiple resources, including the Federal Bureau of Prisons' Interim Guidance for Management of Chronic Hepatitis C, the California Department of Corrections'

HCV care guide, Centurion's HCV guidelines, and the then-in-effect guidance published by the American Association for the Study of Liver Disease (AASLD) and Infectious Disease Society of America (IDSA). (*Id.*)  At that time, the AASLD/IDSA guidance recommended prioritization among HCV patients based on their medical status and potential for liver-related complications. (*Id.* ¶ 52.)  In accordance with these resources, Dr. Paulson concluded that he would prioritize treatment of DOC inmates with evidence of stage 3 and 4 liver fibrosis. (*See* Paulson Aff. ¶ 55; 2015 Guidelines.)[4]  The 2015 Guidelines were in accordance with all of the HCV treatment and screening guidelines from various state departments of corrections, the FBOP, and other institutions with which Dr. Paulson was familiar. (Paulson Aff. ¶ 55.)

### b.   The DOC's January 2016 HCV Treatment Guidelines.

In January 2016, Dr. Paulson drafted and the DOC adopted updated guidelines (hereinafter "2016 Guidelines"). (*See* 2016 Guidelines, attached to the Paulson Aff. as Ex. F; Paulson Aff. ¶ 56.)[5]  The 2016 Guidelines are designed "to provide guidance to health services staff about screening and testing [inmates] . . . ; evaluating HCV infected [inmates] for treatment with antiviral agents; and monitoring the condition of HCV infected [inmates] during and after treatment." (2016 Guidelines at 1.)  Like the 2015 Guidelines, the 2016 Guidelines were informed by treatment recommendations by nationally recognized authorities, including the AASLD/IDSA, FBOP, and California Department of Corrections. (Paulson Aff. ¶ 56; *see also* 2016 Guidelines at 1; Kendig

---

[4] *See* Paulson Aff. ¶ 19 (describing stages of liver disease).
[5] The Second Amended Complaint was filed in October 2015. (Doc. No. 42.)

Rep. at 15-16 .)  The 2016 Guidelines are informational only and are not a substitute for evaluation of individual cases and patient-specific treatment decisions.  (2016 Guidelines at 1-3; Paulson Aff. ¶ 60.)

The 2016 Guidelines' provisions on screening and testing are in line with the recommendations published by the CDC and the USPSTF, and consistent with the practices of other state correctional facilities, the FBOP, and the larger county and local jails across the country.  (Kendig Dep. 69-71; Kendig Rep. at 11, 15; *see also* Paulson Aff. ¶ 56.)

### 2.     Implementation Of The DOC's 2016 Guidelines.

#### a.     Screening.

The DOC has trained and instructed its staff members to follow the DOC's 2016 Guidelines for screening inmates for HCV on intake, to explain the HCV risk factors, recommend that inmates request blood testing if they have any of the risk factors, provide education information on transmission, and explain procedures for requesting a blood test.  (Paulson Aff. ¶¶ 63, 64; 2016 Guidelines at 1.)  If an inmate identifies any one of the CDC-recognized risk factors, DOC staff members strongly encourage the inmate to consent to an HCV test.  (Paulson Aff. ¶ 65.)  Inmates can also request an HCV test during their incarceration, or testing may be offered by an inmate's medical practitioner.  (*Id.* ¶ 69.)  When inmates report a potential exposure to a blood-borne pathogen, they are also provided with the option of a test for HCV and other blood-borne pathogens.  (*Id.* ¶ 69.)

### b.     Monitoring And Treatment.

Upon diagnosis with an active HCV infection, DOC inmates are scheduled for an initial evaluation with an on-site medical practitioner.  (*Id.* ¶ 71.)  Dr. Paulson has directed on-site medical practitioners to forward laboratory test results from the initial evaluation and any other clinically significant information to him at the DOC Central Office.  (*Id.* at ¶ 74.)  Based on the laboratory test results, Dr. Paulson calculates each inmate's FIB-4 and APRI scores, considers any other information he has received, and uses his medical judgment to identify those with an immediate medical need for HCV treatment.  (*Id.* ¶¶ 74-77.)

For inmates without an immediate need, Dr. Paulson assigns each inmate a treatment priority level based on his medical judgment.  (*Id.* at ¶¶ 75-76.)  These inmates are informed that they should follow-up with the on-site medical practitioner every six months.  (*Id.* at ¶ 79.)  Dr. Paulson has repeatedly expressed to on-site medical practitioners that information from such follow-up appointments and any other clinically significant information must be sent to his attention at the DOC Central Office.  (*Id.* at ¶¶ 73, 80.)  After each follow-up appointment, Dr. Paulson evaluates each inmate's medical information, FIB-4 and APRI scores, and any other clinically significant medical information to establish an updated priority level.  (*Id.* ¶ 80.)

### G.     Cost.

On a percentage basis, correctional systems have a much larger number of patients who are potential candidates for HCV treatment than any other large health care system

in the United States.  (Kendig Rep. at 13.)  The wholesale cost of DAAs for a 12-week course of treatment ranges from \$54,600 to \$147,000 per patient.  (*Id.* at 9.)  This presents an unprecedented challenge to correctional systems across the United States, and data show that in many cases the cost of treating all inmates with HCV would eclipse some correctional systems' budgets by a factor of three.  (*Id.*)

Despite the fact that treatment is costly, the DOC has spent millions of dollars treating inmates with DAAs.  (Defendants' Supp. Ans. Interr., attached to the Fodness Aff. as Ex. H at 14.)  From July 1, 2016 through March 6, 2017, the DOC had spent \$1,691,176.69 on DAAs, outpacing DAA spending for the entirety of the entire prior fiscal year by a wide margin.  (Larson Aff. ¶ 15.)

