UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Ronaldo Ligons, et al.,                              Case No.:  15-cv-2210 (PJS/BRT)


        Plaintiffs,                          **DEFENDANTS' MEMORANDUM**
                                             **IN REPLY SUPPORTING**
                                             **SUMMARY JUDGMENT AND**
vs.                                          **IN OPPOSITION TO**
                                             **PLAINTIFFS' MOTIONS FOR**
                                             **CLASS CERTIFICATION,**
                                             **PRELIMINARY INJUNCTION,**
Minnesota Department of Corrections, et al., **PARTIAL SUMMARY**
                                             **JUDGMENT, AND TO EXCLUDE**
        Defendants.                          **EXPERT TESTIMONY OF**
                                             **DR. NEWTON KENDIG**


## INTRODUCTION

Defendants have shown that they are entitled to summary judgment because all of

Plaintiffs' claims are meritless.  (Doc. 106.)  Plaintiffs' response attempts to rehabilitate

their case, in part, by building a new one.  "[W]hile . . . the pleading requirements under

the Federal Rules are relatively permissive, they do not entitle parties to manufacture

claims, which were not pled, late into the litigation for the purpose of avoiding summary

judgment."  *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057

(8th Cir. 2004); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15

(11th Cir. 2004) (collecting cases).  Defendants' Motion for Summary Judgment,

(Doc. 104), should be granted, and Plaintiffs' Motions, (Docs. 135, 136, 137, & 138),

should be denied.

# ARGUMENT

## I. SUMMARY JUDGMENT REMAINS APPROPRIATE ON ALL OF PLAINTIFFS' CLAIMS.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████ Against

Defendants' fully supported motion, Plaintiffs bear the burden to demonstrate a genuine

issue of material fact; however, Plaintiffs have failed to identify admissible evidence

establishing a single factual dispute. Plaintiffs' "facts," (Doc. 141 at 18–39),[1] consist of

legal arguments and unsupported allegations.

### A. Plaintiffs Have Failed To Proffer Evidence Of Deliberate Indifference ███████████████████████████████

Defendants established in their initial memorandum that the Eighth Amendment

standard is extraordinarily high, with citations to many precedential cases. (Doc. 106

at 16–20.) Negligence is not enough. Plaintiffs failed to meet their burden to provide

evidence on which a jury could find that their medical care was "so inappropriate as to

evidence intentional maltreatment[.]" *Jolly v. Knudsen*, 205 F.3d 1094, 1096

(8th Cir. 2006) (citations omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 839 (1994)

(citations omitted) (holding that a plaintiff must show that an official acted despite

"knowledge of a substantial risk of serious harm").

The AASLD guidance does not establish the Eighth Amendment standard.

Plaintiffs fail to cite legal precedent establishing that the standards are equivalent. ███

███████████████████████████████████████████████████

---

[1] Docket reference page numbers cited herein refer to the ECF header.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████   The Eighth Amendment does not guarantee "medical care commensurate with that enjoyed by civilian populations." *Hines v. Anderson*, 547 F.3d 915, 922 (8th Cir. 2008).[2]   Indeed, the Constitution does not mandate that inmates be provided with unqualified access to medical care. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (citation omitted).

Plaintiffs have failed to clear the "substantial evidentiary threshold to show" deliberate indifference, and their lawsuit should be dismissed. *See Meuir v. Greene Cty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir. 2007).   The DOC has at all times treated Plaintiffs in accordance with guidelines that mirror protocols adopted by the FBOP and are in line with, or exceed, the practices in other state and local correctional systems. (Doc. 108 ¶ 55; *see also* Doc. 128 at 17.)   Plaintiffs do not identify any evidence to the contrary.[3]   There is also no genuine dispute of fact that Dr. Paulson has repeatedly changed the DOC's HCV treatment guidelines to reflect the evolving approach to treat

---

[2] Plaintiffs conveniently ignore that civilians with health insurance are approved for DAA treatment on evidence-based prioritization similar to that used by the DOC, notwithstanding the AASLD guidance. (Doc. 108 ¶¶ 55, 90.)

[3] Plaintiffs' assertion that the DOC has capped treatment of HCV at $3,000,000 is incorrect, unsupported by the record, and irrelevant. (Doc. 141 at 19.)   The text of the agreement and Larson's testimony are clear that Centurion pays $3,000,000, and the DOC pays anything in excess of this amount. (Doc. 115 ¶ 11.)   There is no record evidence that Plaintiffs, or any inmate, have been denied treatment because the contract cap was reached and the DOC refused to pay.   In any event, the terms in a negotiated contract are irrelevant to whether Larson or Dr. Paulson were deliberately indifferent to Plaintiffs' medical needs.

HCV in the medical and correctional communities.[4]  As of March 27, 2017, the DOC has treated at least 77 individuals with DAAs, and Dr. Paulson has started to assess for treatment inmates with stage 2 fibrosis.  (Doc. 115 ¶ 14; Doc. 108 ¶ 85.)[5]

Plaintiffs do not offer any evidence that Dr. Paulson evaluated ███████ ███████ based on impermissible considerations.  The record is uncontroverted that Dr. Paulson completes a detailed individualized assessment of all information sent to him by on-site Centurion medical practitioners, uses his medical judgment to assess that information, and recommends DAA treatment for inmates he concludes require immediate treatment.  (Doc. 108 ¶¶ 71–86; Paulson Dec. ¶ 14–15.)  The purported disagreement between one group of physicians, the AASLD, and another group of physicians, correctional medical practitioners, is insufficient to establish that Dr. Paulson inflicted cruel and unusual punishment ███████.  *See Fourte v. Faulkner*, 746 F.3d 384, 387 (8th Cir. 2014) (holding that disagreement among experts may be probative in a tort case, but it is insufficient to establish an Eighth Amendment violation).

---

[4]  Plaintiffs assert that the 2015 Guidelines referenced in Dr. Paulson's Affidavit, (Doc. 109, 109-1 at 4-7), were never produced to them, and that there is a dispute of fact as to whether the Guidelines were ever put into effect.  The 2015 Guidelines were served on Plaintiffs on February 18, 2016, (Letter to Counsel & Aff. of Serv., attached to Tweeten Aff. as Ex. A), and Plaintiffs have not identified any record evidence that contradicts Dr. Paulson's testimony.

[5]  Comparing Dr. Paulson's deposition and Larson's affidavit, (Doc. 115), Plaintiffs baldly allege that the number of inmates treated with DAAs is genuinely disputed. (Doc. 152 at 24-25, 30.)  Plaintiffs' argument is unsupported by the record.  Dr. Paulson was deposed in March 2016.  His testimony reflects the total number of individuals who had been treated at that time.  (Doc. 121-1 at 3.)  Over a year later, Larson attested to the updated number of treated inmates.  (Doc. 115 ¶ 14.)  The DOC has continually treated inmates with DAAs, and the number has increased.  (Doc. 108 ¶¶ 41-42, 85.)  This is not a factual dispute.

████████████████████████████████████████

████████████████████████████████████████

HCV infection is slow-moving, and the decades-long progression of liver disease is highly patient-specific. (Doc. 108 ¶¶ 5, 13; Doc. 128 at 6, 8.) It is likewise undisputed that the progression of such conditions is better controlled within the corrections environment. (Doc. 108 ¶¶ 16, 17.)

Plaintiffs have also failed to put forth any facts that Larson has any role in directing medical treatment for any inmate. Plaintiffs' entire theory is that Larson is at the top of the DOC's chain of command for medical grievances. (*See* Doc. 141 at 62-63.) Plaintiffs' theory is foreclosed by the fundamental principle that Section 1983 does not create vicarious liability. (*See* Doc. 106 at 23–25 (citing case law).) Plaintiffs also ignore that non-medical staff, like Larson, are allowed to rely on and defer to medical staff's medical decisions. (*See id.*)

## B. Plaintiffs' Claims For Monetary Damages Are Barred By Qualified Immunity.

There can be no dispute that qualified immunity bars government officials from being liable on Section 1983 claims unless clearly established precedent places the constitutional question beyond debate. (*Id.* at 25–29.) To overcome Dr. Paulson and Larson's qualified immunity, Plaintiffs must identify cases to clearly establish "beyond debate" that Defendants' actions violated Plaintiffs' constitutional rights. *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Plaintiffs have not cited a case that would put Dr. Paulson on notice that doing what the FBOP—and every other correctional system in the country—is doing constitutes cruel and unusual punishment.   Defendants have cited numerous cases from various jurisdictions setting forth the high standard to overcome an assertion of qualified immunity.   (*See* Doc. 106 at 17–20, 27–28 (citing cases).)   Plaintiffs now cite the factually-distinct opinion in *Abu-Jamal v. Wetzel*, 16-cv-2000, 2017 WL 34700 (M.D. Pa. Jan. 3, 2017).   Five months ago, a district court judge granted a preliminary injunction to treat one Pennsylvania inmate with DAAs after finding that Pennsylvania's prison system required inmates to exhibit "jaundice, ascites, bleeding esophageal varices, or hepatic encephalopathy" to receive DAAs.[6]   *Id.* at *5.   It is uncontroverted that the DOC acts sooner.   Pennsylvania's requirement that a patient be cirrhotic and "fac[ing] the imminent prospect of 'catastrophic' rupture and bleeding out of the esophageal varices," *id.* at *15, has never been part of the Minnesota DOC's treatment guidelines.   (Doc. 108 n.11 (discussing the factual differences between the protocol in *Abu-Jamal* and the DOC's guidelines).)[7]   The Pennsylvania case was decided after the implementation of the DOC's current guidelines ███████████████████████████████████████.   Nothing

---

[6] For a discussion of these medical concerns, *see* Doc. 108, Appx. ¶¶ D (ascites), N (esophageal varices), V (hepatic encephalopathy).

