UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RONALDO LIGONS,

Civil No. 15-2210 (PJS/BRT)

BRENT BUCHAN,
LAWRENCE MAXCY,

Third Amended Class Action
Complaint

JOHN ROE and JANE ROE,

Individually, and on behalf of those similarly situated,

      Plaintiffs,

V.

MINNESOTA DEPARTMENT OF CORRECTIONS,

THOMAS ROY,
In his official capacity as Commissioner, Minnesota Department of Corrections;

DAVID A. PAULSON, M.D.,
In his official capacity as Medical Director, Minnesota Department of Corrections;

NANETTE LARSON,
In her official capacity as Health Services Director, Minnesota Department of Corrections,

      Defendants.

_____

**THIRD AMENDED CLASS ACTION COMPLAINT**

1.    Plaintiffs Ronaldo Ligons, Brent Buchan, Lawrence Maxcy, John Roe and Jane Roe bring this

complaint against the Minnesota Department of Corrections ("MN DoC") and Thomas Roy

(Commissioner, Minnesota Department of Corrections), Dr. David A. Paulson, M.D. (Medical

Director, Minnesota Department of Corrections), and Nanette Larson (Health Services

Director, Minnesota Department of Corrections).  Defendants Roy, Paulson, and Larson are

sued in their official capacities.  Plaintiffs seek declaratory and prospective injunctive relief, on

their own behalves and on behalf of all others similarly situated, under the Eighth Amendment

of the U.S. Constitution and 42 U.S.C. § 1983, and under the Americans with Disabilities Act,

42 U.S.C. § 12131, et. seq.

## Background

2.   Defendants created and maintain a policy and practice that delays and denies necessary medical

care to over 1,000 Minnesota prisoners with chronic viral hepatitis C ("chronic HCV").

3.   Chronic HCV is cured by treatment with Direct Acting Antiviral ("DAA") medications.

4.   Defendants' failure to test for and treat chronic HCV manifests deliberate indifference to a

serious medical need, and is cruel and unusual punishment in violation of the medical standard

of care and the Eighth Amendment.

5.   The standard of care endorsed by practitioners, major medical associations, and care providers

requires testing and the immediate treatment of all with chronic HCV, with limited exceptions.

This is the medical standard of care for HCV.

6.   Governmental and private health insurance programs and plans provide access to DAA

medications to patients with chronic HCV.

7.   Defendants' policies and practices deviate from the recognized medical standard of care:

  a)   Contrary to the medical standard of care, the MN DoC has no program for the
       systemic testing of the prison population for HCV and does not test all prisoners
       with risk factors for the disease upon their entry into custody.

  b)   Contrary to the medical standard of care, the MN DoC policy does not treat all
       with chronic HCV with DAA medications.

8.   Defendants discriminate against untreated prisoners with chronic HCV by refusing to follow

the medical standard of care for people with chronic HCV while providing testing and medical

standard of care treatment to prisoners with other diseases, including HIV.

9.   Those with chronic HCV left untreated are people who would have public and private access to the cure were they not incarcerated.  Their sentences include the extra-judicial punishment of being deprived of an available cure, while their disease advances.

## Jurisdiction and Venue

10.   The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as Plaintiffs' claims under 42 U.S.C. § 1983 and 42 U.S.C. §§ 12131, et. seq. and 12205 arise under the Constitution and Laws of the United States.

11.   Venue is proper in this District pursuant to 28 U.S.C. § 1391, because defendants are residents of the District of Minnesota.

12.   The acts and omissions giving rise to plaintiffs' claims occurred in this District.

## Plaintiffs

BRENT CHARLES BUCHAN

13.   Plaintiff BRENT CHARLES BUCHAN is a prisoner in MN DoC custody, currently detained at Minnesota Correctional Facility ("MCF") Lino Lakes.

14.   He has chronic HCV, which MN DoC has not treated with DAA medication.

15.   His fibrosis level is stage 2.

16.   MR. BUCHAN is scheduled for release on February 24, 2020.

LAWRENCE AUGUSTINE MAXCY

17.   Plaintiff LAWRENCE AUGUSTINE MAXCY is a prisoner in MN DoC custody, currently detained at MCF Faribault.

18.   He has chronic HCV, which MN DoC has not treated with DAA medication.

19.   His fibrosis level is stage 1 or 2.

20.   MR. MAXCY is scheduled for release on January 12, 2021.


RONALDO SYLVESTER LIGONS

21.   Plaintiff RONALDO LIGONS is a prisoner in MN DoC custody, currently detained at MCF,

Faribault, Minnesota.

