

# STATE OF MINNESOTA

**OFFICE OF THE ATTORNEY GENERAL**

SUITE 1100
445 MINNESOTA STREET
ST. PAUL, MN 55101-2128
TELEPHONE: (651) 282-5700

December 21, 2017

The Honorable Becky R. Thorson
United States District Court
646 Federal Building
316 N. Robert Street
St. Paul, MN 55101

      Re:    *Ligons et al. v. Minnesota Department of Corrections, et al.*
              Case No. 15-cv-2210

Dear Judge Thorson:

      Pursuant to the Court's request at the status conference on December 11, 2017, Defendants Minnesota Department of Corrections ("DOC"), Commissioner Tom Roy, Dr. David Paulson, and Nanette Larson, in their official capacities, submit this letter in response to Plaintiffs' proposal to reopen discovery and serve new written discovery requests. (*See* Docs. 210 & 210-1.)

      On July 26, 2017, the Court heard argument on the parties' dispositive motions. The Court observed that this case had "been very well discovered on both sides" and stated that "we are not going to redo all the discovery." (Doc. 204 at 44:12-16.) The Court noted that after Plaintiffs Ligons and Michaelson filed a Third Amended Complaint, any further discovery allowed would be "very limited, very quick, clean-up discovery[.]" (*Id.* at 37:23-38:7.) The Court specifically envisioned clarification of deposition responses and allowing Defendants the opportunity to depose newly-named class representatives. (*See id.* at 37:23-38:8.)

      The Court's comments did not contemplate that Plaintiffs be allowed to retread the same ground or topics that they simply elected not to cover—such as exploring "the adequacy of the testing procedures Defendants used to diagnose prisoners with chronic HCV," determining why there is an alleged difference between national and Minnesota estimates for rates of HCV infection, and having the DOC come up with "data and statistics" showing the implementation of not only the September 2017 guidelines, but

The Honorable Becky R. Thorson
December 21, 2017
Page 2

"prior ones." (Doc. 210 at 1-2.)[1] Plaintiffs' proposed written discovery is far afield of the discovery contemplated by the Court at the July 26 hearing. Their request to serve this discovery should be denied. In the event that the Court determines that any of the proposed discovery is within the narrow scope contemplated at the July 26 hearing, the proposed written discovery should be expressly limited consistent with the Court's guidance and the realities of this case in light of the already voluminous discovery conducted.

## GENERAL OBJECTIONS

In advance of the December 11 status conference, the parties prepared a Joint Proposal discussing their respective positions on reopening discovery. (Doc. 207.) In this proposal, Plaintiffs proposed 10 interrogatories, 10 document requests, 10 requests for admission, and two fact depositions, including one Rule 30(b)(6) deposition limited to 10 topics. (*See* Doc. 207 at 3.) Although Plaintiffs assert that they are not seeking a "do-over," (Doc. 210 at 1), they nonetheless propose a broad range of written discovery and suggest to the Court that "[t]he topics of any such discovery are not limited." (Doc. 207.)

Defendants have already indicated that they will provide medical records and grievances for the newly-named class representatives. As indicated in the Joint Proposal, should the Court determine that additional discovery is necessary, Plaintiffs should be limited to discovery of information related the newly-named Plaintiffs and the DOC's September 2017 HCV treatment guidelines. (Doc. 207 at 5.)

As explained herein, Plaintiffs' proposed discovery is overbroad and should not be permitted. After discussion of preliminary matters, each proposed interrogatory and request is analyzed in turn. Where possible, Defendants offer suggestions for tailoring Plaintiffs' proposed written discovery for consideration in the event the Court allows additional discovery.

---

[1] The DOC has had guidelines for the treatment of HCV since at least 1999. (Doc. 109 ¶ 28.)

The Honorable Becky R. Thorson
December 21, 2017
Page 3

    **A.    The Proposed Discovery Is Beyond The "Clean-Up" Discovery Contemplated By The Court.**

As an initial matter, Plaintiffs' proposed interrogatories, document requests, and requests for admissions are outside the scope of the "clean-up discovery" contemplated by the Court.

