# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Ronaldo Ligons, et al., | Civil File No. 15-CV-2210 (PJS/BRT) |
| Plaintiffs, | **MEMORANDUM OF LAW IN** |
| | **SUPPORT OF DEFENDANTS** |
| vs. | **MINNESOTA DEPARTMENT OF** |
| | **CORRECTIONS, THOMAS ROY, DR.** |
| Minnesota Department of Corrections, et al., | **DAVID A. PAULSON, M.D., AND** |
| | **NANETTE LARSON'S MOTION FOR** |
| Defendants. | **SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiffs Ronaldo Ligons, Brent Buchan, and Lawrence Maxcy are inmates in the custody of Defendant Minnesota Department of Corrections.  Plaintiffs assert that the DOC's alleged failure to treat their Hepatitis C with newly-developed drugs violates their Eighth Amendment rights and the Americans with Disabilities Act (ADA).  Plaintiffs' injunctive relief claims are moot and otherwise barred by the law.  ████████

████████████████████████████████████████████

████████████████████████████████  Because Plaintiffs' claims are without support in the record and otherwise fail as a matter of law, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the Third Amended Complaint in its entirety, and with prejudice.

## DOCUMENTS COMPRISING THE RECORD

1.   Third Amended Complaint (TAC) (Doc. No. 205)

2.   Answer to the Third Amended Complaint (Doc. No. 213)

3.      Second Affidavit of David A. Paulson, M.D., M.B.A. and exhibits

4.      Second Affidavit of Nanette Larson and exhibits

5.      Second Affidavit of Kathryn A. Fodness and exhibits

## STATEMENT OF UNDISPUTED FACTS

### A.      The Parties.

Maxcy, Ligons, and Buchan are currently inmates incarcerated in Minnesota prisons.  (TAC ¶¶13, 17, 21.)[1]

Defendant DOC is an agency of the State of Minnesota, which is headed by a Commissioner of Corrections.  Minn. Stat. §§ 15.01, 241.01.  Defendant Roy is the DOC's Commissioner.  (TAC ¶32.)

Defendant Dr. Paulson is a medical doctor, and the DOC's Medical Director. (Second Affidavit of David A. Paulson, M.D., M.B.A. ("Paulson Aff.") ¶¶1, 2; Deposition of David A. Paulson ("Paulson Dep."), attached to the Second Affidavit of Kathryn A. Fodness ("Fodness Aff.") as Ex. A at 7.)   Except under unusual circumstances, Dr. Paulson does not see inmates for primary care.  (Paulson Aff. ¶8.)

Defendant Larson is the DOC's Health Services Director.  (Second Affidavit of Nanette Larson ("Larson Aff.") ¶1; Deposition of Nanette Larson ("Larson Dep."),

---

[1]  Michaelson, who was a named plaintiff in the Complaint ("Compl.") (Doc. 1), First Amended Complaint ("FAC") (Doc. 11), and Second Amended Complaint ("SAC"), (Doc. 174) was incarcerated when this case was filed.  Michaelson was released from prison on March 27, 2017, and has been living in the community on supervised release since that date.  (Larson Aff. ¶27.)  He is not named in the Third Amended Complaint.

attached to the Fodness Aff. as Ex. B at 9.)  Larson is an administrator, not a medical practitioner.  (Larson Dep. at 9, 19; Larson Aff. ¶2.)

The Commissioner, Dr. Paulson, and Larson are sued in their official capacities only.  (TAC ¶¶32, 38, 42.)

### B.    Medical Care At The Minnesota Department of Corrections.

The DOC contracts with Centurion Managed Care to provide medical services and day-to-day care to inmates.  (Larson Aff. ¶6.)  Centurion medical practitioners, including medical doctors, physician assistants, and nurse practitioners, provide health care at each DOC facility with the assistance of DOC-employed registered nurses and licensed practical nurses.  (*Id.* ¶7.)

### C.    Hepatitis C.

HCV is a blood-borne pathogen that can affect the liver.  (Paulson Aff. ¶¶9-10.) HCV infection progresses slowly, if at all, and most patients do not report subjective symptoms.  (*Id.* ¶15; March 2018 Expert Report of Newton E. Kendig, MD ("Kendig Rep."), attached to the Fodness Aff. as Ex. C at 6.)  The modes of HCV transmission are well understood.  (Paulson Aff. ¶10.)  HCV is primarily spread through percutaneous exposures.  (*Id.*; Kendig Rep. at 6; Deposition of Dr. Newton Kendig ("Kendig Dep."), attached to the Fodness Aff. as Ex. D at 56-59.)  Until the late 1980s and early 1990s, when testing became available, individuals were also at an increased risk of contracting HCV through receipt of clotting factors or from solid organ transplants.  (Paulson Aff. ¶10.)