**H.**   ████████████████████████

████████████████████████████████████████████

██████████████████████████████   ███████████████

████████████████████████████████

1.   **Ligons**

Ligons was incarcerated in 1993.  (Pung Aff. ¶ 8.)  ██████████████████

████████████████████████████████   While Ligons has been housed at various facilities in the DOC, he is currently in prison at MCF-FRB.  (Pung Aff. ¶ 10.)  Ligons is currently scheduled for supervised release into the community on November 21, 2019.  (*Id.*)

████████████████████████████████████████████

██████████████████████████   ███████████████

[REDACTED]

### 2.    Michaelson

Michaelson was released from the DOC on March 27, 2017, and is serving his sentence on supervised release in the community.  (Pung Aff. ¶ 16.) [REDACTED]

[REDACTED] (*Id.* ¶ 134.)

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[S]ummary judgment procedure is properly regarded not as

a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quotation and citation omitted).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## LEGAL ARGUMENTS

I.   **THE ELEVENTH AMENDMENT BARS CLAIMS FOR MONETARY DAMAGES AGAINST THE DOC AND ITS OFFICIALS IN THEIR OFFICIAL CAPACITIES AND AGAINST THE DOC FOR PROSPECTIVE INJUNCTIVE RELIEF.**

Plaintiffs Ligons and Michaelson assert Section 1983 claims against the DOC and the Commissioner in his official capacity.  (SAC ¶¶ 137-44 (Claim IV).)  Plaintiffs Roe, Miles, and Stiles purport to allege the same claims against the DOC and the Commissioner, Larson, and Dr. Paulson, in their official capacities.  (SAC ¶¶ 145-52 (Claim V).)[6]  To the extent that Plaintiffs seek monetary damages against the DOC and

---

[6] Although the Court mentioned the potential of a motion for class certification in its Second Amended Briefing Order, Doc. No. 98, none has been noticed.  (*See generally* Docket.)  To date, no class has been certified, and Plaintiffs John Roe, Jane Roe, John Miles, Jane Miles, John Stiles, or Jane Stiles have never identified themselves, nor been identified by Plaintiffs Ligons or Michaelson.

its officials acting in their official capacities, Plaintiffs' claims are barred by the Eleventh Amendment.

"The Eleventh Amendment immunizes an unconsenting State from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular federal cause of action." *Hadley v. N. Ark. Cmty. Tech. Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996). Congress has not abrogated state immunity to Section 1983 claims and Minnesota has not waived its immunity. *Capers v. Ramsey Cty. Public Def.*, No. 13-cv-1041 (PJS/JJG), 2014 WL 1048517, at * 4-5 (D. Minn. Mar. 18, 2014) (citations omitted). States are also entitled to sovereign immunity from claims for prospective injunctive relief under the Eleventh Amendment. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) (state university is entitled to sovereign immunity and dismissal from suit for monetary damages and prospective injunctive relief). While state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment, the same doctrine does not extend to states or state agencies. *Id.* (citations omitted). Accordingly, the DOC is immune under the Eleventh Amendment from Plaintiffs' claims and is entitled to summary judgment dismissing Claims IV and V.

Plaintiffs' claims for monetary damages are also barred against the Commissioner, Dr. Paulson, and Larson in their official capacities. A claim against a state employee in his or her official capacity is a claim against the state. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). State officials acting in their official capacities are not considered "persons" who can be sued under Section 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997).

As such, claims against Dr. Paulson, Larson, and the Commissioner in their official capacities should be dismissed to the extent that Plaintiffs seek monetary damages.

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECTION 1983 CLAIMS BECAUSE PLAINTIFFS CANNOT ESTABLISH THAT THEIR EIGHTH AMENDMENT RIGHTS WERE VIOLATED.

Plaintiffs sue Dr. Paulson and Larson in their individual capacities, alleging under Section 1983 that their Eighth Amendment rights have been violated by the failure to provide them with DAAs. (SAC ¶¶ 121-27 (Claim II).) Dr. Paulson is entitled to summary judgment because his exercise of medical judgment in assessing each Plaintiff's respective medical condition did not violate Ligons or Michaelson's Eighth Amendment rights. Larson is entitled to summary judgment because she also did not make decisions related to either Plaintiff's HCV. Dr. Paulson and Larson are entitled to summary judgment on the alternative grounds that qualified immunity protects them from civil liability.

### A. Plaintiffs Cannot Meet The Demanding Burden To Establish A Claim Of Deliberate Indifference.

The Eighth Amendment only protects prisoners from the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). In the medical context, a prisoner must establish that a prison official was deliberately indifferent to a serious medical need to maintain a claim under Section 1983. *See id.* at 106. Society does not expect prisoners to have unqualified access to health care. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (quoting *Estelle*, 429 U.S. at 103-04). The Eighth Amendment does not guarantee "medical care commensurate with that enjoyed by civilian populations."

*Hines v. Anderson*, 547 F.3d 915, 922 (8th Cir. 2008). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105. Deliberate indifference is "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Fourte v. Faulkner County*, 746 F.3d 384, 387 (8th Cir. 2014) (quotations omitted).

To survive summary judgment, a plaintiff must provide evidence on which a jury could find that a defendant rendered medical care "so inappropriate as to evidence intentional maltreatment." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (citations and quotations omitted). This demanding standard requires Plaintiffs to "prove that [they] suffered from one or more objectively serious medical needs, and that [] officials actually knew of but deliberately disregarded those needs." *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999). To be actionable, the risk of harm created by the official must be substantial. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Establishing deliberate indifference requires evidence both of "an objective element, which asks whether the deprivation was sufficiently serious, and a subjective element, which asks whether the defendant officials acted with a sufficiently culpable state of mind." *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993).