[7] Plaintiffs also cite cases that superficially discuss HCV.   (Doc. 141 at 61.)   None support Plaintiffs' argument that Dr. Paulson violated the Eighth Amendment, let alone he should have known that he was doing so.   *See Erickson v. Pardus*, 551 U.S. 89 (2007) (applying the unremarkable proposition that the district court must assume the allegations in a complaint to be true on Rule 12 motion); *Burke v. N.D. Dept. of Corr. & Rehab.*, 294 F.3d 1043 (8th Cir. 2002) (same); *Moore v. Duffy*, 255 F.3d 543 (8th Cir. 2001) (dismissing interlocutory appeal without analysis of the nature of claims or record evidence of inmates' AIDS and HCV infections).

in the Pennsylvania case would put a Minnesota prison medical director on notice that the DOC's HCV treatment guidelines were constitutionally infirm, because the protocols are entirely dissimilar.  This is especially true as the correctional medical community keeps pace with rapid medical developments in this field.

Once again, Plaintiffs rely entirely on the AASLD guidance, and they fail to address the demanding Eighth Amendment or qualified immunity legal standards established by the U.S. Supreme Court.  *Taylor v. Barkes*, ___ U.S. ___, 135 S. Ct. 2042, 2044–45 (2015) (holding prison official entitled to qualified immunity where no U.S. Supreme Court or Court of Appeals precedent "could itself clearly establish the federal right . . . alleged").  (*See also* Doc. 106 at 17–20, 27–28 (citing cases).) The AASLD guidance is not binding judicial authority.  Plaintiffs' novel argument that a group of physicians in a specialized practice organization can establish a standard of conduct for the purposes of overcoming qualified immunity on an Eighth Amendment claim must be rejected.

With respect to Larson, Plaintiffs have not cited a single case holding that a non-medical employee who "comments on replies and correspondence" or administers a contract, (Doc. 141 at 20–21), violates an inmate's Eighth Amendment rights by deferring to a licensed medical practitioner's judgment.  Plaintiffs again ignore the overwhelming authority holding that non-medical officials are entitled to qualified immunity and are affirmatively empowered to rely on the medical judgment of medical practitioners.  (*See* Doc. 106 at 28–29 (citing cases).)  *See also Wheatley v. Smith*, No. 12-cv-880 (DWF/AJB), 2014 WL 1207800, at *6 (D. Minn. 2014) (holding that

Larson was entitled to qualified immunity for her administrative role where she reviewed medical treatment grievances and relied on the judgment of medical personnel).

### C. The Eleventh Amendment Bars Claims For Monetary Damages Against The DOC And Its Officials In Their Official Capacities And Prospective Injunctive Relief Against The DOC.

As established in Defendants' initial memorandum, Plaintiffs cannot seek money damages against the DOC or its officials in their official capacities, nor seek injunctive relief against the DOC itself under Section 1983.   Plaintiffs appear to concede this fundamental premise of constitutional law.  (*See* Doc. 141 at 59–60.)

### D. Plaintiffs' ADA And Rehabilitation Act Claims Fail As A Matter Of Law.

Plaintiffs agree that medical treatment decisions cannot ground a cause of action under the ADA and Rehabilitation Act.  (Doc. 141 at 79.)  Distilled down, Plaintiffs' ADA and Rehabilitation Act claims attack Dr. Paulson's medical judgment in crafting the HCV treatment guidelines.   Dr. Paulson appropriately evaluates each HCV-infected inmate's medical condition.   Although the DOC has HCV treatment guidelines, Dr. Paulson makes a case-by-case assessment of each inmate's medical condition, considering the information provided by on-site medical practitioners.  Plaintiffs' attacks on medical judgment and treatment decisions are not actionable under either the ADA or Rehabilitation Act.  *See Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014) (per curiam) (dismissing ADA and Rehabilitation Act claims based on failure to diagnose and treat inmate's pernicious anemia).

Plaintiffs now attempt to bootstrap Section 1983 equal protection and due process claims to their ADA and Rehabilitation Act claims. (Doc. 141 at 78–80.) The Complaint and First Amended Complaint included equal protection claims, (Doc. 1 ¶¶ 160–85; Doc. 11 ¶¶ 164–176), but they were omitted from the Second Amended Complaint. (*See* Doc. 42.) The due process claim appears for the first time in Plaintiffs' memorandum. (*See* Doc 1; Doc. 11.) Plaintiffs may not introduce new claims and attempt to amend their complaint through argument in a brief. *See* Introduction, *supra*.

Plaintiffs purport to support these new constitutional claims by citing cases that have nothing to do with decisions to provide medication. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) (holding that inmate's ADA and Rehabilitation Act claim survived Rule 12 motion where the complaint alleged he was denied transfer to court-recommended early-release boot camp program based solely on his hypertension); *Dinkins*, 743 F.3d at 634–35 (holding paralyzed inmate could proceed on ADA and Rehabilitation Act claim where he alleged denial of reasonable modifications that had the effect of denying him mobility, adequate housing, and the ability to eat meals); *Randolph v. Rodgers*, 253 F.3d 342, 346–48 (8th Cir. 2001) (discussing hearing impaired inmate's allegation that prison's failure to provide sign language interpreter during disciplinary proceedings and medical appointments violated the ADA and Rehabilitation Act).

Plaintiffs also appear to raise a new claim about unidentified uninfected prisoners who have ADA and Rehabilitation Act claims because they live with inmates who are allegedly disabled by HCV. (Doc. 141 at 79–80.) This incomprehensible allegation is

not pled in Plaintiffs' Second Amended Complaint, (*see* Doc. 42 ¶¶ 175–184), and accordingly not properly before the Court, *see* Introduction, *supra*.

### E.   Plaintiffs Have Not Identified Any Evidence Of Causation Of Alleged Physical Injuries.

In their initial memorandum, Defendants demonstrated that even if Plaintiffs could maintain a claim under any of their legal theories, they cannot maintain a claim for damages premised on physical injury because there is no record evidence of such allegations.  (Doc. 106 at 35–37, n.7.)  Plaintiffs ignore this argument, and did not submit any record evidence to create a genuine dispute of material fact.  (*See generally* Doc. 141.)

### F.   Plaintiffs Cannot Establish That The DOC's HCV Screening Guidelines Are Deliberately Indifferent.

Plaintiffs' screening claims appear to be part of the putative class action against the Commissioner, in his official capacity, for prospective injunctive relief.  (Doc. 42 ¶¶ 146–52.)  These claims, brought by Unnamed Plaintiffs, fail as a matter of law. ███

████████████████ (*see* Paulson Dec. ¶ 4), he apparently intends to stand in for one of the Unnamed Plaintiffs, without amending his Second Amended Complaint or moving for substitution of parties.  (Doc. 141 at 70.)  Neither Ligons nor Michaelson have standing to bring such a claim because neither has alleged an injury-in-fact stemming from the DOC's screening policy. ████████████████████████

████████████████████████████████ Michaelson is not in prison, (Doc. 116 ¶ 16).

Independent of the justiciability problems with Unnamed Plaintiffs' screening claims, (*see* Doc. 106 at 38–39), neither the law or facts support an Eighth Amendment claim.  First, the record is undisputed that HCV transmission overwhelmingly occurs through infected blood passed by intravenous drug use and the use of contaminated needles for tattooing.  (Doc. 108 ¶¶ 9, 10; Doc. 122 at 5–8; Doc. 128 at 6–7.)  Plaintiffs have not put forth any competent evidence that HCV is transmitted in DOC prisons, nor do they contest that HCV is transmitted through percutaneous exposures such as in injection drug use or use of contaminated needles for tattooing.  It is undisputed that the DOC has policies in place prohibiting both activities.  (Doc. 116 ¶¶ 20, 21.)[8]  In over two decades as the DOC's Medical Director, Dr. Paulson has never heard of a single inmate or employee becoming infected with HCV as a result of an exposure in a DOC facility.  (Doc. 108 ¶ 10; Doc. 122-1 at 79–82.)