22.   MR. LIGONS was infected with chronic HCV while in MN DoC custody.

23.   At the outset of this lawsuit, MR. LIGONS was untreated for Hepatitis C

24.   Beginning February 2017, Defendants chose to treat Plaintiff LIGONS for HCV infection.

25.   MR. LIGONS is scheduled for release on November 21, 2019.


JOHN ROE and JANE ROE.

26.   JOHN ROE and JANE ROE are prisoners in MN DoC custody who have chronic

HCV, which MN DoC has not treated with DAA medication.

27.   They have two years or more left to serve before their projected releases.


28.   Each of the above-named plaintiffs has exhausted all administrative remedies available to them,

in accordance with 42 U.S.C. § 1997e(a).

29.   Plaintiffs bring this action on their own behalves and on behalf of all prisoners in MN DoC

custody who have chronic HCV, who have not received treatment with DAA medication.

**Defendants**

MINNESOTA DEPARTMENT OF CORRECTIONS

30. Defendant MINNESOTA DEPARTMENT OF CORRECTIONS ("MN DoC"), is an agency of the state of Minnesota, with its Central Office and principal place of business and headquarters in the city of St. Paul, Ramsey County, State of Minnesota.

31. MN DoC is a recipient of federal funds.

THOMAS ROY

32. Defendant THOMAS ROY, the Commissioner of the Minnesota Department of Corrections, is sued in his official capacity.

33. At all times relevant to this action, Commissioner Roy was responsible for MN DoC policy and administration, and for the supervision of MN DoC staff.

34. At all times relevant to this action, Commissioner Roy acted and will continue to act under color of state law.

DAVID PAULSON, M.D.

35. Defendant DAVID A. PAULSON, M.D. is the Medical Director of MN DoC, with his office in the Central Office of MN DoC.

36. As the Medical Director, he is responsible for medical services within the MN DoC system.

37. Defendant Paulson is the author of, and the final authority for interpretation and execution of, the MN DoC's current Hepatitis C treatment policy, effective January 2016. (Minnesota Department of Corrections Guidelines for Evaluation and Management of Chronic Hepatitis C (HCV) Infection ("MN DoC HCV Policy"), Bates No. DOC Ligons.Michaelson 0004080. A

true and correct copy of MN DoC HCV Policy attached as Exhibit 1.

38.   Under this policy, Defendant Paulson determines who receives HCV treatment and who does

not.  Plaintiffs sue Defendant Paulson in his official capacity for actions taken as Medical

Director, MN DoC.

39.   At all times relevant to this action, Defendant Paulson acted and will continue to act under

color of state law.


NANETTE LARSON

40.   Defendant NANETTE LARSON is the Director of Health Services, with her office in the

Central Office of MN DoC.

41.   Defendant Larson supervises the MN DoC medical staff, including Dr. Paulson.  (March 28,

2017 Affidavit of David Paulson, Docket No. 108, at 3.)

42.   Plaintiffs sue Defendant Larson in her official capacity as Director of Health Services, MN

DoC.

43.   On information and belief after reasonable inquiry, grievances arising from the denial of

medical care, and the denial of Plaintiffs' requested medical care by MN DoC staff that are

appealed to the Central Office, are reviewed and ruled upon by Defendant Larson, in

consultation with Defendant Paulson.

44.   Defendant Larson is the last authority to approve or deny a medical grievance of an inmate

before exhaustion of administrative remedies takes place.

45.   Defendants Paulson and Larson, jointly and severally, denied Hepatitis C treatment with direct-

acting antiviral medication to Plaintiffs Buchan, Maxcy, Roe, and Roe, and until 2017 to

Plaintiff Ligons.

46.   At all times relevant to this action, Defendant Larson acted and will continue to act under color

of state law.

## HCV

47.     Hepatitis C is a contagious viral infection that attacks the liver and causes hepatitis, or liver

inflammation.  It is spread primarily through contact with infected blood.  (See HCV Guidance:

Recommendations for Testing, Managing, and Treating Hepatitis C ("the National

Guidelines"), a protocol jointly prepared by the American Association for the Study of Liver

Disease and the Infectious Disease Society of America and most recently revised on September

21, 2017.)  A true and correct copy of the National Guidelines is attached as Exhibit 2.