Plaintiffs had over two years to conduct discovery in this case. As the Court stated, the case has been "very well discovered." (Doc. 204 at 44:12-16.) Over the span of these two years, the parties both served interrogatories, document requests, and requests for admissions. Plaintiffs took nine depositions, including Defendants' expert Dr. Newton Kendig and a medical provider who never treated Michaelson or Ligons, but who Plaintiffs' counsel believed may have a bearing on the outcome of the case. Dr. Paulson was deposed twice—once as a fact witness and once as the DOC's designee for a Rule 30(b)(6) deposition. Plaintiffs' notice for the Rule 30(b)(6) deposition included 59 discrete topics, all of which Dr. Paulson was prepared to address at the deposition.

Defendants produced nearly 5,000 pages of documents to Plaintiffs, including medical records, historical guidelines for the treatment of HCV, and the then-effective guidelines for the treatment of HCV.[2] Plaintiffs never brought a motion to compel discovery nor pursued any claim that Defendants' responses were in any way deficient.

Defendants took five depositions, including Plaintiffs' three expert witnesses. The discovery was sufficient for both of the parties to file motions for summary judgment and for Plaintiff to file motions for a preliminary injunction, class certification, and to exclude expert testimony. Neither Plaintiffs nor Defendants sought to defer consideration of these motions due to incomplete discovery. *See* Fed. R. Civ. P. 56(d). To reopen discovery now and allow further inquiry of the DOC is unnecessary and inconsistent with the Federal Rules. *See* Fed. R. Civ. P. 26(b)(1) (requiring discovery be "proportional to the needs of the case").

---

[2] Plaintiffs' assertion that the controlling DOC's guidelines "[a]t the beginning of this case . . . did not contemplate any DAA treatment," (Doc. 210 at 1 (discussing the 2012 HCV treatment guidelines)), is a misstatement of the undisputed record. The Complaint was filed on May 1, 2015. (Doc. 1.) The DOC revised its HCV treatment guidelines in April 2015 consistent with the AASLD's recommendation at that time that certain patients with chronic HCV be prioritized for treatment with DAAs. (*See* Doc. 109 ¶¶ 44-55; Doc. 109-1 at 4-7.)

The Honorable Becky R. Thorson
December 21, 2017
Page 4

### B.  The Proposed Discovery Invades Inmates' Privacy.

Pursuant to Minnesota Statutes section 13.384, inmates' medical data is designated as private. The medical data contained in inmate medical records is some of the most sensitive information about a person. Other than Plaintiffs Ligons, Michaelson, Buchan, and Maxcy, no inmate has consented to opposing counsel, who have not been appointed as class counsel, being provided with the highly sensitive personal information sought in Plaintiffs' proposed written discovery requests.

### C.  The Proposed Discovery Fails To Recognize That The DOC's Inmate Population Is Not Static.

The DOC's inmate population changes from day to day. DOC records reflect that 55,975 individuals have been incarcerated in and admitted to the DOC's prisons from January 1, 2012 to present day. As of 2015, the average sentence length at the DOC was 45 months. (Doc. 115 ¶ 4.) This average sentence length means that the inmate population fluctuates from day to day. On average, more than 17,000 unique individuals are incarcerated during a calendar year. (*Id.*)

Plaintiffs' proposed discovery does not account for DOC's fluctuating inmate population and therefore exceeds the Federal Rules' directive that discovery be relevant and proportional to the needs of the case. *See* Fed. R. Civ. P. 23(b)(1). Plaintiffs' proposed interrogatories 1-4 seek information about individuals in prison from 2012 through the present. The realities of the DOC's inmate population mean that a majority of the individuals who were in prison in 2012 are no longer in prison. The interrogatories therefore seek substantial amounts of data about individuals who are outside of Plaintiffs' proposed class. (*See* Doc. 205 ¶ 145 (setting forth Plaintiff's proposed class of "all current and future persons in MN [DOC] custody who have or will have chronic HCV").)

The date range of Plaintiffs' proposed interrogatories also exceeds the scope limitation set by the Federal Rules. The U.S. Food and Drug Administration approved Olysio—the first once-daily protease inhibitor for the treatment of chronic HCV—in November 2013. (Doc. 108 ¶ 40.) Plaintiffs seek discovery of highly-sensitive medical data about other inmates for a period of 23 months prior to the first availability of any of the class of drugs they now seek. This information is neither relevant nor proportional to the needs of this case. *See* Fed. R. Civ. P. 23(b)(1).

### D. Review Of Inmate Medical Records Would Require Significant Staff Time And Expense.

As described *supra*, a number of Plaintiffs' proposed interrogatories would require DOC staff to review inmates' individual medical records to compile responsive information. The expenditure of the DOC staff's time and resources would be enormous, impacting the DOC's day-to-day health services operations.