The risk of HCV transmission through sexual contact or in the household setting is considered extremely low.  (*Id.*; *see also* Kendig Rep. at 5, 6; Kendig Dep. at 56-59, 75-76; Deposition of Dr. Julie Thompson ("Thompson Dep."), attached to the Fodness Aff. as Ex. E at 105-106; Deposition of Dr. Bennet D. Cecil III ("Cecil Dep."), attached to the Fodness Aff. as Ex. F at 40-41.)  Likewise, transmission among individuals sharing personal care items is extremely rare.  (Paulson Aff. ¶10; Paulson Dep. at 78-81; Kendig Rep. at 6.)

Illicit injection drug use and tattooing are prohibited by the DOC.  (Paulson Aff. ¶11.)   In his 23 years as Medical Director, Dr. Paulson has never heard of HCV transmission between inmates or between inmates and DOC staff.  (*Id.*; *see also* Paulson Dep. at 78-81.)

Not everyone infected with HCV develops a chronic HCV infection.  (Paulson Aff. ¶13; Kendig Rep. at 7.)  Approximately 25-30% of individuals infected with HCV clear the infection from their system without any treatment.   (Paulson Aff. ¶13.) The remaining individuals develop a chronic HCV infection.  (*Id.*)[2]  A subset of those individuals who develop chronic HCV infection develop liver disease or other medical conditions attributable to HCV.  (Kendig Rep. at 5.)  Among those individuals who do develop liver disease, the disease progresses slowly over the course of decades.  (*Id.* at 7; Paulson Aff. ¶15.)

---

[2] Hereinafter and unless otherwise stated, reference to HCV patients or inmates means only those individuals who have chronic HCV infection, not the 25-30% of individuals whose bodies eradicate the infection without treatment.

**D.**     **Screening For Hepatitis C.**

Health care systems generally offer testing on an "opt-in" or "opt-out" basis. (Paulson Aff. ¶67.)  Opt-out testing means a patient will be tested unless they decline. (*Id*.)  Opt-in testing means that a patient must agree before the test is performed.  (*Id*.)

Medical practitioners use a two-step process to determine whether a patient has an active HCV infection.   (*Id.* ¶¶25-26, 70; Kendig Rep. at 6-7.)   First, a blood test determines whether the patient has the HCV antibody in his or her blood.  (Paulson Aff. ¶25; DOC Deposition under Fed. R. Civ. P. 30(b)(6) ("DOC Dep."), attached to the Fodness Aff. as Ex. G at 15-16; Kendig Rep. at 6.)[3]  Results of this HCV antibody test are reported as "non-reactive," "reactive," or "indeterminate."   (Paulson Aff. ¶25.) A patient with a "non-reactive" result has never been infected with HCV.  (*Id.*)  A patient with a "reactive" result has the HCV antibody in his or her blood.  (*Id.*)  Patients with a reactive result either have an active infection or had an active infection at some time in the past (*i.e.*, the patient's body eradicated the infection on its own or the patient was successfully treated for HCV).  (*Id.*)

Patients who test positive for the HCV antibody receive a second blood test called an antigen or RNA test to determine whether the patient has an active HCV infection. (*Id.* ¶26; Kendig Rep. at 6-7.)   Patients who are "HCV RNA positive" have an active

---

[3] In addition to his factual deposition, Dr. Paulson testified as the DOC's designated representative for the purposes of the depositions of the DOC noticed by Plaintiffs under Fed. R. Civ. P. 30(b)(6) in both June 2016 and when discovery reopened in February 2018.

HCV infection. (Paulson Aff. ¶26.) Those who test "negative" do not have an active infection, even if the result of the initial HCV antibody test was reactive. (*Id.*)

**E.   Medical Monitoring Of HCV Patients.**

If HCV infection progresses, it progresses slowly and can remain dormant for many years. (Paulson Aff. ¶¶14-15; Kendig Rep. at 7.) Progression is even slower in a correctional setting where medical practitioners can control an inmate's other medical conditions and medications. (Paulson Aff. ¶¶16-17; *see also* Kendig Dep. at 84-85.) The correctional environment itself, which is free of environmental toxins and prohibits the use of drugs and alcohol, also slows progression. (Paulson Aff. ¶¶16-17; *see also* Kendig Dep. at 84-85.)