Prison doctors are not constrained from "exercising their independent medical judgment" under the Eighth Amendment and inmates do not have a constitutional right to any particular or requested course of treatment. *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). An inmate cannot maintain a deliberate indifference claim as a matter of law

where prison officials adopt a HCV treatment policy mirroring the FBOP policy, prioritize antiviral treatment on the basis of lab results, and provide "regular care and close monitoring of his Hepatitis C." *See Black v. Ala. Dept. of Corr.*, 578 Fed. App'x 794, 795-96 (11th Cir. 2014) (holding that prison officials are not deliberately indifferent by monitoring a patient who is "stable" and prioritizing treatment based on "periodic liver function and liver enzyme test results"). "As numerous courts have acknowledged, HCV does not require treatment in all cases." *Smith v. Corizon, Inc.*, No. 15-743, 2015 WL 9274915, at *5 (D. Md. Dec. 17, 2015) (holding that physician's determination that inmate was not a priority candidate for treatment with Harvoni based on inmate's lack of symptoms was not deliberately indifferent); *see also, e.g.*, *Phelps v. Wexford Health Sources*, No. 16-2675, 2017 WL 528424, at *4 (D. Md. Feb. 8, 2017) (granting summary judgment where inmate was monitored with blood panels and prison officials evaluated lab results for treatment eligibility, reasoning that inmates are not entitled "to Harvoni" or "the treatment of [] choice").

For example, in *Fitch v. Blades*, the court granted summary judgment in favor of prison physicians who determined that an HCV-positive inmate was not an immediate priority for treatment with Harvoni. No. 15-cv-00162, 2016 WL 8118192, at *7 (D. Ida. Oct. 27, 2016),   In concluding that the inmate did not have an immediate need for treatment, prison physicians evaluated the inmate, concluded that he was "stable," and established a follow-up timeline. *Id.* The court held that the prison physicians' exercise of "deliberate, careful judgment about the course of [the inmate]'s treatment" evinced

only a difference in medical judgment not giving rise to a deliberate indifference claim. *Id.*

Similarly, the court in *Binford v. Kenney* also granted summary judgment to prison officials on an inmate's deliberate indifference claim. No. 4:14-CV-5103, 2015 WL 6680272 (E.D. Wash. Nov. 2, 2015). There, prison officials did not provide an inmate HCV treatment with DAAs because the inmate's liver biopsy did not indicate stage 3 or higher liver disease. *Id.* at *1. The court reasoned that "an inmate is not entitled to the best or most expensive cutting-edge medical treatment. Instead, inmates must be provided medically acceptable treatment under the circumstances." *Id.* at *4.

To withstand summary judgment, Plaintiffs must establish more than mere disagreement with a prison doctor. *See Velarde v. LeBlanc*, No. 03-cv-2995 (PAM/SRN), 2004 WL 2271746, at *1 (D. Minn. Sept. 25, 2004) (holding that disagreement between inmate and prison doctor as to whether HCV medication treatment should have been stopped was a "medical malpractice claim at best" and did not give rise to a claim for deliberate indifference under the Eighth Amendment). Courts routinely dismiss inmates' deliberate indifference claims when a prison doctor exercises medical judgment regarding the treatment of HCV. *See also, e.g.*, *New v. Shelton*, No. 2:12-cv-1726, 2015 WL 4716020, at *5 (D. Or. Aug. 7, 2015) (holding that a prison doctor's decision not to prescribe telaprevir or Harvoni was based on reasonable medical judgment and not deliberately indifferent); *Hill v. Wexford Health Sources, Inc.*, No. 1:13-cv-544, 2015 WL 7864190, at *6-7 (S.D. Miss. Dec. 3, 2015) (holding that prison doctor's decision not to prescribe interferon treatment to inmate was based on

medical judgment and was not deliberately indifferent); *Emery v. Premo*, No. 6:14-cv-285, 2014 WL 5019898, at \*3 (D. Ore. Sept. 30, 2014) (holding inmate not likely to succeed on the merits with his deliberate indifference claim where prison medical director made medical judgment that treatment with Sovaldi is not appropriate for inmates who with Stage 2 fibrosis); *Harrell v. Cal. Forensic Med. Grp., Inc.*, No. 2:15-cv-579, 2015 WL 6706587, at \*2 (E.D. Cal. Nov. 3, 2015) (dismissing suit against prison doctor who decided not to treat inmate with Harvoni based on state correctional department's protocol and policies for HCV treatment where inmate had FIB-4 score of 1.18); *Ross v. Kelso*, No. 2:14-cv-2533, 2016 WL 123052, at \*3 (E.D. Cal. Jan. 11, 2016) (holding that a prison doctors' decision not to prescribe Sovaldi due to concerns regarding inmate's blood platelet levels was not deliberately indifferent).

### B. Dr. Paulson Is Entitled To Summary Judgment Because His Exercise Of Evidence-Based Medical Judgment In Assessing Each Plaintiff's Medical Condition Was Not Deliberately Indifferent.

Based on the record before the Court, Plaintiffs cannot establish a genuine issue of material fact demonstrating that Dr. Paulson's assessment of Plaintiffs' respective medical conditions was deliberately indifferent.  To the contrary, the record demonstrates that Dr. Paulson exercised independent medical judgment, rooted in evidence-based medicine, to make medical decisions about whether and how to treat Plaintiffs' HCV.[7]

---

[7] ████████████████████████████████████████████████████████████████████████████████████████████████████████. *See Cullor v. Baldwin*, 830 F.3d 830, 837 (8th Cir. 2016) (holding that claims of deliberate indifference related to the delay in medical treatment require the inmate to "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment") (Footnote Continued on Next Page)

Dr. Paulson testified that he completes a detailed evaluation of each inmate's medical condition, directs on-site medical practitioners to monitor HCV-infected inmates' medical status, and orders the on-site practitioners to send him test results and other salient medical information.  (Paulson Aff. ¶¶ 71-75, 80.)  Using this information, Dr. Paulson calculates FIB-4 and APRI scores for inmates, ███████████████ ███████████and prioritizes those with advanced liver disease for immediate treatment. (*Id.* ¶¶ 75-77.)  By applying the 2016 Guidelines and Dr. Paulson's medical judgment, the DOC has treated 77 inmates with DAAs, and has treated, or is treating, all inmates known to have stage 3 or 4 fibrosis.  (*Id.* at ¶¶ 85-86*; see also* Larson Aff. ¶ 14.) Dr. Paulson is now in the process of reviewing HCV cases to treat inmates with stage 2 fibrosis, in accordance with the 2016 Guidelines and mirroring the practice of the FBOP. (Paulson Aff. ¶ 86.)