Plaintiffs make the unfounded assertion that Dr. Paulson's testimony on this point is disputed.  There is no admissible record evidence that either Ligons or Michaelson were exposed to or infected with HCV while in a DOC prison.  A positive HCV antibody test does not indicate how an individual was infected.  ██████████████████

---

[8] While the CDC lists incarceration as a risk factor for having HCV, Dr. Kendig's testimony is undisputed:  the "risk" inherent in incarceration is not due to transmission while incarcerated.  (Doc. 122 at 5-8; Doc. 108 ¶ 62.)  Rather, the "risk" arises from the fact that prisoners as a population have engaged in other behaviors (i.e., illicit drug use and unlicensed tattooing) at a higher rate than individuals who have never been incarcerated.  (*See* Doc. 122 at 5-8; Doc. 108 ¶ 62.)  Nor is there any allegation that the DOC or its officials have knowledge of rampant illicit drug use or tattooing in contravention of these policies.  The DOC does not have a duty under the Eighth Amendment to protect inmates from exposure to HCV from illicit activities that it does not know are occurring.

██████████████████████████████████████████████████████████████

███████████████ to support a claim that HCV transmission is rampant in DOC prisons in

2017.  *See Grant v. City of Blytheville*, 841 F.3d 767, 770 (8th Cir. 2016) (non-movant

"must substantiate his allegations with sufficient probative evidence [that] would permit a

finding in [his] favor on more than mere speculation, conjecture, or fantasy" in order to

withstand summary judgment) (emendations in original).  ████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████ (*See* Paulson Dec. ¶¶ 7–12.)[9]

        In addition to relying solely on their own inadmissible speculation, Plaintiffs'

claims also fail as a matter of law.  █████████████████████████████████

██████████████████████████████████████████████████████████████

█████████  There is no duty to test asymptomatic inmates for HCV, and there is no

threat of substantial harm given the fact that HCV is not readily communicable.

(*See* Doc. 106 at 39–40 (citing cases).)  In any event, the DOC's practice is consistent

with the CDC's recommendations for HCV screening in a correctional setting.  (Doc. 128

at 16; Doc. 122 at 5–8.)

---

[9] ████████████████████████████████████████████████
████████████████████████████████████ (Paulson Dec. ¶ 12.)
████████████████████████████████ (*Id.* ¶ 11; Doc. 108 ¶ 12
& Appx. ¶ T.)

## II.   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT FAILS FOR THE SAME REASONS DEFENDANTS' MOTION SHOULD BE GRANTED.

Plaintiffs move for partial summary judgment for liability under the Eighth Amendment for their treatment claims.  Plaintiffs' entire argument is premised on the allegation that the AASLD guidance sets the standard for cruel and unusual punishment under the Eighth Amendment.  Plaintiffs cite no case for this novel proposition.  For all of the reasons stated in Defendants' initial memorandum and *supra* Part I, Plaintiffs' motion should be denied and Defendants' motion should be granted.

## III.   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED.

Plaintiffs' motion for class certification is fatally flawed.  Each of the following independent reasons justifies rejecting it outright.  *First*, no Plaintiff has standing. *Second*, Plaintiffs' imprecise class definition fails to satisfy the numerosity requirement. *Third*, Plaintiffs' atypical claims do not fairly and adequately protect the interests of all proposed subclass members.  *Fourth*, resolution of Plaintiffs' claims by class action is not warranted because diagnosis and treatment of HCV is multifarious; common questions of law or fact do not predominate over individual questions and claims.  *Fifth*, Plaintiffs and their counsel do not adequately represent absent members of the proposed class.  And *sixth*, the relief sought is not uniformly applicable and therefore not suitable for

Plaintiffs' action under Rule 23(b)(2).[10]   Based on the following background facts and class certification rules, Plaintiffs' certification motion should be denied.

### A.   Background.

*Complaint.*   Plaintiffs filed their Complaint in May 2015.   (Doc. 1.)   The now-operative Second Amended Complaint was filed on October 29, 2015.   (Doc. 42.)   Under Rules 23(a) and 23(b)(2), Plaintiffs proposed the following "Class and sub-classes" of incarcerated persons:

> (a)   All persons (male and female) incarcerated in Minnesota Department of Corrections facilities with 12 weeks remaining on their sentence; who test HCV-positive and wish to participate in the 12-week oral-medication HCV treatment, equivalent to AASLD/IDSA Community Standard of Professional Medical Care Guidelines of June 29, 2015.

> (b)   All persons as in (a) who tested HCV[-]positive before entering MN DOC facilities, but who have not been screened by MN DOC, and are thus unaware of their HCV infection and cannot request the 12 week oral, non-interferon medication.

> (c)   All persons as in (a) who were not HCV-positive before entering facilities and became infected while housed in [MN] DOC facilities.

> (d)   All persons as in (a) who are not aware of their HCV status who are fearful of being exposed to HCV because of MN DOC policies and practices that make it impossible to know if any other inmates with whom they come in contact are HCV-positive, or not.

---

[10] Plaintiffs inconsistently frame the Rule 23(b) class type.   In their Second Amended Complaint, Plaintiffs plead a class under Rule 23(b)(2), but include a paragraph about Rule 23(b)(3).   (Doc. 42 ¶¶ 101-10.)   In their certification motion, Plaintiffs move for certification under Rule 23(b)(2).   (Doc. 137 at 3.)   In their unified memorandum, they rely primarily on Rule 23(b)(2) but also refer to Rule 23(b)(1).   (*See* Doc. 141 at 71–72, 77–78.)   Defendants respond specifically to the Rule 23(b)(2) formulation emphasized in each, but by doing so do not concede that Plaintiffs meet the requirements of Rule 23(b)(1) or (3).

(*Id.* ¶ 102.)   None of these categories include offenders living in the community. The proposed classes are at odds with how Plaintiffs framed their actual claims and requested relief. (*Compare id.* ¶ 102 *with* ¶¶ 146–52.) *See also infra* Part III.C.4.

    *Certification Motion.*   Nearly two years later, on April 26, 2017, Plaintiffs filed their motion for class certification.   (Doc. 137.)   Plaintiffs claimed that changed circumstances required the classes to be reordered and proposed the following newly-defined classes:

> **Subclass A:** "Ronaldo Ligons, Barry Michaelson, ███████, ███████ ████, John Roe and Jane Roe seek to represent the following class, pending amendment of the complaint:  that portion of the approximately 10,000 inmates at the nine Minnesota Department of Correction . . . facilities who have tested positive, or will test positive, for HCV . . . who have sufficient time remaining on their sentence to be cured of HCV using the AASLD/IDSA standard of care." (*Id.* at 2.)[11]

> **Subclass B:** "Plaintiffs Ronaldo Ligons[,] John Stiles and Jane Stiles [seek to represent] the estimated 50–80% of male and female inmates of MN DOC institutions who do not know their HCV status, or who are HCV-negative, and who wish to avoid being infected or re-infected by other HCV-positive prisoners." (*Id.*)

> **Subclass C:**   "Barry Michaelson[,] John Miles and Jane Miles[] seek to represent[] those inmates who were known to be HCV-infected on the date this suit was filed and who are now on supervised release." (*Id.*)

---

[11] In the same document, Plaintiffs alternately describe this subclass as "all persons who are currently incarcerated in a Minnesota Department of Corrections facility . . . who are HCV infected who have sufficient time remaining on their sentence to benefit from being cured of HCV infection by the AASLD/IDSA medical standard of care." (Doc. 137 at 1.) This is materially different from the description on Page 2 of the certification motion because, as discussed *infra*, a positive HCV antibody test does not necessarily indicate active HCV infection.

However, Plaintiffs have not moved to amend the operative complaint, even though their description of Subclass A recognizes amendment is required.

*Class Discovery.*  Defendants engaged in discovery based on the claims pled in the Second Amended Complaint.  Defendants have not had an opportunity to conduct class discovery regarding the new, reframed putative subclasses stated in Plaintiffs' certification motion.  For example, Plaintiffs identify ██████████ and ██████████ as putative class representatives.  These individuals were not identified to Defendants in discovery and have not been named as parties to this action.  (*See* Doc. 1; Doc. 11; Doc. 42; Plf. Init. Disc., attached to Tweeten Aff. as Ex. B; Plf. Interr. Ans., attached to Tweeten Aff. as Ex. C; Doc. 142-9 at 25–26; Doc. 142-10 at 135:18–148:7.)  Plaintiffs have not even put medical evidence into the record on either of these new putative class representatives.  Defendants have not had any opportunity to conduct necessary and appropriate discovery to adduce any facts material to these individuals' claims, standing to sue, suitability to serve as class representatives, or exhaustion of administrative remedies under the PLRA.[12]

### B.    The Court Must Conduct A Rigorous Analysis Of Plaintiffs' Claims Under Rule 23 To Test Whether Plaintiffs Have Met Their Burden.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*,

---

[12] Plaintiffs do not specify the procedural mechanism by which claims by ██████ and ██████ could be brought.  Neither have been joined.  Neither have moved to intervene. Neither have been disclosed in discovery.  Their relationship with Plaintiffs' counsel is undisclosed and unknown.