48.     Hepatitis C infections can be either acute or chronic.  A small percentage of people who are

exposed to infected blood develop an acute infection that their bodies resolve without medical

treatment.  A significant majority of people who develop acute HCV go on to develop chronic

HCV.

49.     Chronic HCV is a serious medical need, regardless of the stage to which the disease has

progressed.

50.     Liver inflammation caused by chronic HCV can significantly impair liver function and damage

its role in digestion, filtering toxins from the blood, preventing disease, and supporting the

body's metabolic processes.

51.     People with chronic HCV can develop fibrosis of the liver, a process by which healthy tissue is

replaced with scarring.

52.     Fibrosis reduces liver function, because scar tissue cannot perform the functions of healthy

liver cells.

53.     When scar tissue begins to take over the liver, this fibrosis is called cirrhosis.

54.     Cirrhosis is irreversible.

55.    Of those with untreated chronic HCV, 70 to 90% will develop chronic liver disease.

56.    Of those with untreated chronic HCV, half or more will develop cirrhosis.

57.    Chronic HCV can cause additional painful complications.

58.    These include body-wide arthritic pain, kidney disease, jaundice, internal bleeding, fluid

retention with edema, abdominal ascites (the accumulation of fluid in the peritoneal cavity),

mental confusion, and extreme fatigue.

59.    Postponing treatment increases the likelihood of cirrhosis, liver cancer, and death for those

with chronic HCV

60.    The severity of liver damage is commonly described by the Metavir fibrosis score, which assigns

a number from 0 to 4 to correspond to the degree of scarring/fibrosis.

61.    Because of inaccuracies in some of the commonly used tests, low fibrosis scores do not

necessarily correlate with minor liver damage.

62.    The progression of chronic HCV through these stages is not linear.  Its pace varies from

individual to individual, and from stage to stage.

**Standard of Care**

63.    Chronic HCV is a curable disease.  Cirrhosis of the liver is not.

64.    The standard of care endorsed by practitioners, major medical associations, and care providers

requires testing and the immediate treatment of all with chronic HCV, with limited exceptions.

65.    The only exceptions are patients "with a short life expectancy that cannot be remediated by

HCV therapy, liver transplantation, or other similar directed therapy."  National Guidelines,

Exhibit 2.

66.    The American Association for the Study of Liver Diseases ("AASLD"), the Infectious Diseases

Society of America ("SDSA"), and the Centers for Disease Control and Prevention ("CDC") are

recognized authorities on the treatment of chronic HCV.  They all recommend the medical standard of care of testing and treatment of all with chronic HCV.

67.   Defendant Paulson considers the National Guidelines a helpful resource, and consulted them in developing the MN DoC Policy for treatment of prisoners with chronic HCV.

68.   Testing subpopulations at higher risk of carrying HCV for the presence of chronic HCV is a component of the medical standard of care, as recommended by the National Guidelines.

69.   These subpopulations for testing include all persons born between 1945 and 1965, all persons who have ever used illicit drugs either by injection or intranasally, all with HIV, and all persons who were ever incarcerated.

70.   Depending on the risk factor, regular retesting is recommended.

### Testing and Diagnosis

71.   Separate testing protocols are used to determine the presence or absence of chronic HCV in a patient and the degree to which the disease has progressed.

72.   Three inexpensive tests determine the presence or absence of chronic HCV.  The three tests are: 1) HCV antibody, 2) HCV nucleic acid, and 3) HCV RNA.

73.   The tests for determining the disease's progression include two blood tests, AST to Platelet Ration Index ("APRI"), and FIB-4, each of which compare ratios of enzymes and a platelet count.  They also include Fibroscan, an ultrasound technology, and liver biopsy, a surgical procedure.

74.   Defendant MN DoC no longer uses biopsies to assess the extent of fibrosis.

75.   The APRI test and resulting scores are known to be inaccurate.

76.   Although a very high APRI score reliably predicts the presence of severe liver damage, low and mid-range scores miss many with significant cirrhosis.

77.   For example, more than 90% of people with chronic HCV and APRI scores of 2.0 or higher have cirrhosis, but more than 50% of the people with cirrhosis have APRI scores at or below 2.0.