Medical records for current inmates are maintained on paper at each of nine prisons across Minnesota. Paper medical files move with each inmate. For example, an inmate who receives treatment at MCF–Stillwater and then transfers to MCF-Faribault will be transferred with all of his medical records to the new facility. Each inmate's medical record varies in length based on his or her unique medical needs.[3] Detailed review of individual medical records would pose an undue burden and expense.

### RESPONSE TO SPECIFIC PROPOSED REQUESTS

As described below, Plaintiffs' specific discovery requests are not warranted under the Federal Rules.

### I. INTERROGATORIES

#### A. Proposed Interrogatory No. 1 (Doc. No. 210-1 at 4).

This proposed interrogatory seeks the identities of all DOC inmates who have been tested "for HCV" since January 1, 2012.

##### 1. Steps Necessary for the DOC to Respond.

In the regular course of business, the DOC does not maintain a comprehensive list of inmates who have been tested for the HCV antibody or HCV RNA in a database or other format from which it would be readily accessible.

The reality of the DOC's changing inmate population makes responding to this request burdensome in terms of staff time and expense. To answer this proposed interrogatory, the DOC would need to collect all HCV test results within the time period

---

[3] Inmate medical records can be quire voluminous. By way of example, Defendants have produced 2,466 pages of medical records for Ligons. Defendants have also produced 932 pages of kites and grievance documents for Ligons.

The Honorable Becky R. Thorson
December 21, 2017
Page 6

specified from its contractor's subcontracted laboratory, BioReference. To ensure all responsive data is collected DOC would first have to determine the BioReference codes used to order tests (however that term is defined or intended by Plaintiffs).[4] Because these codes change over time, the DOC would need to identify how the tests were coded at various points in time.

After the DOC has identified the correct codes for the tests, the DOC would need to contact BioReference to request a list of all of the tests (however that term is defined) run since January 1, 2012.[5] Assuming that BioReference is able to query all tests ordered by the DOC's contracted medical staff over the time period specified, the results would then need to be deduplicated by inmate. Depending on the format of the data DOC receives from BioReference, this may be a manual task requiring data entry into a spreadsheet or database.

The DOC would then need to compare the deduplicated list from BioReference to a list of current inmates (assuming the term "prisoners" in Plaintiffs' proposed interrogatory means current inmates) to determine which inmates in the current population have been tested for HCV. To the extent that Plaintiffs mean the term "prisoners" to include current and former inmates, the interrogatory is overbroad and seeks information that is not relevant or proportional to this case.

## 2. Proposed Compromise.

The DOC has already provided data to Plaintiffs indicating the DOC's quarterly testing rates of inmates at intake for fourth quarter of fiscal year 2016. (Doc. 128-1 at 118-19.) The DOC agrees that it will supplement this data with information for testing at intake for the most recent complete quarter of the current fiscal year. The DOC has also already provided an estimated number of inmates that have been tested for HCV at intake since January 1, 2012. (*See* Defs.' Am. Answers to Pls.' Interrogs., June 7, 2016.) The DOC agrees to supplement this response in accordance with the Federal Rules.

---

[4] Plaintiffs' phrasing makes the proposed interrogatory vague. Are Plaintiffs referring to the antibody test? (*See* Doc. 109, Appendix ¶ W (discussing antibody test).) Are Plaintiffs referring to the viral load test? (*See* Doc. 109, Appendix ¶ X (discussing viral load test).) Are Plaintiffs referring to both the antibody and viral load tests or to some other test?

[5] Defendants would also need to determine whether BioReference Laboratories, the laboratory subcontracted through its current medical services provider, Centurion, was also the sole laboratory used by its previous contractor, Corizon, during the requested period.

**B.      Proposed Interrogatory No. 2 (Doc. 210-1 at 4).**

This proposed interrogatory seeks information for any inmate testing positive for chronic HCV since January 1, 2012, who was provided with treatment with DAAs. Plaintiffs ask for each inmate's name, OID, FIB-4 score, location of HCV contraction, and treatment status/plan.

**1.      Steps Necessary for the DOC to Respond.**

In the regular course of business, the DOC does not maintain all of the information requested about inmates who have received treatment with DAAs in a database or other format from which it would be readily accessible. As such, this proposed interrogatory is burdensome, requiring the DOC to go through the paper medical records of every inmate who has received treatment with DAAs.