One condition that may affect HCV patients is chronic liver disease, which generally develops over the course of decades. (Paulson Aff. ¶18; Kendig Rep. at 7-8.) The degree to which an HCV-infected patient's liver has been affected by liver disease is discussed in terms of fibrosis or accumulation of scar tissue in the liver. (Paulson Aff. ¶19; Kendig Rep. at 7-8.) "Stage" refers to the amount of liver scarring. (Paulson Aff. ¶19.) Stages of fibrosis range from Stage 0 to Stage 4. (*Id.*) Stage 0 is absence of fibrosis. (*Id.*) Stage 4 means a large amount of scarring, known as cirrhosis of the liver. (*Id.*)

Ultrasound elastography, an alternative to more invasive procedures, such as a liver biopsy, is a relatively new tool that stages hepatic fibrosis. (*Id.* ¶20.) The technology sends ultrasonic waves through the liver to measure fibrosis, resulting in a stage of fibrosis. (*Id.*)

In addition to staging tests, medical practitioners can estimate the degree of fibrosis in a patient's liver by calculating the AST-Platelet Ratio Index (APRI) and Fibrosis-4 (FIB-4) index using blood test results.  (*Id.* ¶¶23-24; Kendig Rep. at 8; Kendig Rep. at 8; Kendig Dep. at 81-82; 147-49.)

### F.     Hepatitis C: Screening And Treatment At The Minnesota Department of Corrections.

#### 1.     Development Of DOC Guidelines For Screening And Treatment Of HCV.

The DOC has had HCV treatment guidelines since at least 1999.  (Paulson Aff. ¶28.)  Since then, the DOC's HCV treatment guidelines have had multiple iterations and have been subject to substantial review and revision based on a collaborative, evidence-based approach.  (*Id.* ¶¶32-58 (describing revisions).)

Treatment of HCV has been revolutionized over the last several years.  (Paulson Aff. ¶42; Kendig Rep. at 8.)  Previous HCV treatments involving pegylated interferon and ribavirin, which often took nearly a full year of treatment, have been phased out with the advent of a class of drugs referred to as direct-acting antivirals (DAAs).  (Paulson Aff. ¶31.)

In response to the development of DAAs, the DOC first amended its treatment guidelines in April 2015 (hereinafter "2015 Guidelines").  (*Id.* ¶¶44-55.)  Subsequent amendments to the Guidelines in 2016, 2017, and 2018 expanded treatment and removed prerequisites to approval of treatment, meaning that more inmates qualified for treatment with each iteration.  (*Id.* ¶¶56-66.)

**2.     The DOC's April 2018 HCV Treatment Guidelines.**

In April 2018, the DOC adopted updated guidelines (hereinafter "2018 Guidelines"). (*See* 2018 Guidelines, attached to the Paulson Aff. as Ex. I; Paulson Aff. ¶60.) The 2018 Guidelines are designed to provide guidance to health services staff when:

- Screening and testing offenders to determine whether they have a chronic hepatitis C virus (HCV) infection;
- Determining the stage of liver fibrosis in offenders with chronic hepatitis C infection[;]
- Identifying risk factors that are associated progression of fibrosis in those with chronic HCV[;]
- Evaluating HCV infected offenders for treatment with antiviral agents;
- Counseling offenders with chronic HCV; and
- Monitoring the condition of HCV infected offenders before, during and after antiviral treatment.

(2018 Guidelines at 1.)

Like previous versions, the 2018 Guidelines were informed by treatment recommendations by nationally recognized authorities, including the AASLD/IDSA and the Federal Bureau of Prisons (FBOP). (Paulson Aff. ¶60; *see also* 2018 Guidelines at 1; Kendig Rep. at 15-16.) The AASLD continues to recognize that certain settings require prioritization and do not identify any adverse health consequences for stable patients who are deferred for reassessment. (Paulson Aff. ¶61.) The 2018 Guidelines are informational only and are not a substitute for evaluation of individual cases and patient-specific treatment decisions. (2018 Guidelines at 1-6; Paulson Aff. ¶63.)

### a.   Opt-Out Testing.

The 2018 Guidelines changed the DOC's screening procedure from opt-in to opt-out testing.  (*Compare* 2017 Guidelines *with* 2018 Guidelines; *see* Paulson Aff. ¶67 (explaining the difference between opt-in and opt-out testing).)  On April 12, 2018, Dr. Paulson directed the DOC's on-site Health Services staff to implement immediately the new opt-out HCV testing procedure for all new intakes.  (*Id.* ¶65.)[4]  These testing procedures exceed the recommendations published by the CDC and the U.S. Preventive Services Task Force, and are consistent with the practices of the FBOP.  (Kendig Dep. 69-71; Kendig Rep. at 11, 15; *see also* Paulson Aff. ¶65.)

### b.   Monitoring And Treatment.

Upon diagnosis with an active HCV infection, DOC inmates are scheduled for an initial evaluation with an on-site medical practitioner.  (Paulson Aff. ¶73.)  Dr. Paulson has directed on-site medical practitioners to forward laboratory test results from the initial evaluation and any other clinically significant information to him at the DOC Central Office.  (*Id.* at ¶75.)