Plaintiffs allege that Dr. Paulson's decision not to immediately treat them with DAAs deviates from the applicable medical standard of care.  Even if Plaintiffs could prove this, it does not satisfy the deliberate indifference standard.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a

---

(Footnote Continued from Previous Page)
(quoting *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (affirming summary judgment in favor of state prison officials where inmate failed to put any medical evidence into record to establish that delay in treatment had a detrimental effect)). (*See also infra* at Part III.B (discussing lack of causation evidence).)

prisoner." *Estelle*, 429 U.S. at 106; *see also Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013) (deliberate indifference "requires a showing more than negligence, more even than gross negligence") (quotations and internal citation omitted); *Dulany*, 132 F.3d at 1239 ("Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.").

Plaintiffs' experts assert that the community standard of care for the treatment of HCV requires immediate treatment without regard to anything other than the fact that an individual has HCV.  (*See generally* Declaration of Julie A. Thompson, M.D. (Thompson ("Thompson Rep.") (Doc. No 79); Affidavit of Martin E. Gordon, M.D. ("Gordon Rep.") (Doc. No. 37); Affidavit of Bennett D. Cecil, III, M.D. ("Cecil Rep.") (Doc. No. 36).) However, Dr. Paulson and Dr. Newton Kendig, former Medical Director of the FBOP, identify the standard for treating HCV in a correctional setting.  (*See generally* Kendig Rep.; Paulson Aff. ¶¶ 46-54, 88.)  This standard is rooted in evidence-based medicine. While the disagreement among medical experts may be probative in a tort case, it is insufficient to establish an Eighth Amendment violation.  *See Fourte*, 746 F.3d at 389.

Plaintiffs also allege that Dr. Paulson's judgment is based on cost, which Dr. Paulson denies.  Consideration of the costs and benefits of the particular treatment – including financial costs – does not render his treatment decisions deliberately indifferent under the Eighth Amendment.  Federal courts have held that the cost of treatment is a legitimate consideration in medical treatment decisions.  *See Cramer v. Iverson*, Civil No. 07-725 (DWF/SRN), 2008 WL 4838715, at *5 n.8 (D. Minn. Nov. 5, 2008) (rejecting plaintiff's argument that the cost of treatment is not a valid basis for denying

treatment under the Eighth Amendment) (citing *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)); *see also Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) (holding that "the deliberate indifference standard . . . does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society"); *Binford*, 2015 WL 6680272, at *4 (holding that "an individual defendant may consider resources in determining a course of action."). Plaintiffs can proffer no evidence supporting the contention that Dr. Paulson's treatment decisions were based on cost or administrative convenience.

There are no genuine issues of material fact that would demonstrate that Dr. Paulson was deliberately indifferent to Plaintiffs' medical condition. The Court should dismiss their Eighth Amendment claims against him.

**C.    Larson Had No Involvement In Evaluating Plaintiffs For Treatment Or Establishing Treatment Guidelines For Treatment Of HCV And Is Therefore Entitled To Summary Judgment.**

Non-medical staff cannot be liable for the decisions made by medical staff. *See Drake v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006) (stating that "it is not deliberate indifference when an official relies on the recommendations of a trained professional"); *Davis v. Superintendent Somerset SCI*, 597 Fed. App'x 42, 45-46 (3d Cir. 2015) (rejecting claim that non-medical personnel violated a prisoner's constitutional rights by failing to respond to complaints about the sufficiency of medical treatment). "The law does not clearly require an administrator with less medical training to second-guess or disregard" medical practitioners' treatment decisions. *See Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002).

The record is undisputed that Larson is an administrator and does not have any direct responsibility for the provision of medical care.  (Larson Aff. ¶ 2; Larson Dep. At 19.)  On the contrary, Larson's duties include program and contract administration, and her role is akin to that of a hospital administrator.  (Larson Aff. ¶¶ 2-3.)  Because Plaintiffs cannot establish that Larson was personally involved in any alleged deprivation of medical care, she is entitled to summary judgment.  *See Niewind v. Smith*, No. 14-cv-4744 (DWF/HB), 2016 WL 3960356, at *11 (D. Minn. May 24, 2016) (granting summary judgment on Section 1983 claim in favor of Larson where she was not personally involved and deferred to licensed medical providers, including Centurion doctors).

Plaintiffs do not even allege a claim against Larson based on her supervisor-supervisee relationship with Dr. Paulson, but even if they had, such claim would fail as a matter of law.  Section 1983 does not create a cause of action for supervisory liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) (holding that "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights" (internal quotations and citations omitted)).   "In the section 1983 context, supervisor liability is limited. A supervisor cannot be held liable, on a theory of *respondeat superior*, for an employee's unconstitutional actions."  *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).

There are no genuine issues of material fact that would demonstrate that Larson was responsible for medical decisions and thus she was not deliberately indifferent to

Plaintiffs' medical conditions.  The Court should dismiss Plaintiffs' Eighth Amendment claims against her.

## III.   DR. PAULSON AND LARSON ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity protects government officials from liability for civil damages so long as his or her conduct violates the "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, ___ U.S. ___, ___, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. ___, ___, 136 S. Ct. 305, 308 (2015)).