564 U.S. 338, 348 (2011) (citations and quotation marks omitted). Plaintiffs bear the burden of demonstrating that each element of Rule 23 is satisfied. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158–61 (1982); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). This Court must undertake a "rigorous analysis" to determine whether Plaintiffs have met their burden of proof. *See Falcon*, 457 U.S. at 161.

Under Rule 23(a), plaintiffs must prove that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims and defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In addition to proving each element of Rule 23(a), Plaintiffs must prove under Rule 23(b)(2) that the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Each subclass must independently satisfy the requirements of Rule 23. *See* Fed. R. Civ. P. 23(c)(5); *Roby v. St. Louis Sw. Ry. Co.*, 775 F.2d 959, 961 (8th Cir. 1985).

Rule 23 is not a pleading standard. *Dukes*, 564 U.S. at 350. The moving party "must affirmatively demonstrate his compliance" with all of the class certification requirements under Rule 23. *Id.* at 350. A court's "rigorous analysis" must determine that plaintiffs' claims "*in fact*" comply with Rule 23. *Id.* at 350–51 (emphasis in original). After this rigorous analysis, a court may only certify a class if it is able to produce "an adequate statement of the basic facts [indicating] that each requirement of

the rule is fulfilled." *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612 (8th Cir. 2017) (citation and quotation marks omitted).

### C. Numerous Defects Defeat Plaintiffs' Motion For Class Certification.

#### 1. Plaintiffs Do Not Have Standing To Seek Relief On Behalf Of The Class.

No Plaintiff or representative party has standing to represent either the general class of individuals pled in the Second Amended Complaint or the attempt to redefine that class as Subclass A in the certification motion. "A class representative must have standing to assert claims on his or her own behalf in order to have standing to assert claims as a class representative." *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 863 (D. Minn. 2012); *see also E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (citation and quotation marks omitted). The "irreducible constitutional minimum of standing" requires that Plaintiffs/class representatives have suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs must establish "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent[.]" *Id.* (citations and quotation marks omitted).

█████████████████████████████████████████████

████████████████████████████ Michaelson is no longer incarcerated. (Doc. 116

¶ 16.) ███████████████████████████████████████

███   (Paulson Dec. ¶ 4.)  The only representative *parties* lack standing to represent the class as pled and as reframed as Subclass A.

Plaintiffs attempt to skirt this requirement by naming two new individuals in their certification motion, ███ and ███.   These individuals cannot be representative *parties* because they are not parties to this action.   The text of Rule 23(a) plainly limits the right to pursue a class action to "representative parties."   Because Plaintiffs may not pursue an action on behalf of purported, but not joined, class representatives, certification should be denied.  Plaintiffs cannot attempt to add ███ and ███ as parties and class representatives solely by mentioning them in a brief.  *See* Introduction, *supra*.

### 2.   Plaintiffs' Overbroad Class Includes Inmates Who Do Not Have Claims.

The class pled and reframed as Subclass A is overbroad.   "A class must . . . be defined in such a way that anyone within it would have standing."  *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (citation and quotation marks omitted). Many of the "HCV-positive" inmates included in Subclass A do not have active HCV infection that would benefit from the injunctive relief Plaintiffs seek, because they have naturally cleared the infection or have been successfully treated.   Plaintiffs do not dispute that a positive HCV antibody test is not indicative of active or chronic infection. (*See* Doc. 108 ¶¶ 25–26.)   Inclusion of "HCV-positive" inmates without active HCV infection in Plaintiffs' Subclass A mandates denial of certification.   These inmates do not have "injury in fact . . . that is fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision."  *Avritt*, 615 F.3d at 1034.  They, ███

███ have no need for DAAs and no Eighth Amendment claim.  Plaintiffs' class "cannot be certified [because] it contains members who lack standing."  *Id.*

### 3.    Plaintiffs Do Not Satisfy The Requirements Of Rule 23(a).

Plaintiffs bear the burden of demonstrating that each element of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation—is satisfied.  *Falcon*, 457 U.S. at 158–61.  Certification must be denied because Plaintiffs fail to meet the requirements.[13]

### a.    Plaintiffs' Imprecise Class Definition Fails The Numerosity Requirement.

Numerosity requires that the class be so numerous that joinder of all members is "impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs' imprecise and overbroad class definition prevents them from offering sufficient proof of numerosity.  Plaintiffs cannot meet their burden to demonstrate the size of the purported class because the class definition is not precise.

Rule 23 implicitly requires "the existence of a precisely defined class."  *Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D. Minn. 2012) (citation and quotation marks omitted); *see also Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 495 (7th Cir. 2012) (holding that the class "lacks the definiteness required for class certification" when "there is no way to know or readily ascertain who is a member of the class").

---

[13] Plaintiffs' suggestion in the definition of Subclass A that future amendment will save their class action allegations is incorrect.  Any amendment would be futile because the legal requirements of Rule 23(a) cannot be met.

There is no way to know or readily ascertain who is a member of the class because Plaintiffs imprecisely define class membership.   In the Second Amended Complaint, Plaintiffs seek to represent all "HCV-positive" individuals with 12 weeks or more remaining on their sentence, so that they may be treated pursuant to the AASLD guidance.   (Doc. 42 ¶ 102(a).)   Plaintiffs also refer to these individuals as "HCV-positive" in the "sub-classes" pled.   (*Id.* ¶¶ 102(b)–(d).)   When Plaintiffs refer to "HCV-positive" individuals, it is unclear whether they intend to sue on behalf of all individuals who test positive for the HCV antibody, or active or chronically infected individuals. A positive HCV antibody test is not indicative of active or chronic infection. (*See* Doc. 108 ¶¶ 25–26.)   The focus of the Second Amended Complaint is on individuals who allegedly need DAAs, not individuals who have tested positive for the HCV antibody, who may have already been treated or naturally cleared the infection. If certified, this defect would produce absurd results because the relief sought would not match the putative subclasses.   (*Compare* Doc. 42 at 58–59 *with* Doc. 108 ¶ 102.) For example, Plaintiffs' demand of DAA treatment for all "HCV-positive" inmates would unnecessarily provide DAA treatment to inmates who had an active HCV infection in the past but have successfully treated or naturally cleared it.

Despite Plaintiffs' attempts to shift the definition of the putative subclasses, other imprecise language remains and disqualifies Plaintiffs' certification motion. (*See* Doc. 137.)   The third subclass pled in the Second Amended Complaint appears to be totally rewritten as Subclass B, and phrased in terms of fear of HCV infection generally, rather than a specific fear based on inability to identify other "HCV-positive" inmates.

(*Compare* Doc. 42 ¶ 102(d) *with* Doc. 137 at 2.)   The distinction between individuals who became infected with HCV prior to incarceration and individuals who were infected while incarcerated is erased.   (*Compare* Doc. 42 ¶¶ 102(b)–(c) *with* Doc. 137 at 2.) Plaintiffs' motion also creates an entirely new and unpled Subclass C, which includes individuals who were released from prison, are on supervised release, and are not receiving medical treatment from the DOC.   (*Id.*)[14]   By abandoning any reference to the length of incarceration remaining, Plaintiffs would nonsensically have the DOC provide DAA therapy to all "HCV-positive" individuals who may be in prison for only one day or one week.   Plaintiffs admit and the AASLD guidance specifies that successful DAA therapy requires at least eight weeks of treatment, and follow-up occurs over an additional twelve weeks. (Doc. 141 at 40, 63.)

As Plaintiffs' proposed class shifts from pleading to pleading, brief to brief, Plaintiffs still miss the mark and fail to precisely define the individuals on whose behalf they bring this lawsuit.

### b.   Plaintiffs Cannot Demonstrate Typicality.

No case of HCV is "typical" and susceptible to uniform diagnosis and treatment. Rule 23(a)(3) requires plaintiffs seeking class certification to show that "the claims or

---

[14] Plaintiffs do not even attempt to satisfy their burden of providing record evidence of the number of individuals who would fall into this subclass.   The definition of this subclass is also flawed because it does not take into account individuals who have received DAAs since leaving prison.

defenses of the representative parties are typical of the claims or defenses of the class."[15]

Plaintiffs cannot meet their burden.

The prerequisite of typicality is not met because each claim depends on the individualized details of an inmate's medical history. Where class representatives are not typical if they

> [can] not advance the interests of the entire . . . class. Each claim, after all, depend[s] on each individual's particular [medical history] and these . . . var[y] from person to person. A named plaintiff who proved his own claim would not necessarily have proved anybody else's claim.