78.   Using a person's APRI score alone to determine the severity of HCV disease progression and as the deciding factor for treatment manifests deliberate indifference to the person's serious medical need for treatment.

79.   Once diagnosed, chronic HCV is treated with DAA medications.

80.   The medical standard of care for treatment of chronic HCV is to begin DAA treatment upon diagnosis.

81.   Defendants do not follow this standard of care of treating prisoners diagnosed with HCV. Instead, Defendants consider only for treatment those prisoners believed to be at fibrosis stages 3 and 4, and prisoners at stage 2 with specific co-occurring conditions.

82.   If the cost of DAA medications was inexpensive, such as $1, the MN DoC would treat those diagnosed with chronic HCV.

83.   Most DAA treatment consists of taking a pill once or twice a day, for twelve or fewer weeks.

84.   In 95% or more cases, treatment with DAA medication cures the disease.

85.   The medical standard of care, as reflected in the National Guidelines, recommends against rationing or prioritizing access to treatment with DAA medications.

86.   Immediate treatment benefits people at all stages of fibrosis.

87.   Immediate DAA treatment is associated with a decrease in liver inflammation, a reduction in the rate of cirrhosis progression, the reduction or elimination of painful side effects, a reduction in the rate of liver cancer of more than 70%, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

88.  Benefits arise from the treatment of people at early stages of chronic HCV progression, including those at fibrosis stages 0 and 1.

89.  Delaying treatment decreases the benefits associated with DAA treatment.

## Eliminating HCV

90.  Like polio and smallpox before it, hepatitis C can be eliminated as a threat to public health. (See National Academies of Science, Engineering, and Medicine, Eliminating the Public Health Problem of Hepatitis B and C in the United States: Phase One Report (April 2016), and A National Strategy for the Elimination of Hepatitis B and C: Phase Two Report (March 2017 (concluding that the elimination of viral hepatitis as a public health problem in the United States is possible by 2030).)

91.  Curing all chronic HCV infections, and thereby reducing the opportunities for the infection or reinfection of others, is a central component of the elimination of HCV.

92.  Prisoners as a population bear a disproportionate burden of viral hepatitis.

93.  The National Academies recommend that the national practice guidelines for HCV testing and treatment be followed in correctional facilities.

94.  The controlled prison environment makes diagnostic testing and treatment compliance easier to accomplish than in the general population.

95.  The National Academies conclude that the success of the overall elimination effort may depend on reaching imprisoned patients.

## HCV in Minnesota Prisons

96.  Approximately 1% of the United States' population has chronic HCV.

97.  The prevalence of chronic HCV in prison populations is several times higher than in the general population.

98.   According to the "An Overview of Hepatitis C in Prisons and Jails, National Hepatitis Corrections Network" (Feb. 22, 2016), between 12% and 35% of the national prison population is infected with the virus.  A true and correct copy of this Overview is attached as Exhibit 3.

99.   MN DoC estimates that 10-15% of the Minnesota prison population is infected with chronic HCV.

100.   Defendants have not tested all of the MN DoC prison population for chronic HCV.

101.   The actual number of MN DoC prisoners with chronic HCV is unknown.

102.   According to the public report, Minnesota Department of Corrections Adult Prison Population Summary, July 1, 2017, the adult prison population in MN DoC facilities is 10,111.  A true and correct copy of this Population Summary is attached as Exhibit 4.

103.   Using the National Overview data (Exhibit 3), it is estimated that Minnesota has 1,213 to 3,539 prisoners with chronic HCV.

104.   Using the MN DoC's estimate and Prison Population Summary (Exhibit 4), it is estimated that Minnesota has 1,011 to 1,517 prisoners with chronic HCV.

105.   Defendant MN DoC reports that it "is currently tracking more than 400 offenders who are positive for Hepatitis C."  (Defendant MN DoC's Budget for 2018-19, Bates No. DOC Ligons.Michaelson 0004869, 4880.)  A true and correct copy of this budget is attached as Exhibit 5.

106.   As of March 28, 2017, the MN DoC had treated roughly 66 prisoners with DAA medications.

107.   MN DoC has denied treatment to as many as 98.1% of its prisoners with chronic HCV, using the National Overview estimate, or to 93.5%, using its own estimates.