An individual does not "test[] positive for chronic viral hepatitis C." A test result indicates whether an individual has a viral load at a given time. A medical practitioner makes a diagnosis that the test results (either standing alone or as a series) mean that the individual has chronic HCV. This diagnosis is noted in each inmate's paper medical record. As of March 6, 2017, the DOC had treated 77 individuals with DAAs. (Doc. 115 ¶ 14.) Treatment has been ongoing since that time. Identifying the date a practitioner diagnosed an individual with chronic HCV would require an individual inquiry into 77 inmates' medical records. This would require significant expenditure of DOC staff time.

As explained in Dr. Paulson's summary judgment affidavit, he is unaware of any inmate who contracted HCV while in prison. (Doc. 109 ¶ 11.) To the extent that Plaintiffs seek an inmate-by-inmate breakdown of where each inmate claims to have contracted HCV, if this information was ever communicated to DOC medical staff, this again requires a review of each inmate's medical record. This information is also not relevant.[6] Plaintiffs' claims relate to whether they are entitled under the Eighth Amendment to immediate treatment with DAAs. This portion of the proposed interrogatory is irrelevant to the claims and defenses in this matter.

Plaintiffs' request that Defendants identify each inmate's "priority level for treatment" is vague. (Doc. 210-1 at 3.) The proposed interrogatory relates to individuals

---

[6] Plaintiffs' own experts disclaim the relevance of this information. (*See* Doc. 142-1 at 29 (Dr. Thompson testifying that: "We can go through maybe all of [the methods of exposure to HCV for] these people and they don't always know exactly where they got it from. And my goal as a liver doctor is not necessarily identifying that one thing . . . . And that's not the most important thing.").)

who have already received treatment with DAAs.  It is likewise unclear what Plaintiffs mean by "treatment status or plan." (*Id.*)

### 2. Proposed Compromise.

The DOC agrees to provide summary data related to individuals who have been treated with DAAs.  The following information will be included in a summary chart:

- A pseudonym for each inmate who is currently being treated, or has been treated, with DAAs (e.g., "A.A.," "A.B.," etc.);
- The date that the inmate had a positive PCR test;
- The inmate's FIB-4 and/or APRI score at the time of treatment, if calculated and available;
- If treatment has concluded, whether treatment was successful, as indicated by sustained virologic response ("SVR") at 12 weeks post-treatment;
- If treatment has concluded and the inmate has not achieved SVR, whether the DOC retreated; and
- The name of the DAA prescribed to each inmate.

The DOC is more readily able to gather this information, which is responsive to Plaintiffs' request and also protects the privacy interests of the inmates in question.

### C. Proposed Interrogatory No. 3 (Doc. 210-1 at 4).

This proposed interrogatory seeks information about any prisoner who has tested positive for chronic HCV since January 1, 2012 and "is or was denied treatment." The proposed interrogatory asks for the inmate's name, OID, stage of fibrosis, and reason for denial or delay of treatment.

In the regular course of business, the DOC does not maintain all information about inmates who have requested treatment with DAAs in a database or other format from which it would be readily accessible.  The information about whether an inmate has requested treatment with DAAs may be located in the inmate's individual paper medical file or in kites or grievance documents.  As such, this proposed interrogatory is burdensome, requiring the DOC to go through voluminous paper medical records, kites, and grievances of every inmate with chronic HCV to determine whether they have ever requested treatment with DAAs.

The individualized medical assessment of each individual inmate is explained at length in Dr. Paulson's Affidavit.  An individual-by-individual recitation of inmates' medical conditions is not relevant or proportional to the needs of the case.

The Honorable Becky R. Thorson
December 21, 2017
Page 9

    **D.**    **Proposed Interrogatory No. 4 (Doc. 210-1 at 4).**

This proposed interrogatory seeks information about prisoners who have died while "in custody with liver disease or liver failure as a contributing factor since January 1, 2012." Plaintiffs seek this information about other inmates by name and OID.

In addition to invading the privacy of deceased inmates, this proposed interrogatory is overbroad and not proportional to the needs of the case. As the Court may be aware, liver disease is caused by multiple factors other than HCV, such as Hepatitis A, Hepatitis B, the use of alcohol and drugs, environmental toxins, obesity, diabetes, and fatty liver disease (i.e., nonalcoholic fatty liver disease and alcoholic fatty liver disease).