Based on the information sent to him, Dr. Paulson assigns each inmate a priority for ultrasound elastography.  (*Id.* ¶¶77-79; 2018 Guidelines at ¶4(c).)[5]  The DOC

---

[4] Previously, DOC staff members explained the CDC-identified risk factors to inmates and strongly recommended that inmates be tested if they had any of the risk factors.  (*See* 2017 Guidelines at 2.)  It is undisputed that this previous practice led to a high rate of testing prisoners for HCV at intake.  (Kendig Dep. at 130-32.)

[5] The DOC's contractor has a contract with a vendor to provide elastography examinations in Minnesota prisons.  (Paulson Aff. ¶78.)  Each inmate who receives an elastography examination also receives a limited abdominal ultrasound.  (*Id.*)

anticipates that all current inmates on the elastography prioritization list who consent to the procedure will have had an initial elastography exam by the end of June 2018. (Paulson Aff. ¶79.)

Based on the elastography results and other clinically significant information, Dr. Paulson uses his medical judgment to identify inmates who should immediately receive HCV treatment and those for whom treatment can be safely deferred with continued monitoring. (*Id.* ¶¶86-89.) Under the 2018 Guidelines, the following HCV-positive inmates are presumed to be candidates for immediate treatment:

- Those with fibrosis stages 2, 3, and 4;
- Those with concurrent chronic Hepatitis B or HIV infections;
- Those with certain other co-morbid conditions or extra-hepatic manifestations of chronic HCV infection (i.e., cryoglobulinemia or significant renal insufficiency);
- Those admitted to the DOC receiving an uninterrupted and documented HCV anti-viral treatment;
- Those who have had a liver transplant or hepatocellular carcinoma; or
- Those with diabetes mellitus.

(2018 Guidelines at 3-4; *see also* Paulson Aff. ¶87.)

Under the 2018 Guidelines, inmates with F0 or F1 elastography results are generally deferred for treatment and informed that they should follow-up with the on-site medical practitioner every six months. (*Id.* at ¶¶74, 82.) In addition to six month follow-up appointments, the DOC will schedule inmates with an F0 elastography report for a new ultrasound elastography study, if they are still in custody, in two years. (2018 Guidelines at 6.) Inmates with F1 elastography reports are restaged annually. (*Id.*)

Dr. Paulson has repeatedly directed on-site medical practitioners to send information from follow-up appointments and any other clinically significant information to his attention at the DOC's Central Office.  (Paulson Aff. at ¶¶75, 82-83.)  After each follow-up appointment, Dr. Paulson again evaluates each inmate's medical information, including any new elastography reports, FIB-4 and APRI scores, and any other clinically significant medical information to determine whether the inmate should have further follow-up or receive treatment.  (*Id.* ¶82.)

**G.    Cost.**

Correctional systems have a much larger percentage of patients who are potential candidates for HCV treatment than any other large health care system in the United States.  (Kendig Rep. at 13.)  The wholesale cost of DAAs for a 12-week course of treatment ranges from $54,600 to $147,000 per patient.  (*Id.* at 9.)  This presents an unprecedented challenge to correctional systems across the United States, and data show that in many cases the cost of treating all inmates with HCV would eclipse some correctional systems' budgets by a factor of three.  (*Id.*)

Despite the fact that treatment is costly, the DOC has spent millions of dollars treating inmates with DAAs.  (Defs.' 1st Supp. Ans. Interr., attached to the Fodness Aff. as Ex. H at 14; Defs.' 2d Supp. Ans. Interr., attached to the Fodness Aff. as Ex. I at 4.)  For the FY17-18 biennium to date, the DOC has spent over $3,000,000, and is on pace to more than double what it spent in the previous biennium.  (*See* Larson Aff. ¶19.)

**H.** ██████████████████████████

Portions of Plaintiffs' respective medical histories, ████████████████, are detailed below.

**1.    Ligons**



**2.    Buchan**

---

[6] The hearing on Defendants' first motion for summary judgment was held on July 26, 2017.  (*See* Doc. 189.)   Plaintiffs' Third Amended Complaint was filed on December 1, 2017.  (*See* Docket.)

[7] ████████████████████████████████████

[8] ████████████████████████████████████



### 3.   Maxcy

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quotation and citation omitted).  A fact is material if it might affect the outcome of the suit, and a dispute is

genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

**I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EIGHTH AMENDMENT CLAIMS BECAUSE PLAINTIFFS CANNOT ESTABLISH THAT THE DOC HAS ACTED WITH DELIBERATE INDIFFERENCE TO THEIR SERIOUS MEDICAL NEEDS.**

Plaintiffs allege that their Eighth Amendment rights have been violated by the failure to provide them with DAAs. (TAC ¶¶152-61.) The Eighth Amendment only protects prisoners from the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). To survive summary judgment, a plaintiff must provide evidence on which a trier of fact could find that a defendant rendered medical care "so inappropriate as to evidence intentional maltreatment." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (citations and quotations omitted). This demanding standard requires Plaintiffs to "prove that [they] suffered from one or more objectively serious medical needs, and that [] officials actually knew of but deliberately disregarded those needs." *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999).