To defeat a claim of qualified immunity, a plaintiff must present sufficient facts to establish that: (1) the official's conduct violated a constitutional right and (2) that the constitutional right was clearly established. *Pearson*, 555 U.S. at 232.  "Unless both of these questions is answered affirmatively, [a government official] is entitled to qualified immunity." *Nord v. Walsh County*, 757 F.3d 734, 738 (8th Cir. 2014).  Plaintiffs cannot meet either step.  As to the first step, Plaintiffs cannot establish that their constitutional rights were violated.  (*See supra* Part II.)

With respect to the second step, Plaintiffs must prove that the right was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232.  "The contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).   The United States Supreme Court explained "decades ago, [that] the clearly established law must be 'particularized' to the facts of the case." *White*, ___ U.S. at ___, 137 S. Ct. at 552 (citing *Anderson*, 483 U.S. at 640) (reversing denial of qualified immunity on summary judgment where the district court "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated" an individual's rights)).

Binding precedent "must have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, 571 U.S. ___, ___, 134 S. Ct. 3, 5 (2013).   "[T]he question is whether, in light of precedent existing at the time, [the official was] 'plainly incompetent'" in executing his or her duties." *Id.*; *see also Anderson*, 483 U.S. at 639-41. The court may "not . . . define clearly established law at a high level of generality." *Mullenix*, ___ U.S. at ___, 136 S. Ct. at 308.   Rather, a court must assess the law within the specific context of the case. *Id.* at ___, 136 S. Ct. at 309-11 (reversing denial of qualified immunity on summary judgment where "hazy legal backdrop" did not put officer on notice that he could not shoot a fleeing suspect in the back).

Summary judgment is a particularly important procedural mechanism in cases where government actors assert qualified immunity from suit.   *See Katosang v. Wasson-Hunt*, 392 Fed. App'x 511, 513-14 (8th Cir. 2010).   Qualified immunity "is an immunity from suit rather than a mere defense to liability [and] it is effectively lost if a case is erroneously permitted to go to trial." *Handt v. Lynch*, 681 F.3d 939, 943 (8th Cir. 2012)

(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Because neither Dr. Paulson nor Larson violated clearly established law, they are entitled to qualified immunity.

### A.   Dr. Paulson Is Entitled To Qualified Immunity For His Treatment Decisions.

Dr. Paulson's decision to prioritize HCV treatment is not contrary to any clearly established law.  There is no Eighth Circuit precedent that would put Dr. Paulson on notice that such medical treatment decisions violate the Eighth Amendment.  S*ee Wilson v. Layne*, 526 U.S. 603, 617 (1999) (holding that a plaintiff must show "cases of controlling authority in [the] jurisdiction at the time of the incident which clearly established the rule . . . [or] a consensus of cases of persuasive authority"); *White*, ___ U.S. at ___, 137 S. Ct. at 552 (holding that the law must be "'particularized' to the facts of the case" to constitute a clearly established right).

To the contrary, as discussed *supra* at Part II.A, federal courts have widely held that a medical decision not to treat a prisoner's HCV with new DAAs does not constitute deliberate indifference to a serious medical need under the Eighth Amendment. The federal district court in *Maskelunas v. Wexford Health Source, Inc.*, No. 2:14-cv-369, 2015 WL 6686709 (W.D. Pa. Oct. 8, 2015) reached this same conclusion.  The court held that state corrections officials were protected by qualified immunity where they had refused to provide an inmate with new medications for HCV, including Harvoni and Sovaldi.  *Id.* at *3.  The court reasoned that "[q]uite simply, when the treatment protocols for a serious condition . . . are in flux, it is impossible for a medical care provider to know what the 'contours'. . . of an inmate's rights are."  *Id.  See also Fourte*, 746 F.3d at 389

(holding that prison doctor had qualified immunity from deliberate indifference claim where the plaintiff produced two expert witnesses who disagreed with the doctor's protocol). The Court should dismiss all claims against him in his individual capacity.

The record is undisputed that HCV treatment protocols have been rapidly changing as new medications have come to market. (Kendig Rep. 8; Paulson Aff. ¶¶ 49, 62; Thompson Dep. at 70-71 (stating that in private practice patients were being "warehoused" for treatment as new drugs became available and that those who were "warehoused" have not all been contacted for follow up).) Given these changes in the medical treatment for HCV, Plaintiffs cannot show that Dr. Paulson would reasonably have understood that the decision ██████████████████████ constituted deliberate indifference.

Despite this volatility, Dr. Paulson has tailored the DOC's HCV treatment guidelines to mirror those established by the FBOP and has set treatment guidelines either in line with the HCV treatment provided by other state departments of corrections. (Paulson Aff. ¶¶ 57-58; Kendig Rep. 11, 15-16; Kendig Dep. at 69-71.) Because there is no precedent that would have informed Dr. Paulson that his approach ████████████ ████████████████ violated their rights, he is entitled to qualified immunity on their Section 1983 claims.

**B.      Larson Is Entitled To Qualified Immunity For Her Administrative Role.**

Larson is protected by qualified immunity for the same reasons that Dr. Paulson is entitled to qualified immunity, but is entitled to qualified immunity for the additional

reason that she reasonably relied on Dr. Paulson's medical judgment and expertise in overseeing the establishment of treatment guidelines for HCV.  *See Meloy*, 302 F.3d at 849 (holding that a prison official was entitled to qualified immunity where she did not deny a patient access to medical practitioners and the law did not require "an administrator with less medical training to second-guess or disregard a treating physician's treatment decision").

Larson is also entitled to qualified immunity to the extent that Plaintiffs allege that she failed to intervene in their medical treatment.  *See Josey v. Beard*, C.A. No. 06-265, 2009 WL 1858250, at *6-7 (W.D. Pa. June 29, 2009) (holding that a Health Services Administrator was entitled to qualified immunity where, without passing on the constitutionality of a HCV protocol, it would not be apparent to a Health Services Administrator without medical training that the protocol was unconstitutional).  Because Larson has qualified immunity from suit, the Court should dismiss all claims against her in her individual capacity.