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (holding that district court abused of discretion in certifying class where facts varied from person to person). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.* Plaintiffs' claims are not typical.

*First*, the named Plaintiffs' claims are moot.

*Second*, each inmate with active HCV infection has unique diagnostic characteristics, (Doc. 108 ¶¶ 64–68), that requires individual monitoring, (*id.* ¶¶ 70–80), and exercise of individual medical judgment to develop a "patient-specific treatment" plan, (*id.* ¶ 83). Moreover, each case has unique symptoms and progression. (*Id.* ¶ 72.) Even the AASLD guidance recognizes this. (*See* Doc. 141 at 29 ("Fibrosis progression

---

[15] Plaintiffs' commonality contentions cannot save their typicality analysis. "The presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006) (citing *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1004–05 (8th Cir. 2004) (class certification inappropriate where liability "remains a case-by-case determination"); *see also Dukes*, 564 U.S. at 350 (liability questions must be answered as to "each one of the claims in one stroke.").

varies markedly between individuals . . . . Others may never develop substantial liver fibrosis despite longstanding infection.").)

*Finally,* proof of every claim at issue rests on whether the HCV treatment was constitutionally adequate under the Eighth Amendment.  This query turns on the unique medical needs of each putative class representative or member.  *See, e.g.*, *Bender v. Regier*, 385 F.3d 1133, 1135 (8th Cir. 2004) (selection of HCV patients for interferon treatment "highly individualized" and "depend[ent] on many factors"); *Villarreal v. Holland*, No. 14-9-DLB, 2016 WL 208310, at *9 (E.D. Ky. Jan. 10, 2016) (treatment for HCV is individualized, and "[t]here is no uniform rule applicable to all cases"); *Gillentine v. Corr. Med. Servs. Inc.*, No. 5:11-cv-02694-RDP-TMP, 2016 WL 7325708, at *8 (N.D. Ala. Dec. 16, 2016) (Eighth Amendment claim for denial of antiviral medication to treat HCV "highly individualized" medical determination) (citation omitted).

The highly individualized factual background for each putative class member's claims defeats Plaintiffs' typicality.  The DOC treats inmates with DAAs when they have a serious medical need.  (Doc. 108 ¶¶ 83–85; Paulson Dec. ¶¶ 13–15.)  Proof of the purported violation of each inmate's Eighth Amendment rights is independent, requiring evaluation of a unique set of operative facts including diagnosis, monitoring, and

treatment.[16]  A named plaintiff is atypical if the facts vary too much from the class

claims, and the named plaintiff cannot demonstrate standing[17] or that he was harmed at

all, or he cannot prove the claims of other class members operating under different sets of

facts.  *See, e.g., Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 187–89 (E.D. Pa.

2007) (typicality not met and certification denied because class members had different

medical histories and took different doses of Paxil); *Doe v. Unified Sch. Dist. 259*,

240 F.R.D. 673, 680 (D. Kan. 2007) (typicality not met and certification denied where

"harassment allegations took place in different settings, with different students and

involving other relationships").

### c.     Common Questions Of Law Or Fact Do Not Predominate Over Individual Questions.

To establish commonality, a plaintiff must "demonstrate that the class members

have suffered the same injury," *Dukes*, 564 U.S. at 349–50 (citation and quotation marks

omitted).  The commonality requirement "tends to merge" with typicality because "[b]oth

serve as guideposts for determining whether under the particular circumstances the

maintenance of a class action is economical and whether the named plaintiff's claim and

the class claims are so interrelated that the interests of the class members will be fairly

---

[16] Just as there is no "typical" case of active HCV infection, as theorized in Subclasses A and C, there is likewise no "typical" risk profile for contracting HCV, as theorized in Subclass B.  (Doc. 108 ¶¶ 9–11.)  And every putative subclass will have individuals with no constitutional claim because they have or will clear the infection without treatment.  (*Id.* ¶ 13.)

[17] *See supra* Part I.C.1.  Without standing, the "named representative[s] do[] not have the requisite typicality to raise the same claim on behalf of a class."  *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

and adequately protected in their absence."  *Id.* at 350 n.5 (quoting *Falcon*, 457 U.S. at 157–58 n.13).  Even so, commonality is a requirement with its own essential character: every class member's claim must depend upon a common legal contention that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

> What matters to class certification . . . is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* (citation and quotation marks omitted, emphasis in original).  *Dukes* accordingly sets a high burden of proof for Plaintiffs' commonality claims.

The *answers* to the questions posed by Plaintiffs' Second Amended Complaint do not support certification.  For example, even under Plaintiffs' proposal that a community standard of care is required, the standard only takes on a constitutional dimension when an inmate's medical need is sufficiently serious.  *See Estelle*, 429 U.S. at 104–05.  Each case is unique.  Some individuals clear HCV without any treatment or any negative effect on their health.  Some individuals carry a latent infection for many years without any symptoms or medical effects.  Some individuals will develop chronic infection and serious medical need.

The DOC monitors individuals' conditions and administers treatment before serious medical consequences are realized.  Whether the DOC's treatment of an individual inmate rises to the level of cruel and unusual punishment would depend on the

26

unique facts of each case.  Dissimilarities among members of each proposed subclass short-circuit the generation of common *answers* required under Rule 23(a)(2).

Commonality is especially important where, as here, a Rule 23(b)(2) class is pled because unnamed members are bound by the action without the opportunity to opt out. *See In re St. Jude Med., Inc.*, 425 F.3d at 1121–22 (stating that "even greater cohesiveness generally is required [for a Rule 23(b)(2) class] than in a Rule 23(b)(3) class").  "[T]he cohesiveness requirement of Rule 23(b)(2) is more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3)."  *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016).  "A suit could become unmanageable and little value would be gained in proceeding as a class action . . . if significant individual issues were to arise consistently . . . .  Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries."  *In re St. Jude Med., Inc.*, 425 F.3d at 1122–23 (citation and quotation marks omitted).

### d.    Plaintiffs Do Not Satisfy The Adequacy Of Representation Requirement.

"Rule 23(a)(4) asks whether the class representatives will vigorously prosecute the interests of the class."  *In re Workers' Comp.*, 130 F.R.D. 99, 107 (D. Minn. 1990).  "In considering . . . adequacy of representation, under 23(a)(4), the primary criterion is the forthrightness and vigor with which the representative parties can be expected to assert and defend the interests of the members of the class."  *Buchholtz v. Swift & Co.*, 62 F.R.D. 581, 597 (D. Minn. 1973) (citation and quotation marks omitted).  Adequacy also requires competency of class counsel.  *Amchem Prods., Inc. v. Windsor*,

521 U.S. 591, 626 n.20 (1997).  Because Plaintiffs and their counsel have not exhibited diligence in this matter or incentive to litigate the case on behalf of others who are similarly situated, they cannot meet the requirements of Rule 23(a)(4), and certification should be denied.

*First*, Plaintiffs do not fairly and adequately represent the class because they have not diligently pursued the interests of the class.  Rule 23(c)(1)(A) requires adjudication of class issues at "an early practicable time . . . ."  "A named plaintiff who lacks the desire to 'vigorously pursue' the interests of potential class members is not a fair and adequate representative of the class."  *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) (citation omitted).  Significant delay warrants denial of certification for lack of diligence.  *See Rattray v. Woodbury Cty.*, 614 F.3d 831, 836 (8th Cir. 2010) (six month delay between filing amended complaint and class certification motion sufficient basis to deny certification).  "[F]ailure to move to certify with alacrity undermines confidence in the zeal with which [counsel] would represent the interests of the absent class members."  *Id.*

Plaintiffs and their counsel have not acted vigorously or diligently to pursue this putative class action.  By the time their certification motion is heard on July 26, 2017, the case will have been pending for well over two years.  They waited this long, despite knowing:  the nature of their claims since at least May 1, 2015, when they filed the lawsuit, and opinions of two of their three experts since before the Rule 16 conference held in October 2015.  (*See* Docs. 36, 37.)  Plaintiffs' certification motion comes nearly

28

18 months after the filing of the Second Amended Complaint. (*Compare* Doc. 42 *with* Doc. 137.)

This delay is plainly indicative that Plaintiffs' and counsel are inadequate. As in *Rattray*, the deadline to add parties has expired. (*See* Doc. 43 at 3.) And the delay by Plaintiffs and counsel here is markedly longer than the delay the district court cited as grounds to deny certification in *Rattray*. *See* 614 F.3d at 836; *Rattray v. Woodbury Cty.*, 253 F.R.D. 444, 456 (N.D. Iowa 2008) (Bennett, J.). There, the district court noted that the six month delay between filing of a complaint stating a class claim to filing a motion to certify was "disturbing[] because counsel with any experience litigating class actions could reasonably be expected to assess pertinent evidence and to file a motion to certify a class in much less" time. *Id.* The prejudice attendant to delay—to named Plaintiffs, absent class members, and Defendants—justifies denial of Plaintiffs' certification motion. *See id.* at 456–57. This delay is inexcusable and particularly troubling in light of Plaintiffs' allegations that ███ HCV infection is a "life or death" situation with significant, allegedly debilitating symptoms.[18] (*See, e.g.*, Doc. 141 at 21–25.)