108.   Not treating prisoners with chronic HCV threatens the health and safety of other prisoners and prison staff.

109.    Approximately 90% or more of Minnesota's prisoners will be released into the community.

110.    When existing prisoners are released to the general population with chronic HCV that has not been treated, they threaten the health and safety of the general population.

111.    Defendants claim to follow what they call a "correctional standard of health care" to diagnose and treat prisoners with HCV.

112.    Defendants' "correctional standard of health care" is not the same as the medical standard of care.

113.    Defendants' "correctional standard of health care" provides a lower level of care than the medical standard of care.

114.    Unlike the medical standard of care, Defendants' "correctional standard of health care" for prisoners with chronic HCV does not provide immediate treatment with DAA medications to all prisoners with chronic HCV.

115.    Defendant Paulson is the author of, and final authority for interpretation and execution of, the Minnesota Department of Corrections' current Hepatitis C treatment policy, effective January 2016.  MN DoC HCV Policy, Exhibit 1.

116.    The MN DoC HCV Policy only allows for HCV testing of incoming prisoners if they ask for it ("opt-in testing").  At intake, the Policy directs MN DoC staff to explain the HCV risk factors and to recommend that offenders request blood testing if they have any of its risk factors.  MN DoC HCV Policy, Exhibit 1.

117.    Being a prisoner, or having ever been a prisoner, is a recognized risk factor for HCV under the National Guidelines.  Exhibit 2.

118.    Defendant Paulson does not consider being in custody to be a risk factor for HCV.

119.    As described in Exhibit 1, incoming prisoners who ask for HCV testing are first given a screening test for the HCV antibody.  If that test is positive, a second, HCV RNA test is given

to determine if there is an active infection.

120. People who are determined to have HCV receive an initial health evaluation, including additional testing at the discretion of the practitioner.

121. Prisoners with chronic HCV are responsible for arranging for reevaluations of their condition.

122. DAA treatment of prisoners with chronic HCV is discretionary.

123. Based on the updated Hepatitis C Case Reports and additional clinical information, Defendant Paulson, the DoC Medical Director, may authorize patient-specific antiviral treatment.

124. The MN DoC HCV Policy  states that DAA treatment is reserved to two groups of infected prisoners: offenders with advanced fibrosis (stage 3-4); or for offenders with mild fibrosis (stage 2) who have concurrent hepatitis B or HIV infection or end organ damage caused by HCV infection.

125. The MN DoC HCV Policy also allows for the discretionary deferral of treatment for prisoners who would otherwise qualify.

126. The MN DoC HCV policy contravenes the National Guidelines, which with few exceptions call for the immediate DAA treatment of all people infected with chronic HCV.

127. Defendant MN DoC, Defendant Paulson and Defendant Larson have refused to prescribe DAA medications in accordance with the National Guidelines, and have refused to require testing of all inmates for HCV.

**HCV Treatment Cost**

128. Cost is the principal reason that DAA medications are withheld from most MN DoC prisoners with chronic HCV.

129. Defendants make treatment decisions for prisoners based on the cost of the DAA treatment.

## MN DoC Treatment of Other Conditions

130. Defendants follow the medical standard of care for prisoners with HIV.

131. Defendants do not follow the medical standard of care for prisoners with chronic HCV.

132. MN DoC diagnoses and treats inmates with the life-threatening, incurable blood-borne infection HIV/AIDS according to the medical standard of care, but discriminates against inmates with the life-threatening, but curable, blood-borne HCV infection by limiting testing and treatment to internal protocols of Defendant MN DoC.

133. Medical care of Prisoners in MN DoC custody is regulated by a contract with the provider, Centurion of Minnesota LLC, under the provisions of Contract 70449 ("the Contract"), as amended. A true and correct copy of the Contract is attached as Exhibit 6. Defendant Paulson participated in the creation, and oversees the execution, of the Contract.

134. MN DoC provides "infectious disease screenings" upon inmates' intake. This screening for HIV/AIDS takes place regularly. Intake screening does not automatically include testing for the presence of HCV.

135. MN DoC treats prisoners infected with HIV/AIDS in accordance with the applicable medical standard of care, and does not follow a lesser standard for those in prison. "The contractor shall provide all treatment of HIV/AIDS in a manner consistent with applicable standards of medical care, including CDC guidelines and Twin Cities' area community standard of care." (The Contract, Exhibit 5, Attachment 1 (On-Site Services).)