The number of individuals who died in this timeframe as a result of "liver disease or liver failure" is irrelevant to whether the DOC's HCV treatment guidelines are deliberately indifferent half a decade later in 2017 and 2018. As discussed *supra* at 4, the first modern DAA was not even approved by the U.S. FDA until November 2013. Other DAAs, like Harvoni, were not approved by the FDA until late 2014. (Doc. 109 ¶ 42.)

    **E.**    **Proposed Interrogatory No. 5 (Doc. 210-1 at 4-5).**

This proposed interrogatory seeks information describing the "initial and ongoing testing procedure" for inmates, including the process by which prisoners are identified for potential testing, changes in the testing procedure under the current HCV "policy" over the prior "policy." The DOC interprets this proposed interrogatory to seek an explanation of the differences between the DOC's January 2016 HCV treatment guidelines (Doc. 109-1 at 39-41) and the DOC's September 2017 HCV treatment guidelines (Doc. 210-2).

To the extent that Plaintiffs intend "initial and ongoing testing procedure" to mean the testing of inmates at intake and testing of inmates at times other than intake, the DOC agrees to respond to this proposed interrogatory if it is properly served under the Federal Rules of Civil Procedure.

    **F.**    **Proposed Interrogatory No. 6 (Doc. 210-1 at 4).**

This proposed interrogatory seeks information describing the differences between the September 2017 HCV treatment "policy" and "the prior one." The DOC interprets this proposed interrogatory to seek an explanation of the differences between the DOC's January 2016 HCV treatment guidelines (Doc. 109-1 at 39-41) and the DOC's September 2017 HCV treatment guidelines (Doc. 210-2).

The DOC agrees to respond to this proposed interrogatory if it is authorized by the Court and properly served under the Federal Rules.

## II.     REQUESTS FOR PRODUCTION OF DOCUMENTS

### A.     Proposed Request No. 1 (Doc. 210-1 at 9).

This proposed document request seeks "[a]ll medical records for Plaintiffs Buchan, Maxcy, and updated medical records for Ligons."

If this proposed request is authorized by the Court and properly served under the Federal Rules, Defendants agree to provide the requested medical records. However, Defendants note that it is unclear how Ligons' medical records are relevant. There are no allegations in the Third Amended Complaint related to him, and there is no allegation for which he could obtain relief. (*See generally* Doc. 205.)

### B.     Proposed Request Nos. 2-6 (Doc. 210-1 at 9).

Subject to objections properly raised to these requests, non-privileged documents, if any, responsive to these proposed requests will be produced, if they have not already been produced.

### C.     Proposed Request No. 7 (Doc. 210-1 at 9).

This proposed document request seeks "[a]ll documents referred to and/or used to answer the Second Set of Interrogatories."

If Defendants are ordered to respond to Plaintiffs' interrogatories, Defendants object to providing Plaintiffs with documents responsive to this request. As discussed, Plaintiffs proposed interrogatories would require review of a substantial quantity of private inmate medical data, including inmate medical records for inmates other than the Plaintiffs named in the Third Amended Complaint. Production of that data raises serious concerns about inmate privacy and is neither relevant nor proportional to the needs of the case. Likewise, summary information that would identify any inmate due to small sample size, or summary information with personal identifiers redacted but with information that would allow the inmate to otherwise be identified, should not be produced for the same reasons.

The Honorable Becky R. Thorson
December 21, 2017
Page 11

### III. REQUESTS FOR ADMISSION

If authorized by the Court and properly served under the Federal Rules, Defendants agree to respond to Plaintiffs' proposed requests for admission. (Doc. 210-1 at 14.)

### CONCLUSION

Plaintiffs should not be permitted to reopen discovery and their request to serve the proposed written discovery should be denied. Before discovery was closed and dispositive motions were briefed, Plaintiffs had ample opportunity to conduct discovery and did so, extensively. If the Court is inclined to allow Plaintiffs to proceed with any further discovery, Defendants insist that privacy interests of inmates not party to this case be protected and that any requests served be strictly limited in accordance with the requirement that discovery must be relevant and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). If further discovery is ordered, Defendants will respond as required by the Federal Rules and reserve their right to present objections, as appropriate.

Sincerely,

s/ Kathryn A. Fodness

KATHRYN A. FODNESS
Assistant Attorney General

(651) 757-1348 (Voice)
(651) 282-5832 (Fax)

*Attorney for Minnesota Department of Corrections, Commissioner Tom Roy, Dr. David Paulson, and Nanette Larson*