Defendants are entitled to summary judgment because, ███████████

████████████████████████████████████████████████████

███████ does not violate their Eighth Amendment rights.

### A. Plaintiffs Cannot Establish ██████████████████████ A Serious Medical Need.

To set forth a cognizable claim of deliberate indifference Plaintiffs must demonstrate their medical needs were objectively serious. *Dulany v. Carnaham*, 132 F.3d 1234, 1239 (8th Cir. 1997). The question "is not whether the infection itself is a 'serious medical need,' but rather whether [Plaintiff] had a serious medical need for *prompt* [specific] treatment." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004).

An objectively serious medical need is one that is diagnosed by a physician as requiring treatment. *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1997). The health risks must be so "excessive" that the knowing failure to intervene rises to the level of criminal recklessness. *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015). "As numerous courts have acknowledged, HCV does not require treatment in all cases." *Smith v. Corizon, Inc.*, No. 15-743, 2015 WL 9274915, at *5 (D. Md. Dec. 17, 2015) (holding that determination that inmate was not a priority candidate for treatment with Harvoni based on lack of symptoms was not deliberately indifferent).

Plaintiffs' claims also fail because there is no record evidence that a delay in treatment caused them harm. *See Cullor v. Baldwin*, 830 F.3d 830, 837 (8th Cir. 2016) (holding that claims of deliberate indifference related to delay in medical treatment require inmates to "place verifying medical evidence in the record to establish the

detrimental effect of delay in medical treatment") (quoting *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (affirming summary judgment in favor of prison officials where inmate failed to adduce medical evidence to establish a detrimental effect to treatment delay)).

It is undisputed that HCV generally advances over decades and that the disease's trajectory is not measured in days, months, or even years. █████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████.

### B. The DOC's Use Of Evidence-Based Treatment Guidelines Does Not Constitute Deliberate Indifference.

Society does not expect prisoners to have unqualified access to health care. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (quoting *Estelle*, 429 U.S. at 103-04). The Eighth Amendment does not guarantee "medical care commensurate with that enjoyed by civilian populations." *Hines v. Anderson*, 547 F.3d 915, 922 (8th Cir. 2008). An inmate's "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Fourte v. Faulkner County*, 746 F.3d 384, 387 (8th Cir. 2014) (quotations omitted). To be actionable, the risk of harm created by the official must be substantial. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In the medical context, a prisoner must establish that a prison official was deliberately indifferent to a serious medical need to maintain a claim under Section 1983. *See Estelle*, U.S. at 106.

The Eighth Amendment does not constrain prison doctors from "exercising their independent medical judgment" and inmates do not have a constitutional right to any

particular or requested course of treatment. *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). An inmate cannot maintain a deliberate indifference claim as a matter of law where prison officials adopt a HCV treatment policy mirroring the FBOP policy, prioritize antiviral treatment on the basis of lab results, and provide "regular care and close monitoring of his Hepatitis C." *See Black v. Ala. Dept. of Corr.*, 578 Fed. App'x 794, 795-96 (11th Cir. 2014) (holding that prison officials are not deliberately indifferent by monitoring a patient who is "stable" and prioritizing treatment based on "periodic liver function and liver enzyme test results"); *Smith v. Corizon, Inc.*, No. 15-743, 2015 WL 9274915, at *5 (D. Md. Dec. 17, 2015) (holding that determination that inmate was not a priority candidate for treatment with Harvoni based on lack of symptoms was not deliberately indifferent); *see also, e.g.*, *Phelps v. Wexford Health Sources*, No. 16-2675, 2017 WL 528424, at *4 (D. Md. Feb. 8, 2017) (granting summary judgment where inmate was monitored with blood panels and prison officials evaluated lab results for treatment eligibility, reasoning that inmates are not entitled "to Harvoni" or "the treatment of [] choice").

For example, in *Pevia v. Wexford Health Source, Inc.*, the court granted prison physicians' motion to dismiss an inmate's claim that he was entitled to HCV treatment with Harvoni. No. 16-1950, 17-631, 2018 WL 999964, at *15 (D. Md. Feb. 20, 2018), *appeal filed* (4th Cir. Mar. 7, 2018). The court reasoned that the medical treatment required by the Eighth Amendment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Id.* (quoting *Bowring v.*

*Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1997)); *see also Fitch v. Blades*, No. 15-cv-00162, 2016 WL 8118192, at \*7 (D. Idaho Oct. 27, 2016) (holding that the prison physicians' exercise of "deliberate, careful judgment about the course of [the inmate]'s treatment" with DAAs evinced only a disagreement with medical care).