## IV.  PLAINTIFFS' CLAIMS UNDER THE REHABILITATION ACT AND AMERICANS WITH DISABILITIES ACT FAIL AS A MATTER OF LAW.

Plaintiffs allege that the DOC and the Commissioner violated the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, by not "reasonably accommodating" their "disabilities" by providing medical treatment of HCV with DAAs.  (SAC ¶¶ 169, 179.)  Because neither the Rehabilitation Act nor the ADA provide a mechanism by which an individual can challenge medical care, these claims fail as a matter of law.

Neither the Rehabilitation Act nor the ADA provide a federal cause of action to challenge medical treatment. *See Shelton v. Ark. Dep't of Human Servs.*, 677 F.3d 837, 843 (8th Cir. 2012) ("The district court correctly held that a claim based upon improper medical treatment decision may not be brought pursuant to either the ADA or the Rehabilitation Act."); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (holding that a lawsuit under the Rehabilitation Act or the ADA cannot be based on medical treatment decisions.); *Maxwell v. Olmsted County*, No. CIV. 10-3668 (MJD/AJB), 2012 WL 466179, at *6 (D. Minn. Feb. 13, 2012) (dismissing claim that the county violated Title II of the ADA by failing to provide pain medications and PTSD treatment).

Claims premised on a challenge to medical treatment are contrary to the plain purpose of the respective acts and cannot survive summary judgment. *See Johnson v. Thompson*, 971 F.2d 1487, 1493-94 (10th Cir. 1992), *cert. denied*, 407 U.S. 910 (1993) (holding that medical treatment decisions cannot form the basis of a claim under the Rehabilitation Act "without distorting [the] plain meaning" of the Act's terms); *Holloway v. Corr. Med. Servs.*, No. 4:06-cv-1235, 2010 WL 908491, at *14-15 (E.D. Mo. Mar. 9, 2010) (rejecting inmate's ADA claim based on denial of HCV treatment) (citations omitted); *Redding v. Hanlon*, No. CIV 06-4575 (DWF/RLE), 2008 WL 762078, at *16 (D. Minn. Mar. 19, 2008) (holding that a prison official's alleged interference with medical treatment does not constitute denial of access to any "services, programs, or activities" and thus does not establish a claim under the ADA).

Plaintiffs' claims under the Rehabilitation Act and the ADA, like their Section 1983 claims, are based solely on medical treatment decisions. (*See generally*

SAC ¶¶ 164-184; *see also* Deposition of Barry Michaelson ("Michaelson Dep."), attached to the Fodness Aff. as Ex. I at 150 (stating that ███████████████████ ███████████████████).)  Because claims relating to medical treatment decisions cannot form the basis for a claim under the Rehabilitation Act or the ADA, Defendants' motion for summary judgment should be granted as to Claims VII and VIII.

## V.   PLAINTIFFS ARE NOT ENTITLED TO THE RELIEF THEY SEEK.

### A.   Plaintiffs' Claim For Permanent Injunctive Relief Fails As A Matter Of Law.

Plaintiffs seek wide-ranging injunctive relief on behalf of themselves and unnamed others.[8]   (SAC at 58-60.)   Their requested injunctive relief is moot and prohibited by the Prison Litigation Reform Act (hereinafter "PLRA").

### 1.   Plaintiffs Cannot Meet The Standard To Obtain A Permanent Injunction Because Their Claims Are Moot.

When deciding whether a party is entitled to permanent injunctive relief, a court must consider: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the harm to the nonmoving party should the injunction issue; (3) actual success on the merits; and (4) the public interest in the issuance of the injunction. *See Randolph v. Rogers*, 170 F.3d 850, 857 (8th Cir. 1999) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)).   Because the government "has traditionally been granted the widest latitude in the dispatch of its own internal affairs," a

---

[8] Defendants intend to respond fully to Plaintiffs' anticipated motion for a preliminary injunction, but briefly address the issue here because the injunctive relief requested in Plaintiffs' Second Amended Complaint fails as a matter of law.

plaintiff must present facts showing a threat of immediate, irreparable harm before a federal court will intervene. *Midgett v. Tri-Cty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850-51 (9th Cir. 2001) (citing *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)). Injunctive relief "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged . . . ." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

In addition to the fact that Plaintiffs cannot actually succeed on the merits, *supra* at Part II, their claims for injunctive relief also fail because they are moot. (*See* SAC ¶ 5.) In their request for relief, Ligons and Michaelson ask the Court to order "immediate commencement of the one pill per day, twelve week hepatitis C treatment in accordance with the June 20, 2015 AASLD/IDSA standard of care, WITHOUT first requiring plaintiffs to undergo chemical dependency treatment." (SAC at 59 (emphasis in original).) ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████  ███████  ███████████████

███████████████████████████████████████

███████████████████████████████████████

Michaelson's ██████████████████████████████ been released from prison, and he cannot demonstrate a threat of irreparable harm as a matter of law. *See id.*; *see also Meuir v. Greene Cty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007) (holding that an inmate did not have standing to challenge a prison policy when he had transferred from the prison); *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999)

(holding that the future prospect of a plaintiff being sent back to complained-about facility is insufficient to maintain a justiciable controversy); *Hickman v. Missouri.*, 144 F.3d 1141, 1142 (8th Cir. 1998) (holding that parole release mooted former inmate's equitable claims); *see also Roblero-Barrios v. Ludeman*, No. 07-4101 (MJD/FLN), 2008 WL 4838726, at *10 (D. Minn. Nov. 5, 2008) (holding claims for equitable and injunctive relief are moot when the plaintiff is no longer subject to conditions of confinement of which he complains).  Because neither Ligons nor Michaelson can carry their burden of establishing the requisite threat of immediate irreparable harm, their claims for injunctive relief are not justiciable and fail as a matter of law.