This deficiency and inadequacy is underscored by other aspects of performance of Plaintiffs' counsel in this action. Counsel's scattershot attempt to define a class, as discussed *supra* Part III.A., is plain evidence of an unsatisfactory grasp of Rule 23 and an inability to articulate basic facts about HCV. Plaintiffs' counsel represent that they "are qualified and experienced in conducting class action prisoners' rights litigation," yet do

---

[18] Delay is also an independent basis to deny Plaintiffs' Motion for Preliminary Injunction. *See infra* Part IV.B.2.b.

not list a single class action prisoners' rights litigation in which they participated, let alone where they were appointed class counsel. (Doc. 141 at 75.) Counsel then qualify this representation, admitting that they "have limited experience in class litigation." (*Id.* at 76.) The limits of their experience is evidenced in their struggle to identify a class. Plaintiffs and their counsel have not "adequately demonstrated their ability to competently pursue this action." *Jenson v. Cont'l Fin. Corp.*, 404 F. Supp. 806, 812 (D. Minn. 1975). The Court should not certify a class action on the representation that someone with enough experience might come along. (Doc. 141 at 75.)

*Second*, Plaintiffs are not adequate class representatives because their interests are not aligned with the putative classes they purport to represent. The Court should inquire whether named plaintiffs' claims are "sufficiently parallel to the interests of the other class members to assure a vigorous representation of the class." *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 831 (8th Cir. 1977); *see also Amchem Prods., Inc.*, 521 U.S. at 625 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.").

As discussed *supra*, claims of Ligons and Michaelson are moot. ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998). "The problem of actual and potential conflicts is a matter of particular concern in

a case [seeking certification under Fed. R. Civ. P. 23(b)(2)]," like this one, "which does not allow class members to opt out of the class action." *Ret. Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993).

Plaintiffs' interests diverge from those of the class because ████████████ ████████████████████ Michaelson is no longer incarcerated. Neither is motivated to pursue claims on behalf of individuals with active HCV infection who are currently incarcerated. Absent incentive to litigate this action on behalf of the classes of individuals they purport to represent, Plaintiffs certification motion must be denied.

### 4.     Plaintiffs Do Not Meet the Requirements of Rule 23(b)(2).

Plaintiffs also fail to meet their burden under Rule 23(b)(2) because the injunctive and declaratory relief they seek is not traceable to the proposed subclasses. A Rule 23(b)(2) class may proceed on the theory that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Accordingly, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (citation and quotation marks omitted). Plaintiffs fail to meet this rule for two independent reasons.

*First*, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class[,]" *id.*, meaning that "the relief sought must perforce affect the entire class at once." *Id.* at 361–62. Plaintiffs

cannot meet this requirement.   The class-wide relief sought in Plaintiffs' Second Amended Complaint is incongruous with the classes presented therein and in Plaintiffs' certification motion.   Many individuals naturally clear HCV infection without intervention.   The relief Plaintiffs seek would require DOC to provide a remedy to class members with no injury.[19]   The mandatory testing Plaintiffs seek likewise has cross-cutting effects, especially for inmates who do not consent to have their blood drawn to test for or monitor HCV infection.   Plaintiffs' inability to request or fashion a remedy that provides relief to each member of each subclass is contrary to Rule 23(b)(2) and grounds to deny certification.

*Second*, Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.* at 360.   As discussed in Parts I.C.3.b. and I.C.3.c., *supra*, the highly individualized risk factors, diagnosis, monitoring, symptomatology, and treatment of HCV would entitle each putative class member to an individualized remedies inquiry. For instance, the Court would have to conduct a separate inquiry into which class members are entitled to DAA drug therapy, and which are not.   ███████████████

██████████████████████████████████████████████████

███████████████████████████████   The Court would have to do this mindful of the potential contraindications of each prescription and adjusting other

---

[19] Plaintiffs also improperly seek to enjoin past practices of the DOC.   The DOC no longer requires chemical dependency treatment.   (*Compare* Doc. 42 at 58 *with* Doc. 108 at 14 n.9.)

courses of medical treatment accordingly.  The Court would also have to determine the appropriate dosage and duration for treatment, and identify any medical comorbidities that could impact treatment.  Each individual in each putative class has an individualized harm or risk of harm that requires differing analyses of the declaratory and injunctive relief to which they are allegedly entitled.  The remedies sought by Plaintiffs are not compatible with the classes of individuals they seek to represent.  Certification of their suit as a class action must accordingly be denied.

> **5.    In the Alternative, Certification Should Be Denied Because Defendants Have Not Been Afforded A Full And Fair Opportunity To Oppose Plaintiffs' Motion.**

In the alternative, Plaintiffs' certification motion should be denied because Defendants have not had a full and fair opportunity to conduct discovery and litigate the classes alleged in the motion.  Certification of these moving target allegations offends due process and is contrary to law.

Plaintiffs admit that their certification motion is expressly contingent upon some undisclosed future complaint.  (*See* Doc. 137 at 1–2.)  The reframed class action allegations in Plaintiffs' motion are wholly different from the classes pled in Plaintiffs' Second Amended Complaint.  (*Compare* Doc. 42 at 31 *with* Doc. 137 at 1–2.)  Accordingly, Plaintiffs' Second Amended Complaint cannot conclusively show that the classes, as currently defined, should be certified by this Court.  Where, as here, Plaintiffs' operative complaint does not conclusively show certification is warranted, Defendants must be afforded a full and fair opportunity to contest class certification, including the opportunity to conduct class discovery.  *See Walker v. World Tire Corp., Inc.*, 563 F.2d

918, 921 (8th Cir. 1977) ("Where . . . the pleadings themselves do not conclusively show whether the Rule 23 requirements are met, the parties must be afforded the opportunity to discover and present documentary evidence on the issue."); *see also* Introduction, *supra*.

Defendants have not had any opportunity to assemble a fact record about new Subclasses B and C, through discovery and preparation of expert witnesses.  From the outset, this case has been about HCV treatment for inmates in prison.  Plaintiffs now improperly shift their claims to seek relief for offenders who are living in the community on supervised release.  Defendants have had no opportunity to discover facts regarding the suitability of Ligons and Michaelson to serve as class representatives of Subclasses B and C, respectively, as contemplated in Plaintiffs' certification motion.  Additionally, and perhaps most importantly, Defendants have not been given any opportunity to discover any facts regarding claims by new putative class representatives ██████ and ██████ despite Plaintiffs' disclosure obligations and Defendants past inquiries about the existence of other putative class representatives.  (*See supra* Part III.A.)  Defendants have been given no opportunity to examine ██████ and ██████ claims, standing to sue, or suitability to serve as representatives of Subclass A.  Plaintiffs' certification motion must, therefore, be denied.

## IV.   PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED.

Plaintiffs request that the Court issue an injunction

enjoining the continued operation of the Department of Corrections' current Hepatitis C treatment protocol, and requiring Defendants to adopt a testing and treatment protocol that implements the American Association for the Study of Liver Disease (AASLD)/Infectious Disease Society of America (IDSA) Guidelines in Minnesota Department of Corrections (MN DOC)

> facilities to provide direct acting anti-viral (DAA) drugs to all HCV
> positive inmates and prevent the transmission of HCV to inmates who are
> not yet HCV positive.

(Doc. 136.) Plaintiffs' requested relief is outside the bounds of the Court's authority under the PLRA, and is so vague and overbroad that the motion fails to provide any guidance to the Court on what Plaintiffs want, let alone the basis on which to consider or implement their request. Because Plaintiffs fail to meet their burden to establish entitlement to relief their motion should be denied.

### A.    The Requested Relief Does Not Impact Ligons Or Michaelson.

There are two basic components of Plaintiffs' requested relief. First, that the Court order the DOC to "adopt a testing and treatment protocol that implements" the AASLD guidance. (Doc. 136.) Second, that the Court order the DOC to "prevent the transmission of HCV to inmates who are not yet HCV positive."[20] (*Id.*) Neither order would impact Ligons or Michaelson. ██████████████████████ Michaelson is not in prison.

### B.    Plaintiffs Cannot Meet Their Burden For Relief On Their Ill-Defined Class Claims.

There are two Plaintiffs, neither of whom can benefit from the relief requested. Their request for injunctive relief applies exclusively to an ill-defined putative class that has been defined in numerous different ways over the course of this litigation. (*See supra*

---

[20] Not all individuals who are "positive" for HCV need treatment, since they can test positive for the HCV antibody, but not have an active infection. ████████████

Part III.A.)  Plaintiffs' inability to adequately define any class of inmates carries forward into their analysis on the preliminary injunction motion.