136. MN DoC does not follow the same standard of care for treatment of chronic HCV. It instead limits diagnosis and treatment services to the treatment guidelines and Hepatitis C treatment protocols established by the DoC., as described in Exhibit 5 (the Contract).

137. The current MN DoC treatment protocol is inconsistent with the medical standard of care in the following ways:

     a. The MN DoC HCV Policy has no provision for opt-out testing for the presence of chronic HCV, either of prisoners entering custody or of the existing custodial population.

     b. It uses unreliable and underinclusive testing to develop an estimate of the disease progression and considers for treatment only prisoners at the highest stages of liver disease and cirrhosis.

     c. It does not treat all prisoners diagnosed with chronic HCV.

     d. Cost is a factor in ordering treatment.

     e. The recommended treatment for prisoners is different than the recommended treatment for non-prisoners.

138. In so doing, it denies the recognized benefits of early treatment to prisoners whose disease progression is less advanced.

139. In denying DAA treatment to prisoners with chronic HCV, Defendants manifest deliberate indifference to the serious medical need for treatment.

### Community Access to DAA Treatment

140. As shown in MN DoC Policy 105.170, MN DoC staff exposed to blood-borne pathogens including HCV are given immediate access to testing and treatment, at no cost to the employee. A true and correct copy of this policy is attached as Exhibit 7.

141. Access to treatment consistent with the medical standard of care would be available to MN DoC prisoners were they not incarcerated.

142. Medicare, Medicaid, Minnesota Care, the U.S. Department of Veterans Affairs, and major private health insurance providers including Blue Cross and Blue Shield of Minnesota all provide access to DAA medications to people with chronic HCV, except for those with short life expectancies that will not be improved by DAA or other treatment.

143. For Minnesota prisoners who fall within the scope of the medical standard of care but outside of the MN DoC's guidelines, a sentence of imprisonment includes an extra-judicial punishment of a preclusion of treatment for a life-threatening condition.

**Class Action Allegations**

144.  Plaintiffs bring these claims on behalf of themselves, and others similarly situated, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

145.  Plaintiffs seek to certify a class of all current and future persons in MN DoC custody who have or will have chronic HCV ("the Plaintiff Class").

146.  Identical or substantially similar classes have been certified in the Northern District of Florida, *Hoffer v. Jonas*, 4:17-cv214 (MW/CAS) (Docket No. 152, November 17, 2017), the Middle District of Tennessee,  *Graham v. Parker*, 3-16-cv-01954, 2017 WL 1737871 (May 4, 2017), and the District of Massachusetts, *Fowler v. Turco*, 15-cv-12298-NMG (by consent of the parties) (Docket Nos. 42, 46, July 22, 2016), and the Western District of Missouri, *Postawko v. Missouri Department of Corrections*, 2:16-CV-04219 (NKL) (2017 WL 3185155 (July 26, 2017)(appeal pending).

147.  Preliminary injunctive relief has also been ordered by District Courts around the country.  (See *Hoffer v. Jonas*, 4:17-cv214 (MW/CAS)(N.D. Fl.) (Docket No. 153, November 17, 2017); *Abu-Jamal v. Wetzel*, 2017 WL 34700(M.D. Pa.).)

148.  Plaintiffs seek declaratory and injunctive relief to provide them with testing and treatment with DAA medication for chronic HCV, and enjoin Defendants' actions, policies and practices that infringe on their rights.

149.  The requirements of Rule 23(a) are met by this action

a. Numerosity –under F. R. Civ. P. 23(a)(1):

i. National testing indicates an estimated current population of 1,213 to 3,539 MN DoC prisoners with chronic HCV.

ii. A MN DoC study results in an estimated range of 1,011 to 1,517 infected prisoners.

iii. Under either estimate, this class is so numerous that joinder of all members is impracticable.

b. <u>Commonality</u> – under F. R. Civ. P. 23(a)(2):

i. Questions of law and fact are common to the entire class, because the Defendants' actions are applicable to the entire class.

ii. These common questions include, but are not limited to:

1. What the appropriate medical standard of care is for a person with chronic HCV;

2. Whether the relevant medical standard of care requires DAA treatment for all inmates with chronic HCV;

3. Whether chronic HCV infection is a serious medical need;

4. Whether Defendants' policy and practice of not providing DAA treatment to all inmates with chronic HCV constitutes deliberate indifference;

5. Whether Defendants have knowingly employed policies and practices that unjustifiably delay or deny chronic HCV treatment;

6. Whether Defendants have permitted cost considerations to improperly interfere with the treatment of prisoners with chronic HCV;

7. Whether chronic HCV is a disability under the ADA;

8. Whether medical services in MN DoC facilities are a program for service under the ADA;

9. Whether Defendants have discriminated against MN DoC inmates with chronic HCV with lower fibrosis scores on the basis of their condition by categorically denying them treatment consistent with the medical standard of care, while providing standard of care treatment for other diseases and conditions such as HIV.

c. <u>Typicality</u> –under F. R. Civ. P. 23(a)(3):

    i.  Plaintiffs' claims are typical of the claims of the class members they propose to represent.

    ii.  The class representatives have been diagnosed with chronic HCV and have not received treatment, and as such are harmed by the Defendants' practices and procedures as outlined in this complaint.

    iii. Plaintiffs' claims arise from the same course of conduct that give rise to the claims of the class, and are based on the same facts and legal theories.

  d.    <u>Adequacy</u> – under F. R. Civ. P. 23(a)(4):

    i.  The class representatives and undersigned counsel will fairly and adequately represent the interests of the class.

    ii.  The named plaintiffs are committed to obtaining declaratory and injunctive relief that will benefit themselves and the class, by ending Defendants' unlawful and unconstitutional policies and practices.

    iii. Their interests are consistent, and not in conflict, with those of the class.

    iv. They are represented by experienced counsel.

150.   Certification of the class under Rule 23 (b)(2) is proper, because Defendants have acted and failed to act on grounds generally applicable to the class, so that final declaratory and injunctive relief with regard to the class as a whole is appropriate.

151.   The injunctive relief that is sought will end the policies and practices for all class members, allowing them to receive medically and legally appropriate evaluation and treatment for chronic HCV.


**Count I:  Eighth Amendment to the U.S. Constitution, 42 U.S.C. § 1983**


152.   Plaintiffs re-allege and incorporate paragraphs 1 - 151 above as if fully set forth.

153.   This count is brought under the Eighth Amendment of the U.S. Constitution, through 42 U.S.C. § 1983.  The Eighth Amendment guarantees all citizens, including each Plaintiff and member of the class, the right to be free from cruel and unusual punishment.

154.   Defendants' acts and omissions in failing to provide adequate medical care and delaying care constitute deliberate indifference to the serious medical needs of prisoners with chronic HCV, violating the Eighth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

155.   Defendants know of plaintiffs' and class members' serious medical needs, and intentionally have failed and refused to provide tests and treatment that will address these needs.

156.   Defendants know that their failure to act has resulted and will result in continued suffering and exposure to liver disease and its symptoms.  This includes the failure to test prisoners for HCV and to treat all those with chronic HCV.

157.   By these policies and practices, Defendants subject Plaintiffs and class members to a substantial risk of serious harm and untimely death.

158.   By denying Plaintiffs and class members medically necessary HCV treatment, treatment to which they would have access were they not incarcerated, Defendants impose punishment that violates community standards of decency, in excess of that authorized by law, all in violation of the Eighth Amendment.

159.   As a direct and proximate cause of this deliberate indifference, Plaintiffs and class members have suffered and will continue to suffer harm in violation of their Eighth Amendment rights. These harms will continue, unless and until enjoined by this Court.

160.   Under 42 U.S.C. § 1983, Plaintiffs and class members are entitled to a declaration that Defendants' policies and practices violate the protections of the Eighth Amendment.

161.   Under 42 U.S.C. § 1983, Plaintiffs and class members are entitled to an injunction requiring Defendants to develop and implement policies and procedures that adequately provide for the serious medical needs of prisoners with chronic HCV.

## Count II:  Americans with Disabilities Act, 42 U.S.C. §12131, et. seq.

162.   Plaintiffs re-allege and incorporate paragraphs 1 - 151 above as if fully set forth.

163.   This count is brought under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et. seq., and 12131-34, and the regulations that implement it.