The DOC's approach to testing, monitoring, and treating inmates with HCV far exceeds the Eighth Amendment floor.  Dr. Paulson performs a multifaceted review of each inmate's medical condition to determine whether immediate treatment is required. Dr. Paulson evaluates in detail each inmate's medical condition, orders elastography, directs on-site medical practitioners to monitor each HCV-infected inmate's medical status, and orders the on-site practitioners to forward him all clinically-relevant medical information.  (Paulson Aff. at ¶¶75, 82-83.)  Using this information, Dr. Paulson orders ultrasound elastography and uses the results to order immediate treatment or to defer treatment.  (*Id.* ¶¶86-89.)  Between elastography studies Dr. Paulson evaluates inmates' FIB-4 and APRI scores to make sure that their conditions are stable.  (*Id.* at ¶¶79, 84.)

The DOC has treated, or is treating, all inmates who consent to treatment and are known to have stage 2, 3 or 4 fibrosis.  (*Id.* at ¶102.)  With the advent of the 2018 Guidelines, the DOC is expanding treatment to include all individuals with diabetes and certain comorbidities, without regard to fibrosis.  (*Id.* ¶¶64, 87.)  There is no dispute that the DOC's practice is consistent with that of the FBOP, other departments of corrections, and larger county jails, and in some instances exceeds other entities' practice. (Kendig Rep. at 5, 15; Paulson Aff. ¶¶64, 88.)  The DOC's approach is also generally consistent with the interim relief ordered by the Northern District of Florida as protective

of inmates' health and consistent with the obligations under the Eighth Amendment. *See Hoffer v. Jones*, No. 17cv214 (N.D. Fla. Filed Nov. 17, 2017) (Doc. 153) (order granting preliminary injunction and directing Defendant prison official to submit proposed plan for compliance); *Hoffer*, 17cv214 (N.D. Fla. filed Dec. 13, 2017) (Doc. 185) (order entering preliminary injunction, incorporating by reference and modifying Defendant's proposed plan (Doc. 175)).

Plaintiffs' allegation that the DOC's decision not to immediately treat them with DAAs deviates from the applicable medical standard of care at most supports a negligence claim. Even if Plaintiffs could prove this, "a complaint that a physician has been negligent in . . . treating a medical condition does not state a valid claim . . . under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013) (deliberate indifference "requires a showing more than negligence, more even than gross negligence") (quotations and internal citation omitted); *Dulany*, 132 F.3d at 1239 ("Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.").

The DOC's testing, monitoring, and treatment cannot be considered deliberately indifferent as a matter of law. Undisputed facts show that ███████████████████ ██████████████████████████████████████████████. Accordingly, Plaintiffs cannot satisfy the deliberate indifference requirement.

## II.  PLAINTIFFS' AMERICANS WITH DISABILITIES ACT CLAIM FAILS AS A MATTER OF LAW.

As an initial matter, Plaintiffs' reformulated Americans with Disabilities Act claim should also fail because it is beyond the scope of this Court's Order, which limited Plaintiffs to "delet[ing] or narrow[ing] the claims pleaded in the second amended complaint." (Doc. 201.)   Plaintiffs' initial ADA theory was premised on a failure to accommodate HCV as a disability, not the withholding of the "standard of care" for HCV versus other disabilities.   (*See* SAC ¶¶169, 171, 179, 181, p. 7 ("Introduction" to the SAC).)

Plaintiffs now allege that the DOC violated the ADA because it "withhold[s] medically appropriate, standard of care treatment that will likely cure their disability, while providing standard of care treatment to prisoners with different disabilities." (TAC ¶172.)   Because the ADA does not provide a mechanism by which an inmate can challenge prison medical care, these claims fail as a matter of law.  *See Shelton v. Ark. Dep't of Human Servs.*, 677 F.3d 837, 843 (8th Cir. 2012) (holding that "a claim based upon improper medical treatment decision may not be brought [under] the ADA"); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (holding that an ADA claim cannot be based on medical treatment decisions.); *Maxwell v. Olmsted County*, No. CIV. 10-3668, 2012 WL 466179, at *6 (D. Minn. Feb. 13, 2012) (dismissing claim that the county violated Title II of the ADA by failing to provide pain medications and PTSD treatment).

Plaintiffs' ADA claim, like their Section 1983 claims, is based solely on their disagreement with medical treatment decisions. (*See generally* TAC ¶¶172-173.) Plaintiffs' ADA claim attacks Dr. Paulson's medical judgment in crafting the HCV treatment guidelines and the level of care that should be provided in DOC prisons. However, Dr. Paulson appropriately evaluates each HCV-infected inmate's unique medical condition on a case-by-case basis. Plaintiffs' attacks on medical judgment and treatment decisions are not actionable under the ADA. *See Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014). Because claims relating to medical treatment decisions cannot form the basis for a claim under the ADA, Defendants' motion for summary judgment should be granted as to Count II. No Named Plaintiff can identify record evidence establishing that he is disabled by HCV.