### 2.    Plaintiffs' Claim For Injunctive Relief Is Barred By The Prison Litigation Reform Act.

The Prison Litigation Reform Act ("PLRA") limits the injunctive relief a court may order in a case brought by an inmate alleging that prison conditions violate federal law.  *See* 18 U.S.C. § 3626; 42 U.S.C. § 1997e; *see also Miller v. French*, 530 U.S. 327, 333 (2000).  The PLRA provides that "prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A).  A court may only grant prospective relief if the court finds "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  *Id.*  The scope of the remedy must be proportional to the scope of the violation and the order must not unnecessarily reach out to improve prison conditions other than those that violate

federal law.  *Hines*, 547 F.3d at 921-22 (holding that failure to narrowly tailor injunctive relief to make it "the least intrusive means" of curing an Eighth Amendment violation was "a separate and independent basis on which to terminate" consent decree under the PLRA).  The court must also give substantial weight to any adverse impact on public safety caused by the relief ordered.  18 U.S.C. § 3626(a)(1)(A).

Plaintiffs ask the Court to order the DOC not to engage in a variety of conduct the DOC is not engaging in, for example, "perpetuation" of an alleged protocol that does not exist and would not apply to either of them if it did exist.  (SAC 58-59.)  They also want the Court to order treatment for a wide variety of other inmates, in accordance with the June 29, 2015 recommendations of the AASLD/IDSA.  (SAC 59.)  Plaintiffs' requested injunctive relief, even if they somehow had standing to request such relief, is clearly prohibited under PLRA's mandate that prospective relief extend no further than necessary to correct a federal constitutional right of a particular plaintiff or plaintiffs. It is overbroad in that it seeks treatment for inmates who would not be able to establish an Eighth Amendment violation; would require the Court to substitute its judgment for that of a medical doctor;[9] and it is not limited to a particular plaintiff or plaintiffs.

---

[9] Presumably, Plaintiffs would want the Court to follow the current AASLD/IDSA recommendations.   The current recommendations in a 229-pages report that can be accessed at http://hcvguidelines.org/sites/default/files/HCV-Guidance_October_2016_a.pdf (last visited March 26, 2017).

**B.    To The Extent That Plaintiffs' Claims For Damages Are Not Foreclosed By Qualified Immunity Or The Eleventh Amendment, Their Claims Fail To The Extent That They Are Premised On Physical Injury From Alleged Delay In HCV Treatment.**

As part of their claims under Section 1983, the Rehabilitation Act, and the ADA, Plaintiffs allege damages for "aggravated or exacerbated serious medical harms, including liver malfunction, liver fibrosis, liver cirrhosis, liver cancer, expensive liver transplant, or even death by liver malfunction," *see* SAC ¶¶ 124, 170, 180, and for "increased symptoms" and "decreased life expectancy," *see* SAC ¶¶ 126, 143, 151. Plaintiffs' assertion of lasting or temporary physical injury as a result of any alleged delay or deferral of treatment for HCV are completely unsupported by the record. As such, Defendants are entitled to summary judgment to the extent that Plaintiffs' claimed damages are based on physical injury allegedly caused by Defendants.

The deadline to identify experts passed on September 21, 2016, *see* Order (Doc. No. 43) at 2, and the deadline to submit expert reports passed on October 31, 2016, *see* Order (Doc. No. 77) at 2.  As of the date of the filing of this memorandum, Plaintiffs have never served any expert reports or identified any experts to testify as to the degree of physical injury they allege to have suffered as a result of alleged delay in HCV treatment.  None of Plaintiffs' three disclosed experts have been identified for this purpose.  (*See generally* Thompson Rep.; Gordon Rep.; Cecil Rep.)  There is no evidence in the record, either by way of expert report or otherwise, explaining how Plaintiffs in particular have been harmed by any alleged delay in treatment.

Absent expert testimony, Plaintiffs cannot put to the jury any evidence regarding their "increased symptoms," "decreased life expectancy," or exacerbation of their preexisting liver disease. *See Brooks v. Union Pac. R. Co.*, 620 F.3d 896, 900 (8th Cir. 2010) (holding that in order to withstand summary judgment an injured plaintiff must produce expert testimony not on only on his medical condition but also causation of the alleged injury); *see also Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 899 (8th Cir. 2008) (holding that a plaintiff's failure to make submit expert testimony on causation required that summary judgment be granted in favor of the defendant).

"When an injury is sophisticated, proof of causation generally must be established by expert testimony." *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002) (reversing jury verdict in favor of inmate on Eighth Amendment claim where expert evidence did not establish that failure to provide mediation caused injury).   An injury is "sophisticated" where it requires "surgical intervention or other highly scientific technique for diagnosis" because "proof of causation is not within the realm of lay understanding and must be established by expert testimony." *Id.* (quotation omitted). Likewise, a plaintiff cannot establish a genuine issue of material fact on the issue of physical injury where he fails to adduce any evidence of causation to separate preexisting injury from that allegedly caused by a defendant. *See Saunders v. Frost*, 124 Fed. Appx. 468 (8th Cir. 2005) (affirming judgment as a matter of law in favor of defendant where plaintiff failed to introduce expert testimony regarding knee injury where the plaintiff's "long medical history [was] marked by earlier traumas and an earlier surgery").

Here, the record is insufficient to put the claim of lasting or temporary physical injury to a jury. ███████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████ ████████████████████████████████████████████ ██████ █████ ███████████████████████████████. Competent evidence of causation is essential where, as here, the record is undisputed that liver disease is generally slowly-progressing, taking two to three decades to advance, if at all. (*See* Paulson Aff. ¶¶ 14-16 ; Kendig Dep. 80-81; Kendig Rep. 7; *see also* Thompson Dep. 43-44.)  *See also Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002) (holding that causation can only be inferred where an individual has a sudden onset of injury or visible injury).