### 1.      The PLRA Bars Plaintiffs' Overbroad Request For Relief.

As explained in Defendants' initial memorandum, the PLRA imposes limits on the scope of preliminary and permanent injunctive relief.  (Doc. 106 at 33–34.)  *See also* 18 U.S.C. § 3626(a)(1).  The law is clear.  Prospective relief may only be granted where it is: (1) narrowly drawn; (2) extends no further than necessary to correct the violation of a federal right; and (3) is the least intrusive means necessary to correct such violation. 18 U.S.C. § 3626(a)(1)(A).  Plaintiffs' requested relief fails to meet this compulsory standard, and their motion should be denied.

The PLRA requires that injunctive relief be "narrowly drawn, extend[ing] no further than necessary to correct the violation" of the Eighth Amendment.  18 U.S.C. § 3626(a)(1)(A).  "Unless at least one named plaintiff can demonstrate an actual or imminent injury in fact stemming from the deliberate indifference of prison officials, we have no basis on which to consider either system wide problems or on which to grant system wide relief."  *Dulany v. Carnahan*, 132 F.3d 1234, 1244 (8th Cir. 1997) (citation omitted).  "[T]he plaintiffs must be able to identify a known and unreasonable risk from which serious damage to their future health is imminent in order to maintain suit."  *Id*. The highly individualized inquiry required in cases of HCV is not susceptible to blanket class-wide injunctive relief.

a.      **Treatment.**

Plaintiffs' identification of two new individuals in their April 26, 2017 memorandum is insufficient to overcome their burden of identifying someone with standing and an injury-in-fact to request an injunction.   (*See* Introduction, *supra.*) Neither of their names appear in the Amended Complaint, Plaintiffs' Initial Disclosures, discovery responses, or Plaintiffs' depositions, even though Defendants specifically asked Plaintiffs to identify class members.   (*See supra* Part III.A.)   ███   or   ███ medical records are not in the record.

Beyond the Article III standing concerns, Plaintiffs' ill-defined request to "adopt a testing and treatment protocol that implements the . . . AASLD . . . Guidelines" at the DOC is not susceptible to injunctive relief.  Plaintiffs seek to have the AASLD guidance supplant the individualized assessment performed by the DOC and Centurion medical providers.  The AASLD guidance is not designed to strip physicians of their discretion. (Paulson Dec. ¶ 17; *see also* AASLD Disclaimer, attached to the Paulson Dec. as Ex. P.) In fact, the AASLD guidance explicitly disclaims itself as a one-size-fits-all manual for treatment of HCV, stating that "[n]othing contained at HCVguidelines.org," where the guidance is published, is meant to "suggest a course of treatment for a particular individual." (*Id.*)

Plaintiffs' assertion that DAA therapy is simply one pill a day for 84 days, (Doc. 141 at 15, n.2), is baseless. Treating patients with DAAs demands a rigorous and multifaceted medical review.  The current iteration of the AASLD guidance is a 234-page "living document" identifying contraindications to DAA therapy and matrices of

treatment regimens contingent on each patient's individual medical history.[21]  The regimen includes pretreatment testing, analysis of the patient's pre-existing medical conditions, identifying contraindications among the patient's existing medications, reassessing treatment of other conditions, and obtaining the patient's informed consent to treatment.[22]  (Doc. 108 ¶¶ 91–98; Paulson Dec. ¶ 20.)

Plaintiffs' requested relief asks the Court to conceptualize a preliminary, court-ordered remedy through which:

- All HCV-infected inmates currently in prison would be identified;[23]

- Among those inmates, all HCV-infected inmates with 12 or more weeks remaining on their confinement would be identified;

- Each inmate's medical condition and history would be assessed to determine whether there are any contraindications to treatment;

- Each inmate would have to receive and have reviewed pretreatment lab testing, including a complete blood count, HCV quantitative viral load, basic metabolic panel, liver profile, HIV serology, international normalized ratio (INR), alpha-fetoprotein test, a pregnancy test for female inmates, a genotype test, and NS5A resistance testing;

- For those not identified to have a contraindication to treatment, a course of treatment would be identified (including identifying which DAA from among numerous FDA-approved DAAs should be prescribed based on genotype and

---

[21] *See* AASLD Recommendations for Testing, Managing, and Treating Hepatitis C, available at http://hcvguidelines.org/sites/default/files/HCV-Guidance_April_2017_a.pdf (Apr. 12, 2017) (last accessed May 24, 2017).

[22] Plaintiffs say nothing of the individuals who do not want treatment for HCV, which is their right.  *See Pabon v. Wright*, 459 F.3d 241 (2d Cir. 2006) (discussing inmate's right to refuse HCV treatment). (*See also* Paulson Dec. ¶ 20.)  Plaintiffs have not made any argument regarding how the DOC would force inmates to receive HCV treatment against their will.

[23] Plaintiffs apparently also request that the Court track down all former inmates too. (Doc. 141 at 71.)

history of prior treatment and other factors; determining of whether any medications need to supplement the DAA; and identifying the appropriate length of treatment);

- Someone would complete a review of each inmate's prescription and over-the-counter medications to determine whether adjustments need to be made;

- Someone would need to perform testing throughout the course of treatment to determine whether the inmate is having a virologic response to DAAs; and

- Someone would have to assess the results of the testing to determine whether the treatment should be discontinued.

(Doc. 108 ¶¶ 92–98.)  The proposed process above is not even exhaustive, and says nothing about what happens with inmates who do not consent to treatment, experience side effects, or experience a treatment failure.

There would be no end to this process or the Court's involvement.  Over 10,000 inmates receive medical care through the DOC at any given time, and 17,000 unique individuals are incarcerated during a calendar year.  (Doc. 115 ¶ 4.)  The constant churn of inmates in a system having an average sentence of 45 months means that the Court would be enmeshed in administration of the DOC's HCV treatment for the foreseeable future.

With respect to the "testing" portion of their request for relief, Plaintiffs do not even indicate what portion of the AASLD guidance they think applies, let alone what they want the Court to order the DOC to do.  Again, Plaintiffs say nothing of inmates who refuse to have their blood tested.[24]  (*See* Paulson Dec. ¶ 20.)  Plaintiffs also leave

---

[24] Does someone get a court order to force the test, and if so, what is the basis when there is no evidence that HCV presents any danger to any other inmate?

unresolved how the intake medical process will need to be changed, or how the process is handled within Minnesota's most secure facilities.

### b. Prevention.

Plaintiffs' request that the Court order the DOC to "prevent the transmission of HCV to inmates who are not yet HCV positive" is incomprehensible and should be denied. *First*, the request supposes a problem that does not exist. (*See supra* Part I.F.) *Second*, it is not clear what Plaintiffs want the Court to order the DOC to do. To the extent that the request is duplicative of their request that the DOC treat every inmate with HCV, it should be denied as discussed above.

To the extent that the request means something other than treatment with DAAs, it violates the requirement that relief be "narrowly drawn." 18 U.S.C. § 3626(a)(1)(A); *see also Hines*, 547 F.3d at 921–22 (holding that injunctive relief that is not "the least intrusive means" violates the mandates of the PLRA). Requesting that the Court to somehow "prevent" HCV transmission, absent any evidence of transmission within the DOC, could mean any number of things. Does it mean more stringent enforcement of disciplinary rules against injection drug use or tattooing? There is no evidence that any individual has been infected with HCV by engaging in these activities, let alone that such infection was causally connected to the DOC's enforcement of policy. Does it mean forced isolation of any inmate who refuses HCV treatment? Plaintiffs do not identify any basis to do so. Does it mean that the DOC violates the Eighth Amendment any time an inmate or an employee with an active HCV infection steps foot inside of a prison?

Plaintiffs' ambiguous request for injunctive relief is unsupported, ill-defined, and must be denied.

> ### 2.     Plaintiffs Cannot Satisfy The Rigorous Standard To Obtain A Preliminary Injunction.

When deciding a motion for interim injunctive relief, a court must consider: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Plaintiffs have not and cannot meet their burden.

"A preliminary injunction is an extraordinary remedy, and the party seeking the injunction bears the burden of establishing the four *Dataphase* factors." *J.K. ex rel. Kaplan v. Minneapolis Pub. Schs.*, 849 F. Supp. 2d 865, 870 (D. Minn. 2011). "[I]n the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (citations and quotation marks omitted); *see also Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982) (holding that an inmate must establish that "a cognizable danger of [a] future [constitutional] violation exists" and that the danger is "more than a mere possibility" to be granted preliminary injunction).