164.   Title II, Subtitle A of the ADA prohibits public entities from discriminating against persons with disabilities in their programs, services, and activities.  42 U.S.C. §§ 12131-34.  Regulations implementing these provisions appear in 28 C.F.R. Part 35.

165.   42 U.S.C. § 12131 defines "public entity" as "any state or local government" or "any department, agency . . . or other instrumentality of a State or States or local government."

166.   Defendant MN DoC is a public entity under 42 U.S.C. § 12131(1)(A) and (B) and 28 C.F.R. § 35.104.

167.   Chronic HCV is a disability.

168.   Chronic HCV is a physiological disorder or condition that affects one or more body systems and is therefore a physical impairment.  42 U.S.C. § 12102(1) and (2); 28 C.F.R. § 35.108 (a) and (b).

169.   Chronic HCV is a physical impairment that substantially limits one or more major life activity, including the operation of major bodily functions and systems.  42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

170.   Each Plaintiff and class member is a qualified individual with a disability as defined by 42

U.S.C. § 12102(1) and 28 C.F.R. § 35.104.

171.   Each Plaintiff and class member meets the essential eligibility requirements for the receipt of

services or the participation in programs or activities provided by MN DoC.

172.   MN DoC subjects Plaintiffs and class members to discrimination by withholding medically

appropriate, standard of care treatment that will likely cure their disability, while providing

standard of care treatment to prisoners with different disabilities.

173.   This discriminatory denial of treatment violates 42 U.S.C. § 12132 and its underlying

regulations, which prohibit denial of the benefits of services, programs, or activities of a public

entity because of a disability.

174.   As a result of Defendant MN DoC's violations of the ADA and its regulations, it is liable to

Plaintiffs and class members for declaratory and injunctive relief, pursuant to 42 U.S.C. 12133,

which incorporates the remedies provisions of 29 U.S.C. § 794a.


### Request for Relief

Wherefore, Plaintiffs demand the following relief:

1.    An Order certifying this case as a class action under Rule 23(a), with the class defined under

Rule 23(b)(2) as encompassing all current and future prisoners in MN DoC custody who have,

or will have, chronic HCV.

2.   A declaratory judgment holding that Defendants Roy (as MN DoC Commissioner), Paulson (as

MN DoC Medical Director), and Larson (as MN DoC Health Services Director), have violated

the Eighth Amendment of the U.S. Constitution and its prohibition of cruel and unusual

punishment, by exhibiting deliberate indifference to the serious medical needs of Plaintiffs and class members.

3.    A declaratory judgment holding that Defendant MN DoC has violated the rights of Plaintiffs and class members under the Americans with Disabilities Act.

4.    An injunction ordering Defendants to develop and implement a plan to eliminate the substantial risk of serious harm that Plaintiffs and class members suffer due to the unconstitutional and unlawful policies and procedures outlined above.

5.    An injunction requiring opt-out testing for HCV of all incoming MN DoC prisoners at intake, and of all MN Doc prisoners at regular intervals thereafter.

6.    An injunction mandating the provision of appropriate DAA medication to all prisoners with chronic HCV, consistent with the medical standard of care.

7.    An Order retaining jurisdiction over this matter, to monitor Defendants' compliance with the foregoing and ensure that the terms of any injunction are fully implemented.

8.    An Order setting a timetable for compliance, with a daily penalty for failure to comply with the Order.

9.    An award of Plaintiffs' attorneys' fees, costs, and litigation expenses (including but not limited to expert fees, trial fees, and costs) against Defendants, under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a.

10.    Such other relief as the Court deems equitable and just.

Dated: December 1, 2017               By: /s/ Andrew H. Mohring
Michael V. Ciresi (MN #0016949)
Katie Crosby Lehmann (MN #0257357)
Andrew H. Mohring (MN #0190731)
Ciresi Conlin LLP
225 South 6th Street, Suite 4600
Minneapolis, MN 55402
Telephone: 612.361.8200

Peter J. Nickitas (MN #0212313)
Peter J. Nickitas Law Office, L.L.C.
431 South 7th Street, Suite 2446
Minneapolis, MN 55415
Telephone: 651.238.3445

C. Peter Erlinder (MN #0398765)
Law Office of C. Peter Erlinder
1043 Grand Avenue West, Suite 228
St. Paul, MN 55105
Telephone: 651.271.4616

ATTORNEYS FOR PLAINTIFFS