## III.   PLAINTIFFS DO NOT HAVE STANDING.

Standing requires a plaintiff to "have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quotation omitted). Plaintiffs do not have standing to complain about the DOC's testing practices. All have been tested and none have been denied a test. None can establish that the DOC's testing guidelines threaten them with an injury likely to be redressed by a favorable judicial decisions.[9]

---

[9] To the extent Plaintiffs intend to make a separate Eighth Amendment claim based on the DOC's testing guidelines, (TAC ¶ 155), the record is undisputed that HCV is not readily communicable and does not cause harm, let alone substantial harm, to Named Plaintiffs. *See Nefferdorf v. Corr. Med. Servs.*, No. 04-cv-3411, 2009 WL 1066017, at *4 (D.N.J. Apr. 21, 2009) (holding that "there is no general constitutional duty to screen (Footnote Continued on Next Page)

██████████████████████████████████████

████████████████████████████

## IV.   PLAINTIFFS' CLAIM FOR PERMANENT INJUNCTIVE RELIEF FAILS AS A MATTER OF LAW.

Plaintiffs seek wide-ranging injunctive relief on behalf of themselves and unnamed others.  (TAC at p. 22-23.)  Their requested injunctive relief is moot and prohibited by the Prison Litigation Reform Act (hereinafter "PLRA").

### A.   Plaintiffs Cannot Meet Their Burden To Show Any Real Or Immediate Threat.

When deciding whether a party is entitled to permanent injunctive relief, a court must consider: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the harm to the nonmoving party should the injunction issue; (3) actual success on the merits; and (4) the public interest in the issuance of the injunction. *See Randolph v. Rogers*, 170 F.3d 850, 857 (8th Cir. 1999) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)).

Because the government "has traditionally been granted the widest latitude in the dispatch of its own internal affairs," a plaintiff must present facts showing a threat of immediate, irreparable harm before a federal court will intervene.  *Midgett v. Tri-Cty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850-51 (9th Cir. 2001) (citing *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)).  Injunctive relief "is unavailable absent a showing of

_____
(Footnote Continued from Previous Page)
asymptomatic inmates for HCV" because HCV is "not the type of easily communicable disease . . . which requires universal screening").

irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged . . . ." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Plaintiffs cannot meet their burden. It is undisputed that only 5-20% of patients with chronic HCV develop cirrhosis over a period of 20-30 years. (Kendig Rep. at 7.) It is likewise undisputed that the course of HCV is measured in decades, not days, weeks, months, or even years. (*Id.*) There is no record evidence indicating that among those individuals deferred for additional ongoing monitoring and not receiving immediate treatment under the 2018 Guidelines are at any risk of "any real or immediate threat," as the law requires before this Court intervenes. The only individuals who are not receiving immediate treatment are those who have normal livers (F0) or only mild fibrosis (F1) and do not have one of a number of comorbid conditions.

## B. Ligons And Buchan Cannot Meet The Standard To Obtain A Permanent Injunction Because Their Claims Are Moot.

In addition to the fact that Plaintiffs cannot actually succeed on the merits, *supra* at Parts I-II, their claims for injunctive relief also fail because they are moot. In their request for relief, Plaintiffs ask the Court to enter "[a]n injunction mandating the provision of appropriate DAA medication to all prisoners with chronic HCV, consistent with the medical standard of care." (TAC at p. 23 ¶6.) ███████████████ ████████████████████████████████████████ .

*See Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (holding that "a prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer

subject to those conditions"). ███████████████████████████████████

███████████████████████████████████████. *Id.*

Because Ligons and Buchan cannot carry their burden of establishing the requisite threat of immediate irreparable harm, their claims for injunctive relief are not justiciable and fail as a matter of law.

### C.   Plaintiffs' Claim For Injunctive Relief Is Barred By The Prison Litigation Reform Act.

#### 1.   Plaintiffs' Wide-Ranging Request For Relief Is Not Narrowly Drawn.

The Prison Litigation Reform Act ("PLRA") limits the injunctive relief a court may order in a case brought by an inmate alleging that prison conditions violate federal law. *See* 18 U.S.C. § 3626; 42 U.S.C. § 1997e; *see also Miller v. French*, 530 U.S. 327, 333 (2000). The PLRA provides that "prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). A court may only grant prospective relief if the court finds "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* The scope of the remedy must be proportional to the scope of the violation and the order must not unnecessarily reach out to improve prison conditions other than those that violate federal law. *Hines*, 547 F.3d at 921-22 (holding that failure to narrowly tailor injunctive relief to make it "the least intrusive means" of curing an Eighth Amendment violation was "a separate and independent basis on which to terminate" consent decree

under the PLRA).  The court must also give substantial weight to any adverse impact on public safety caused by the relief ordered.  18 U.S.C. § 3626(a)(1)(A).