Third, there is no record evidence of how administration of HCV treatment at any particular point in time would have prevented or ameliorated any lasting or temporary physical injury.  Absent expert medical testimony, Plaintiffs' claims that Defendants caused physical injury fail as a matter of law and their assertion of damages must likewise fail.

**VI.   PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW AND MUST BE DISMISSED.**

Plaintiffs appear to allege facts regarding potential claims on behalf of others or against unnamed others.  These claims are unclear and inartfully pled.  Any improperly pled claims should be dismissed.

**A.   Unnamed Plaintiffs' Screening Claims Fail As A Matter Of Law.**

In the Second Amended Complaint, Unnamed Plaintiffs Roe, Stiles, and Miles allege a Section 1983 claim against the DOC and the Commissioner, in his official capacity, based on the DOC's screening process at intake and throughout their respective incarcerations.  (SAC ¶¶ 145-52 (Claim V).)  These unidentified inmate plaintiffs appear to allege that they do not have HCV and they may be exposed to HCV because some other inmates have HCV.  Plaintiffs Ligons and Michaelson do not allege screening claims on behalf of themselves.  (*See id.*)  The screening claim fails as a matter of law.

**1.   Claim V Is Not Justiciable Because Plaintiffs Do Not Have Standing To Litigate Claims On Behalf Of Unnamed Plaintiffs Roe, Stiles, And Miles.**

First, Unnamed Plaintiffs cannot maintain a claim for prospective injunctive relief because they are unidentified and there is no record evidence on which they could have standing.  "Standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Meuir*, 487 F.3d at 1119 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal punctuation omitted).  Federal courts may only hear cases and controversies.  U.S. Const. art. III, § 2.  This requires a plaintiff to "have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be

redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quotation omitted).

Ligons and Michaelson do not purport to maintain the claim on Unnamed Plaintiffs' behalf, *see* SAC ¶¶ 145-52, nor are they entitled to do so. *See Meuir*, 487 F.3d at 1119 (holding that an inmate did not have standing to challenge a prison policy when he had transferred from the prison); *Martin*, 780 F.2d at 1337 (holding that an inmate cannot bring claims on behalf of other inmates, rather he must establish a personal loss). "Standing to seek injunctive relief requires a plaintiff, *inter alia*, to show a likelihood of future injury." *Id.* (citing *Lyons*, 461 U.S. at 111). A plaintiff lacks standing unless the alleged injury-in-fact is "concrete" and "actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quotation omitted); *Martin*, 780 F.2d at 1337.

As explained *supra* Part VI(A)(1), neither Plaintiff can meet this standard because they are not at imminent risk of injury-in-fact. In fact, in Dr. Paulson's 22 years he has never learned of an instance where HCV was transmitted from one inmate to another or between staff and inmates. (Paulson Aff. ¶ 11.) And they are not alleging this claim on behalf of themselves.

### 2.      Claim V Fails On The Merits.

Aside from the justiciability issues inherent in Unnamed Plaintiffs' claim, it also fails on the merits. The record is undisputed that HCV is not readily communicable and therefore does not present a threat of substantial harm to the DOC's inmates actionable under Section 1983. *See Nefferdorf v. Corr. Med. Servs.*, No. 04-cv-3411, 2009 WL

1066017, at *4 (D.N.J. Apr. 21, 2009) (holding that "there is no general constitutional duty to screen asymptomatic inmates for HCV" because HCV is "not the type of easily communicable disease . . . which requires universal screening") (citing *Thomas v. Corr. Med. Servs.*, No. 04-3358, 2009 WL 737105, at *7 (D.N.J. Mar. 17, 2009) (holding that there was no constitutional duty to test inmates for HCV at intake)).

### B.    Any Other Claims Plaintiffs Purport To Bring Under The Second Amended Complaint Fail As A Matter Of Law.

To the extent Plaintiffs purport to bring their own claims related to their conditions of confinement unrelated to treatment for HCV, their claims are unsupported by the undisputed record and fail as a matter of law.  For example, Michaelson alleges that ███

████████████████████████████████████████████████████████████████

█████████████████ (SAC ¶ 9; Plfs.' Ans. to Interr., attached to the Fodness Aff. as Ex. I at 20-21.)  To the extent that Michaelson intends to bring a discrete claim on the basis of this allegation, neither Dr. Paulson nor Larson had any involvement in the alleged situation and therefore do not have any liability.  (*See* SAC ¶ 9; Plfs.' Ans. to Interr., attached to the Fodness Aff. as Ex. J at 20-21 (███████████████████████████

████████████████████████████████████████████████████████████████

Michaelson Dep. at 42-44.)[10]  Neither Dr. Paulson nor Larson are even alleged to have authority over prison guards or prison operations.

---

[10]  The court should also *sua sponte* dismiss the claims against various Unnamed Defendants John and Jane Does A-J because Plaintiffs have failed to identify them in the course of reasonable discovery.  *See Phelps v. U.S. Fed. Gov't*, 15 F.3d 735, 738-39 (8th Cir. 1994).

## CONCLUSION

For all of these reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss Plaintiffs' claims with prejudice.

Dated:  March 28, 2017                    Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota


s/ **Kathryn A. Fodness**
KATHRYN A. FODNESS
Assistant Attorney General
Atty. Reg. No. 0392184

IAN WELSH
Assistant Attorney General
Atty. Reg. No. 0396287

KELLY S. KEMP
Assistant Attorney General
Atty. Reg. No. 0220280

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1348 (Voice)
(651) 296-1410 (TTY)
kathryn.fodness@ag.state.mn.us
kelly.kemp@ag.state.mn.us
ian.welsh@ag.state.mn.us

ATTORNEYS   FOR   DEFENDANTS
MINNESOTA   DEPARTMENT   OF
CORRECTIONS,  ROY,  PAULSON,  AND
LARSON