### a.      Plaintiffs Cannot Show That They Are Likely To Prevail On The Merits.

As discussed *supra* Parts I and II, and in Defendants' initial memorandum at 16-25, Plaintiffs cannot prevail on the merits, and their motion fails as a matter of law.

### b.      Plaintiffs' Request For Injunctive Relief Is Moot, And They Cannot Show Irreparable Harm As A Matter Of Law.

"Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Plaintiffs cannot show irreparable harm because they concede that their claims for injunctive relief are moot.  (Doc. 141 at 14–15.)  Even so, Plaintiffs argue that they should be allowed to proceed because their claims are capable of repetition, yet evading review.  (*Id.*)  Plaintiffs misconstrue the standard.  To maintain a moot claim, a plaintiff must establish a "demonstrated probability" that there is "a reasonable expectation *that the same complaining party* would be subjected to the same action again."  *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (emphasis added) (holding that an inmate released from supervision could not maintain claim against state corrections system for violations of his procedural due process rights in consideration of his application for parole).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

The Court is entitled to presume that Michaelson will remain law abiding and not return

to prison.  *See Hickman v. Missouri*, 144 F.3d 1141, 1143 (8th Cir. 1998).  Plaintiffs'

failure to put forth any argument or evidence means that there is no demonstrated

probability ███████████████████████████████████████████████

██████████████ and their motion should be denied.

Finally, Plaintiffs' delay in bringing their motion also weighs heavily against

granting their requested injunctive relief.  *See, e.g.*, *Hubbard Feeds, Inc. v. Animal Feed

Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999) (holding that plaintiff's delay in

seeking preliminary injunction "belies any claim of irreparable injury pending trial[,]"

and recognizing that delay, standing alone, may justify denying injunctive relief).

Plaintiffs filed an initial complaint on May 1, 2015, and have now waited over 24 months

to request preliminary relief.  This two-year delay undercuts any assertion of irreparable

injury.  *See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, Civ. No. 09-1091,

2010 WL 2131007, at *1 (D. Minn. May 25, 2010) ("[T]he failure to act sooner

undercuts the sense of urgency that ordinarily accompanies a motion for preliminary

relief and suggests that there is, in fact, no irreparable injury.") (internal quotation marks

and citations omitted); *Tarek ibn Ziyad Acad. v. Islamic Relief USA*, 794 F. Supp. 2d

1044, 1059 (D. Minn. 2011) (holding that two-year delay barred request for preliminary

relief).

### c.   The Balance Of Harms Favors Defendants.

The DOC's status quo opt-in screening process reaches the overwhelming

majority of individuals coming into the system's prisons.  (Doc. 108 ¶ 66)  Individuals

who have an immediate medical need or are at a risk of a near-term medical complication

are provided treatment with DAAs.  (*Id.* ¶¶ 77, 91.)  Other individuals who do not require such immediate treatment are routinely monitored.  (*Id.* ¶ 78.)  The uncontradicted record establishes that the highly-controlled prison environment slows the progression of HCV even beyond the decades that it generally takes for the disease to manifest in symptoms or medical consequences.  (Doc. 108 ¶¶ 16–17, 80; Doc. 128 at 8.)

The DOC is a highly-complex organization.  Administration of population-based medicine requires balancing of numerous factors while providing treatment to a complicated population of patients.  (Doc. 108 ¶ 87; *see also* Doc. 128 at 14–15.)  In addition to HCV, the DOC treats an array of chronic medical conditions and an aging prison population with substantial medical needs.  (Doc. 108 ¶ 87.)

In response to this robust record, Plaintiffs have not identified any record evidence of a single HCV-infected inmate at the DOC experiencing any of the speculative harms that some individuals experience decades after being infected.  Plaintiffs' assertion that HCV will be cured society-wide by entering a vague preliminary injunction 24 months into this litigation is unsupported.  (Doc. 141 at 65.)  Plaintiffs' implication that DOC offenders spread HCV "in a prison, or in the public," (*id.*), is likewise not supported by the record.

> **d.   The Public Interest Favors Allowing State Prison Administrators, Not The Court, To Administer Medical Treatment In State Prisons.**

The public has an interest in allowing state corrections officials to administer medical treatment within prisons in accordance with evidence-based practices.  DOC officials are in a better position than the Court to ascertain the medical needs of its

inmate population and how care should be delivered.  "[The Court's] role is not to police the adequacy of prison medical systems." *Dulany*, 132 F.3d at 1244 (quoting discussion of separation of powers concerns in *Lewis v. Casey*, 518 U.S. 343, 350 (1996)).

Plaintiffs' request for preliminary injunction is neither timely nor warranted as a matter of law, so their motion must be denied.

## V.     DR. KENDIG'S REPORT AND TESTIMONY SHOULD NOT BE EXCLUDED.

Dr. Kendig is permitted to offer his expert opinions as to facts material to the determination of this action because his opinions are based on scientifically valid reasoning and methodology and will assist the trier of fact, and are therefore reliable and relevant.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91 (1993) (citing Fed. R. Evid. 702).  Plaintiffs' Motion to Exclude, (Doc. 138), should be rejected.

*Daubert* and Rule 702 "greatly liberalized . . . standards for admission of expert scientific testimony."  *Johnson v. Mead & Johnson Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).   Rule 702 requires the court to screen the admission of scientific evidence.  *Daubert*, 509 U.S. at 589–93.  The Court must base its evaluation on "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . can be applied to the facts in issue."  *Id.* at 592–93.

> While the *Daubert* Court acknowledged that many factors would be instructive to the district court, it focused on four non-exclusive factors: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the known rate of error for the technique or theory and the applicable standards for operation; and (4) whether the technique is generally accepted.

*Johnson*, 754 F.3d at 562.

Plaintiffs do not and cannot challenge Dr. Kendig's reasoning or methodology by reference to any of the factors enumerated in *Daubert*.  The reasoning and methodology supporting Dr. Kendig's opinions are based on sound science.  Dr. Kendig is a medical doctor and infectious disease specialist with nearly two decades experience as the chief medical officer for the FBOP.  (*See* Doc. 128 at 4.)  Based on this expertise, Dr. Kendig offers the reasoned opinion that prioritization of HCV treatment is appropriate in a correctional setting because of the slow, decades-long progression of liver disease and the correctional setting's unique ability to monitor inmates' medical conditions and control the environment.  (*See id.* at 5.)  This opinion is generally accepted and supported by published literature in the field.  (*See id.* at 10–16.)

Instead, Plaintiffs improperly seek exclusion based on their disagreement with the conclusions and factual basis of Dr. Kendig's opinions regarding the applicable standard of care.  (*See* Doc. 141 at 31–34.)[25]  Plaintiffs' objection is not a basis for exclusion, under *Daubert* or otherwise.  "The focus [of a *Daubert* challenge] . . . must be solely on principles and methodology, not on the conclusions that they generate."  *See Daubert*, 509 U.S. at 595.  Furthermore,

> [a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

---

[25] Plaintiffs' argument ignores that Dr. Kendig's opinions also explain HCV, liver disease, and screening in the corrections setting.  This information is independently relevant and a freestanding basis to deny exclusion.

*Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996) (citations and quotation marks omitted).  Central to Plaintiffs' Eighth Amendment claim is whether Defendants "so deviate from the applicable standard of care as to evidence . . . deliberate indifference[.]"  *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001).  Dr. Kendig's expert testimony speaks directly to this point, and is therefore plainly relevant and should not be excluded.  *See id.* ("Often whether such a significant departure from professional standards occurred is a factual question requiring expert opinion to resolve[.]")[26] An expert may render an opinion that is not in lock-step with the AASLD guidance. *See Redmond v. United States*, 194 F. Supp. 3d 606, 618 (E.D. Mich. 2016) (no basis for *Daubert* challenge where experts disagreed regarding whether AASLD guidance were the definitive standard of care).  Dr. Kendig's opinions are also relevant to whether Defendants are entitled to qualified immunity.

---

[26] This authority likewise definitively rejects any suggestion by Plaintiffs that Dr. Kendig's opinions should be excluded because they offer a legal conclusion.

## CONCLUSION

For the above reasons, and those stated in their principal memorandum, Defendants respectfully request that the Court grant their motion for summary judgment and deny Plaintiffs' motions in their entirety.

Dated:  May 24, 2017            OFFICE OF THE ATTORNEY GENERAL
State of Minnesota


 s/Andrew Tweeten
KATHRYN A. FODNESS
Assistant Attorney General
Atty. Reg. No. 0392184

KELLY S. KEMP
Assistant Attorney General
Atty. Reg. No. 0220280

ANDREW TWEETEN
Assistant Attorney General
Atty. Reg. No. 0395190

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1348 (Voice)
(651) 282-5832 (Fax)
kathryn.fodness@ag.state.mn.us
kelly.kemp@ag.state.mn.us
andrew.tweeten@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS MINNESOTA DEPARTMENT OF CORRECTIONS, ROY, PAULSON, AND LARSON