Plaintiffs ask the Court to order DAA treatment for all prisoners and to retain jurisdiction "to monitor . . . compliance" with the terms of any injunction.  (TAC at p. 23 ¶7.)  The requested injunctive relief is clearly prohibited under PLRA's mandate that prospective relief extend no further than necessary to correct a federal constitutional right of a particular plaintiff or plaintiffs.  It is overbroad in that it seeks treatment for inmates who would not be able to establish an Eighth Amendment violation; would require the Court to substitute its judgment for that of a medical doctor;[10] and it is not limited to a particular plaintiff or plaintiffs.

**2.**   ██████████████████████████████████.

In addition to limiting federal courts' authority to enter injunctions against state prisons, the PLRA also requires that inmates exhaust prison grievance procedures before filing suit.  42 U.S.C. § 1997e(a).  The Court is "obligated . . . to determine whether in fact" an inmate has exhausted his administrative remedies before proceeding on the merits.  *See Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000).

The DOC has an administrative procedure for grievances.  (Larson Aff. ¶¶21-25; Larson Dep. at 13-14.)  Larson is the top of the chain of command for all health-related kites and grievances.  (Larson Aff. ¶24; Larson Dep. at 13-14.)  ██████████████

---

[10] Presumably, Plaintiffs would want the Court to follow the current AASLD/IDSA recommendations.  The current recommendations are located in a 241-page report from September 2017 that can be accessed at https://www.hcvguidelines.org/sites/default/files/full-guidance-pdf/HCVGuidance_September_21_2017_h.pdf (last visited Apr. 12, 2018).

████████████████████████████████████. (Larson Aff. ¶26.) ████████████

████████████████████████████████████████████████.

## V.   UNNAMED PLAINTIFFS' REMAINING CLAIMS FAIL AS A MATTER OF LAW AND MUST BE DISMISSED.

The Third Amended Complaint purports to make claims on behalf of Unnamed Plaintiffs John and Jane Roe, unidentified inmates "who have chronic HCV," have not received DAAs, and "have two years or more left to serve before their projected release." (TAC ¶¶26-27.)   Plaintiffs have not amended their Initial Disclosures to identify John or Jane Roe.  The claims brought on their behalf should be dismissed.

## VI.   THE COURT SHOULD ENTER JUDGMENT ON LIGONS AND MICHAELSON'S CLAIMS FOR DAMAGES AGAINST DR. PAULSON AND LARSON.

Although not pled in the Third Amended Complaint, Ligons and Michaelson initially brought Section 1983 claims for damages against Dr. Paulson and Larson. (*See generally* Compl., FAC, SAC.)  Dr. Paulson and Larson defended these claims for nearly three years until the filing of the Third Amended Complaint.  Defendants moved for summary judgment on these individual capacity claims, asserting qualified immunity. (*See* Doc. 107.)  At the initial summary judgment hearing, the Court stated: "I don't have any problem at all with the notion that . . . the defendants have qualified immunity." (Doc. 204 at 12-13.)  Because Fed. R. Civ. P. 41 does not allow Ligons and Michaelson to unilaterally drop their claims for damages as if they were never litigated in this forum,

Defendants request that the Court enter judgment on the individual capacity claims against Dr. Paulson and Larson detailed in the Second Amended Complaint.[11]

## CONCLUSION

For all of these reasons, Defendants Minnesota Department of Corrections, Commissioner Tom Roy, Dr. David Paulson, and Nanette Larson respectfully request that the Court grant their motion for summary judgment and dismiss Plaintiffs' claims with prejudice.

*Signature on page 28*

---

[11] Michaelson has never withdrawn any of his claims. If the Second Amended Complaint remains operative as to Michaelson, his request for injunctive relief is moot because he has been released from prison and he cannot demonstrate a threat of irreparable harm as a matter of law.

Dated:  April 18, 2018

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

s/ **Kathryn A. Fodness**
KATHRYN A. FODNESS
Assistant Attorney General
Atty. Reg. No. 0392184

ANDREW TWEETEN
Assistant Attorney General
Atty. Reg. No. 0395190

KELLY S. KEMP
Assistant Attorney General
Atty. Reg. No. 0220280

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1348 (Voice)
(651) 296-1410 (TTY)
kathryn.fodness@ag.state.mn.us
kelly.kemp@ag.state.mn.us
andrew.tweeten@ag.state.mn.us

ATTORNEYS   FOR   DEFENDANTS
MINNESOTA   DEPARTMENT   OF
CORRECTIONS,  ROY,  PAULSON,  AND
LARSON